# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

OCTAVIA WARD; DENNIS HARGROVE,
and SANDRA TODD,

       Plaintiffs,

vs.                                                                                    No. CIV 18-1025 JB\KRS

THE CITY OF HOBBS; OFFICER TROY
D. BRACKEEN, a Hobbs Police Department
officer; OFFICER ZAKARIAH T. DALE, a
Hobbs Police Department officer, and
OFFICER RUBEN GASTELUM, a Hobbs
Police Department officer,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on (i) the Plaintiffs' Motion for Summary

Judgment, filed January 8, 2019 (Doc. 12)("Pltfs.' MSJ"); and (ii) the City Defendants' Motion

for Summary Judgment, filed January 31, 2019 (Doc. 21)("Defs.' MSJ"). The Court held a hearing

on February 28, 2019. See Clerk's Minutes at 1, filed February 28, 2019 (Doc. 36). The primary

issues are: (i) whether the Court should recognize that qualified immunity protects the City of

Hobbs[1] Police Department Officers, Defendants Troy Brackeen, Zakariah Dale, and Ruben

Gastelum (collectively, "the Defendant Officers"), should grant summary judgment for the

Plaintiffs, or should grant summary judgment for the Defendant Officers, on Count III of Plaintiffs

Sandra Todd, Octavia Ward, and Dennis Hargrove's Complaint to Recover Damages for Civil

Rights Violations, filed November 2, 2018 (Doc. 1)("Complaint"), in which the Plaintiffs allege

---

[1]"The City of Hobbs" refers to the City of Hobbs, New Mexico.

that the Defendant Officers unlawfully entered Todd's home while responding to a domestic violence call with no indication of an emergency, see Complaint ¶¶ 67-72, at 7; (ii) whether the Court should grant summary judgment for Ward and Hargrove on their Counts IV and V in which they allege unlawful arrest, because the Defendant Officers acted unlawfully in ordering Ward and Hargrove to leave their host's home and had no probable cause for arrest, see Complaint ¶¶ 73-84, at 7-8, or should grant summary judgment for the Defendant Officers or recognize their qualified immunity protection, because the Defendant Officers arrested Ward and Hargrove for Resisting, Evading or Obstructing an Officer, N.M. Stat. Ann. § 30-22-1, when Ward and Hargrove ignored their orders to leave the garage door open and to step outside the garage, retreated into Todd's house, and evaded arrest; (vi) whether the Court should grant Defendant City of Hobbs, New Mexico summary judgment on the Complaint's Counts III, IV, and V, because the doctrine of respondeat superior cannot engender liability under 42 U.S.C. § 1983; and (v) whether the Court should grant summary judgment for the Defendants on Counts I and II in which the Plaintiffs allege that the Defendant Officers battered Ward and Hargrove during the arrest, because the Defendant Officers used objectively reasonable force, see Complaint ¶¶ 57-66, at 6-7. The Court will deny the Pltfs.' MSJ, and grant in part and deny in part the Defs.' MSJ. Although the Defendant Officers' entry into Todd's residence violates the Plaintiffs' constitutional rights as the Plaintiffs allege in Count III, qualified immunity protects the Defendant Officers against Count III, see Complaint ¶¶ 67-72, at 7, clearly established law does not establish that the Defendant Officers' committed the Constitutional violation. Likewise, the Defendant Officers violated Ward's and Hargrove's constitutional rights when the Defendant Officers arrested Ward and Hargrove as the Plaintiffs allege in Counts IV and V, see Complaint ¶¶ 73-84, at 7-8, but qualified

immunity protects, however, the Defendant Officers from liability for Counts IV and V, because clearly established law does not establish the Constitutional violation. The Court does not read the Complaint to reflect that the Plaintiffs bring, in Counts III, IV, and V, § 1983 claims against the City of Hobbs. See Complaint ¶¶ 67-84, at 7-8. If the Plaintiffs intend to raise such claims against the City of Hobbs, the Court will grant summary judgment for the City of Hobbs, because a municipality cannot be liable under § 1983 on a respondeat superior theory. See Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 767 (10th Cir. 2013)(quoting Brown v. Montoya, 662 F.3d 1152, 1164 (10th Cir. 2011)). Last, the Court will not grant summary judgment for the Defendants on Counts I and II, because the Defendant Officers unlawfully arrested Ward and Hargrove.

## FACTUAL BACKGROUND

The Court begins by recounting the facts. The Court draws the factual background from the parties' undisputed material facts in the Pltfs.' MSJ, the City Defendants' Response to Plaintiffs' Motion for Summary Judgment, filed January 28, 2019 (Doc. 19)("Defs.' Response to Pltfs.' MSJ"); the Plaintiffs' Reply in Support of Plaintiffs' Motion for Summary Judgment, filed February 15, 2019 (Doc. 27)("Pltfs.' Reply to Pltfs.' MSJ"), the Defs.' MSJ, and the Plaintiffs' Response to City Defendants' Motion for Summary Judgment, filed February 20, 2019 (Doc. 29)("Pltfs.' Response to Defs.' MSJ"). The Defendants did not reply to the Pltfs.' Response to Defs.' MSJ.

On September 9, 2018, at around 12:23 a.m., the Hobbs Police Department received a 911 call from Jessica Gonzales about a verbal altercation, involving no weapons, at 9 Acoma Court in

Hobbs, New Mexico. See Pltfs.' MSJ ¶ 1, at 2 (asserting this fact);[2] Defs.' Response to Pltfs.'

MSJ ¶ 1, at 4 (also asserting this fact)(citing Hobbs Police Department Daily Activity Log, with

CAD Comments at 1, filed January 28, 2019 (Doc. 19-1)("CAD Report"); HPD 911 Call Audio

Recording at 00:52-00:59, filed with court on February 28, 2019 (on file with court)("911 Call");

Transcript of Jessica Gonzales 911 Call at 3:8-12, filed January 28, 2019 (Doc. 19-2)("911 Call

Tr.")); Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3 (admitting this fact). Gonzales informed the Lea

County Communication Authority dispatcher that she was at 10 Acoma Court and that she heard

her neighbors across the street arguing. See Defs.' Response to Pltfs.' MSJ ¶ 2, at 4 (asserting this

fact)(citing 911 Call at 00:03-00:18; 911 Call Tr. at 22:2-6); Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3

(admitting this fact). Gonzales indicated: "There's a man and the other person is a woman. And

he's going off on her, yelling at her." Defs.' Response to Pltfs.' MSJ ¶ 3, at 4 (asserting this

fact)(citing 911 Call at 00:03-00:18, 911 Call Tr. at 2:2-6); Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3

(admitting this fact). Gonzales specified that the fighting was not physical. See Pltfs.' MSJ ¶ 2,

at 2 (asserting this fact)(CAD Report at 1).[3] When the dispatcher asked if the incident was

---

[2]The Defendants do not dispute the truth of the alleged undisputed fact in the text, but they dispute the relevance of the alleged undisputed fact in the text. See Defs.' Response to Pltfs.' MSJ ¶ 2, at 2-3. "The Court has previously held that a 'relevance argument . . . does not dispute the fact' and that 'relevance is a legal argument that is best left for the Analysis Section' of this opinion." Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, No. CIV 16-0127 JB/JHR, 2018 WL 3210531, at *1 (D.N.M. June 29, 2018)(Browning, J.)(quoting SEC v. Goldstone, No. CIV 12-0257, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.)). Because the Defendants do not controvert the fact's truth and assert the same fact in the Defs.' Response to Pltfs.' MSJ, the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[3]The Defendants do not dispute the truth of the alleged undisputed fact in the text, but they dispute the relevance of the alleged undisputed fact in the text. See Response ¶ 2, at 2-3. As indicated supra note 1, "[t]he Court has previously held that a 'relevance argument . . . does not

physical, Gonzales stated: "No.  I'm afraid it will get physical.  They're -- he's yelling at her." Defs.' Response to Pltfs.' MSJ ¶ 4, at 5 (asserting this fact)(citing 911 Call at 00:32-00:43; 911 Call Tr. at 2:18-19).  See Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3 (admitting this fact).  Gonzales specified that "it'll get physical" without intervention, Defs.' Response to Pltfs.' MSJ ¶ 5, at 5 (asserting this fact)(citing 911 Call at 00:42-00:48; 911 Call Tr. at 2:25-3:4); see Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3 (admitting this fact), and stated that the individuals were fighting in the garage, see Defs.' Response to Pltfs.' MSJ ¶ 6, at 5 (asserting this fact)(citing 911 Call at 01:06-01:18; 911 Call Tr. at 3:16-19); Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3 (admitting this fact).  The dispatcher confirmed that the incident was at "9 West Acoma."  Defs.' Response to Pltfs.' MSJ ¶ 7, at 6 (asserting this fact)(citing 911 Call at 02:31-02:33; 911 Call Tr. at 5:7).  See Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3 (admitting this fact).  The dispatcher recorded in the Computer Aided Dispatch ("CAD") Report: "Neighbors across the street are fighting, male/female, just verbal."  Defs.' Response to Pltfs.' MSJ ¶ 9, at 5 (asserting this fact)(citing CAD Report at 1).  See Pltfs.' Reply to Pltfs.' MSJ ¶ 2, at 3 (admitting this fact).

Around one minute later, the dispatcher radioed the Defendant Officers about the call.  See Defs.' Response to Pltfs.' MSJ ¶ 12, at 5-6 (asserting this fact)(citing HPD Dispatch Call at 00:00-00:16, filed January 28, 2019 (on file with court)("HPD Dispatch Call"); Transcript of HPD

dispute the fact' and that 'relevance is a legal argument that is best left for the Analysis Section' of this opinion."  Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 2018 WL 3210531, at *1 (quoting SEC v. Goldstone, 2015 WL 5138242, at *27 n.95).  Because the Defendants do not controvert the fact's truth, the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Dispatch at 2:1-65, filed January 28, 2019 (Doc. 19-3)("HPD Dispatch Tr."); CAD Report, at 1).[4]

The dispatcher informed the Defendant Officers: "10 West Acoma Court, 1-0 West Acoma Court. It's going to be a domestic. Male and female fighting outside." Defs.' Response to Pltfs.' MSJ ¶ 13, at 6 (asserting this fact)(citing HPD Dispatch Call at 00:08-00:16; HPD Dispatch Tr. at 2:3-5; CAD Report, at 1). See Pltfs.' Reply to Pltfs.' MSJ ¶ 3, at 3 (not disputing this fact). The dispatcher followed this call with a correction: "Correction. The offenders are going to be at 9 Acoma Court, Acoma Court in a garage." Defs.' Response to Pltfs.' MSJ ¶ 15, at 6 (asserting this fact)(citing HPD Dispatch Call at 00:30-00:39; HPD Dispatch Tr.at 2:8-10). See Pltfs.' Reply to Pltfs.' MSJ ¶ 3, at 3 (not disputing this fact). On this information, the officers responded to 9 West Acoma Court with the perception that a physical altercation was occurring or had occurred. See Defs.' Response to Pltfs.' MSJ ¶ 16, at 6 (asserting this fact)(citing Affidavit of Officer Troy Brackeen ¶ 5, at 2, filed January 28, 2019 (Doc. 19-4)("Brackeen Aff."); Affidavit of Officer Zakariah Dale ¶ 5, at 2, filed January 28, 2019 (Doc. 19-5)("Dale Aff."); Affidavit of Officer Ruben Gastelum ¶ 5, at 2, filed January 28, 2019 (Doc. 19-6)("Gastelum Aff.")).[5] The officers

---

[4]The Plaintiffs make no comment about the alleged undisputed fact in the text but, rather, skip responding to Defs.' Response to Pltfs.' MSJ ¶ 12, at 5-6, by responding to ¶ 11, at 6, and then to ¶ 13 at 6. See Pltfs.' Reply to Pltfs.' MSJ at 3. The Plaintiffs assert, however, that Defendant Officers responded to the 911 call. See Pltfs.' MSJ ¶ 3, at 2-3 (asserting this fact)(citing generally CAD Report). Because the Plaintiffs do not controvert the alleged undisputed fact and assert a similar fact, the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[5]The Plaintiffs contend that the Defendant Officers' beliefs are grounded on speculation and not on fact. See Pltfs.' Reply to Pltfs.' MSJ ¶ 4, at 3. This contention does not, however, controvert the alleged undisputed fact in the text, because that someone believed something is a different fact from the belief's content. Because the Plaintiffs do not specifically controvert the alleged undisputed fact, the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All

did not review the CAD Report in detail, because they were actively responding to the call.  See

Defs.' Response to Pltfs.' MSJ ¶ 17, at 6-7 (asserting this fact)(citing Brackeen Aff. ¶ 6, at 2; Dale

Aff. ¶ 6, at 2, Gastelum Aff. ¶ 6, at 2); Pltfs.' Reply to Pltfs.' MSJ ¶ 5, at 3 (not disputing this fact).

The decision not to review the CAD Report follows Hobbs Police Department procedures that

discourage officers from using computers while driving.  See Defs.' Response to Pltfs.' MSJ ¶ 18,

at 7 (asserting this fact)(citing HPD -- Rules and Regulations Manual, II, §3, (V)(D), at 2, filed

January 28, 2019 (Doc. 19-7)); Pltfs.' Reply to Pltfs.' MSJ ¶ 5, at 3 (not disputing this fact).

　　　　The Defendant Officers responded to the call.  See Pltfs.' MSJ ¶ 3, at 2-3 (asserting this

fact)(citing generally CAD Report); Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3 (admitting this

fact).  Neither Gastelum nor Dale activated their emergency equipment as they drove to 9 Acoma

Court, and Dale explained that he did not start the equipment, because the call did not threaten

"'danger of life or limb or eyesight.'"  Pltfs.' Response to Defs.' MSJ ¶¶ 1-2, at 2 (asserting this

fact)(quoting Transcript of Interview of Officer Zachariah T. Dale at 11:11-20, filed February 29,

2019 (Doc. 29-1)("Dale Interview"); and citing id. at 10:18-21; Transcript of Interview of Officer

Ruben Gastelum at 3:20-22, filed February 20, 2019 (Doc. 29-2)("Gastelum Interview")).[6]  The

Defendant Officers approached 9 Acoma Court on foot.  See Defs.' Response to Pltfs.' MSJ ¶ 19,

_____

material facts set forth in the Response will be deemed undisputed unless specifically
controverted.").

　　　　[6]The Defendants did not file a reply to the Pltfs.' Response to Defs.' MSJ.  Accordingly,
the Defendants did not respond to this fact.  The record suggests, however, the fact, see Gastelum
Interview at 3:20-22, and the Court deems the fact undisputed, see D.N.M.LR-Civ. 56.1(b) ("All
material facts set forth in the Response will be deemed undisputed unless specifically
controverted.").

at 7 (asserting this fact)(citing Brackeen Body Camera at 00:16, filed January 28, 2019 (on file with court); Dale Body Camera at 00:04, filed January 28, 2019 (on file with court); Gastelum Body Camera at 00:00-00:04, filed January 28, 2019 (on file with court)).[7] As Dale approached the house, he saw and heard nothing that caused alarm or concern. See Pltfs.' Response to Defs.' MSJ ¶¶ 3-4, at 2 (asserting this fact)(citing Dale Interview at 15:10-13; id. at 15:14-16).[8] Gastelum heard two people in the garage and saw a screen with an open door, but he heard no noise and saw nothing that caused him concern or alarm. See Pltfs.' Response to Defs.' MSJ ¶¶ 5-7, at 2 (asserting this fact)(citing Gastelum Interview at 7:6-18; id. at 7:22-24; id. at 10:11-15).[9] An open garage door and lit garage were visible to the Defendant Officers as they approached. See Defs.' Response to Pltfs.' MSJ ¶ 20, at 7 (asserting this fact)(citing Brackeen Body Camera at 00:14-00:42; Dale Body Camera at 00:03-00:20, Gastelum Body Camera at 00:02-00:23); Pltfs.' Reply to Pltfs.' MSJ ¶ 6, at 3 (not disputing this fact). A temporary screen with a built-in door enclosed the garage's front opening. See Pltfs.' MSJ ¶ 6, at 3 (asserting this fact)(citing Gastelum Body

---

[7]The Defendants did not file a reply to the Pltfs.' Response to Defs.' MSJ. Accordingly, the Defendants did not respond to this fact. The record suggests, however, the fact, see Brackeen Body Camera at 00:16; Dale Body Camera at 00:04; Gastelum Body Camera at 00:00-00:04, and the Court deems the fact undisputed, see D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[8]The Defendants did not file a reply to the Pltfs.' Response to Defs.' MSJ. Accordingly, the Defendants did not respond to this fact. The record suggests, however, the fact, see Dale Interview at 15:14-16; id. at 15:10-13, and the Court deems the fact undisputed, see D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[9]The Defendants did not file a reply to the Pltfs.' Response to Defs.' MSJ. Accordingly, the Defendants did not respond to this fact. The record suggests, however, the fact, see Gastelum Interview at 7:6-18; id. at 7:22-24; id. at 10:11-15, and the Court deems the fact undisputed, see D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Camera at 00:17, and citing generally Criminal Complaint (dated September 9, 2018), filed January 8, 2019 (Doc. 12-3)("Ward Criminal Complaint")); Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3 (admitting this fact), id. ¶ 23, at 7-8 (also asserting this fact)(citing Gastelum Body Camera at 00:01-00:47)); Pltfs.' Reply to Pltfs.' MSJ ¶ 6, at 3 (not disputing this fact). The door was open when the Defendant Officers arrived. See Defs.' Response to Pltfs.' MSJ ¶ 22, at 7 (asserting this fact)(citing Gastelum Body Camera at 00:14-00:32); Pltfs.' Reply to Pltfs.' MSJ ¶ 6, at 3 (not disputing this fact). The garage's inside was clearly visible to any persons outside the garage. See Defs.' Response to Pltfs.' MSJ ¶ 24, at 8 (asserting this fact)(citing Gastelum Body Camera at 00:01-00:47; 911 Call Tr. at 3:13-19); Pltfs.' Reply to Pltfs.' MSJ ¶ 6, at 3 (not disputing this fact).

Todd owns 9 Acoma Court, and Ward and Hargrove were at the house as guests. See Pltfs.' MSJ ¶ 4, at 3 (asserting this fact)(citing generally Affidavit of Sandra Renee Todd, filed January 8, 2019 (Doc. 12-2)("Todd Aff.")); Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3 (admitting this fact). Ward and Hargrove were in Todd's garage. See Pltfs.' MSJ ¶ 5, at 3 (asserting this fact)(citing generally Gastelum Body Camera, Ward Criminal Complaint, Criminal Complaint (dated September 9, 2018), filed January 8, 2019 (Doc. 12-4)("Hargrove Criminal Complaint")); Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3 (admitting this fact). As he stopped outside the garage, Gastelum informed Ward and Hargrove that the Hobbs Police Department had received a domestic violence call and that the Defendant Officers wanted to check on the people at the house. See Pltfs.' MSJ ¶ 7, at 3 (asserting this fact)(citing Gastelum Body Camera at 00:25, and citing generally Gastelum Body Camera Tr.); Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3 (admitting this fact); Defs.' Response to Pltfs.' MSJ ¶ 26, at 8 (also asserting this fact)(citing Gastelum Body Camera at 00:24-00:29; Gastelum Body Camera Tr. at 2:4-6); Pltfs.' Reply to Pltfs.' MSJ ¶ 6, at 3

(not disputing this fact). Gastelum spoke to Ward and Hargrove: "How is it going, guys? We got a call over here. Everything all right[?]" Defs.' Response to Pltfs.' MSJ ¶ 21, at 7 (asserting this fact)(alteration in Defs.' Response to Pltfs.' MSJ)(citing Gastelum Body Camera at 00:13-00:19; Gastelum Body Camera Tr. at 2:1-2). See Pltfs.' Reply to Pltfs.' MSJ ¶ 6, at 3 (not disputing this fact). Ward was seated on a pool table in the garage's center and responded "yeah" to Gastelum's question. Defs.' Response to Pltfs.' MSJ ¶ 25, at 8 (asserting this fact)(citing Gastelum Body Camera at 00:17-00:22; Gastelum Body Camera Tr. at 2:3). See Pltfs.' Reply to Pltfs.' MSJ ¶ 6, at 3 (not disputing this fact). Ward and Hargrove told the Defendant Officers that no domestic violence had occurred. See Pltfs.' MSJ ¶ 8, at 3 (asserting this fact)(citing Gastelum Body Camera at 00:28, Gastelum Body Camera Tr. at 2:7-8); Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3 (admitting this fact). Hargrove denied that any domestic violence had occurred, and told the Defendant Officers that he and Ward "were 'just chilling.'" Pltfs.' MSJ ¶ 9, at 3 (asserting this fact)(quoting Gastelum Body Camera at 00:33; Gastelum Body Camera Tr. at 2:10-11). See Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3 (admitting this fact); id. ¶ 27, at 8 (also asserting this fact)(citing Gastelum Body Camera at 00:28-00:34; Gastelum Body Camera Tr. at 2:7-11); Pltfs.' Reply to Pltfs.' MSJ ¶ 6, at 3 (not disputing this fact). Gastelum asked if anyone was in the house. See Pltfs.' MSJ ¶ 10, at 3 (asserting this fact)(citing Gastelum Body Camera at 00:35; Gastelum Body Camera Tr. at 2:13); Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3 (admitting this fact); id. ¶ 28, at 8 (also asserting the fact)(citing Gastelum Body Camera at 00:34-00:36; Gastelum Body Camera Tr. at 2:13); Pltfs.' Reply to Pltfs.' MSJ ¶ 6, at 3 (not disputing this fact). Hargrove replied that his family was in the house. See Pltfs.' MSJ ¶ 11, at 3 (asserting this fact)(citing Gastelum Body Camera at 00:37; Gastelum Body Camera Tr. at 2:15); Defs.' Response to Pltfs.' MSJ ¶ 3-

13, at 3 (admitting this fact); id. ¶ 29, at 8 (also asserting this fact)(citing Gastelum Body Camera at 00:34-00:41; Gastelum Body Camera Tr. at 2:15-16); Pltfs.' Reply to Pltfs.' MSJ ¶ 9, at 3 (not disputing this fact).   Hargrove stood up and, while walking to the door in the screen, told the Defendant Officers that they could leave.   See Defs.' Response to Pltfs.' MSJ ¶ 30, at 8 (asserting this fact)(citing Gastelum Body Camera at 00:34-00:41; Gastelum Body Camera Tr. at 2:15-16); Pltfs.' Reply to Pltfs.' MSJ ¶ 6, at 3 (not disputing this fact).   Dale told Hargrove that the Defendant Officers would "hang out here for a minute until we get this taken care of."   Defs.' Response to Pltfs.' MSJ ¶ 33, at 9 (asserting this fact)(citing Gastelum Body Camera at 00:41-00:44; Gastelum Body Camera Tr. at 2:17-18).[10]   While walking to the door, Hargrove told the Defendant Officers "Oh, you're fine.   That's fine."   Defs.' Response to Pltfs.' MSJ ¶ 34, at 9 (asserting this fact)(citing Gastelum Body Camera at 00:41-00:45; Gastelum Body Camera Tr. at 2:19).[11]

_____

[10]The Plaintiffs do not comment on the alleged undisputed fact in the text but, rather, skip responding to the Defs.' Response to Pltfs.' MSJ ¶ 33, at 9, and respond to ¶ 32, at 9, and then to ¶ 35, at 9.   See Pltfs.' Reply to Pltfs.' MSJ at 4.   The record suggests, however, the alleged undisputed fact.   See Gastelum Body Camera at 00:41-00:44; Gastelum Body Camera Tr. at 2:17-18.   Because the Plaintiffs do not offer a fact or argument specifically controverting the alleged undisputed fact, and because the record supports the fact, the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[11]The Plaintiffs do not comment on the alleged undisputed fact in the text but, rather, skip responding to the Defs.' Response to Pltfs.' MSJ ¶ 34, at 9, and respond to ¶ 32, at 9, and then to ¶ 35, at 9.   See Pltfs.' Reply to Pltfs.' MSJ at 4.   The record suggests, however, the alleged undisputed fact.   See Gastelum Body Camera at 00:41-00:45; Gastelum Body Camera Tr. at 2:19. Because the Plaintiffs do not offer a fact or argument specifically controverting the alleged undisputed fact, and because the record supports the fact, the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Hargrove tried to close the open door.  See Pltfs.' MSJ ¶ 12, at 3 (asserting this fact)(citing Gastelum Body Camera at 00:45); Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3 (admitting this fact). Gastelum told Hargrove three times to leave the door open.  See Defs.' Response to Pltfs.' MSJ ¶ 35, at 9 (asserting this fact)(citing Gastelum Body Camera at 00:45-00:49; Gastelum Body Camera Tr. at 2:20-22); Pltfs.' Reply to Pltfs.' MSJ ¶ 12, at 4 (not disputing this fact).  Gastelum opened the door and told Hargrove to leave the door open, see Pltfs.' MSJ ¶ 13, at 4 (asserting this fact)(citing Gastelum Body Camera at 00:46; Gastelum Body Camera Tr. at 2:21-22); Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3 (admitting this fact); Pltfs.' Response to Defs.' MSJ ¶ 9, at 3 (also asserting this fact)(citing Gastelum Interview at 11:7-19), and again told Ward and Hargrove that the Officer Defendants were "investigating . . . domestic violence," Defs.' Response to Pltfs.' MSJ ¶ 36, at 9 (asserting this fact)(citing Gastelum Body Camera at 00:45-00:51; Gastelum Body Camera Tr. at 2:20-23); see Pltfs.' Reply to Pltfs.' MSJ ¶ 12, at 4 (not disputing this fact).  Ward and Hargrove repeatedly told the Defendant Officers: "[T]here's no domestic violence."  Defs.' Response to Pltfs.' MSJ ¶ 37, at 9 (asserting this fact)(citing Dale Body Camera at 00:48-00:50; Gastelum Body Camera Tr. at 2:24-25).  See Pltfs.' Reply to Pltfs.' MSJ ¶ 12, at 4 (not disputing this fact).  Gastelum responded: "Well, I don't know that yet.  I want to talk to everybody in the house."  Defs.' Response to Pltfs.' MSJ ¶ 38, at 9 (asserting this fact)(citing Dale Body Camera at 00:49-00:53; Gastelum Body Camera Tr. at 3:1-2).  See Pltfs.' Reply to Pltfs.' MSJ ¶ 12, at 4 (not disputing this fact).  "Ward got up from the pool table, approached Hargrove and grabbed his arm to pull him away from the front of the garage, and she stood in front of him."  Defs.' Response to Pltfs.' MSJ ¶ 41, at 10 (asserting this fact)(Dale Body Camera at 00:49-00:56; Brackeen Body Camera at 1:07-1:19).  See Defs.' Response to Pltfs.' MSJ ¶ 14, at 3 (admitting this fact).  During

these events, Ward offered to retrieve Todd.  See Pltfs.' MSJ ¶ 14, at 4 (asserting this fact)(citing Gastelum Body Camera at 00:55; Gastelum Body Camera Tr. at 3:4); Defs.' Response to Pltfs.' MSJ ¶ 14, at 3 (admitting this fact).

Gastelum directed Hargrove to step outside to speak with the Defendant Officers.  See Pltfs.' MSJ ¶ 15, at 4 (asserting this fact)(citing Gastelum Body Camera at 00:57, Gastelum Body Camera Tr. at 5:8-9); Defs.' Response to Pltfs.' MSJ ¶ 15, at 3 (admitting this fact).  Gastelum gestured Hargrove toward him and told Hargrove to "step out."  Defs.' Response to Pltfs.' MSJ ¶¶ 39-40, at 9 (asserting this fact)(citing Dale Body Camera at 00:52-00:56; Gastelum Body Camera Tr. at 3:5).  See Pltfs.' Reply to Pltfs.' MSJ ¶ 12, at 4 (not disputing this fact).  Ward and Hargrove stated that they would not comply with Gastelum's order.  See Defs.' Response to Pltfs.' MSJ ¶ 42, at 10 (asserting this fact)(citing Brackeen Body Camera at 1:16-1:21; Transcript of Officer Brackeen's Body Camera at 3:14-16, filed January 28, 2019 (Doc. 19-10)("Brackeen Body Camera Tr.")); Pltfs.' Reply to Pltfs.' MSJ ¶ 12, at 4 (not disputing this fact).  At the same time, Hargrove began retreating and moving toward the house.  See Defs.' Response to Pltfs.' MSJ ¶¶ 43-44, at 10 (asserting this fact)(citing Dale Body Camera at 00:52-00:54; Gastelum Body Camera at 00:56-1:06); Pltfs.' Reply to Pltfs.' MSJ ¶ 12, at 4 (not disputing this fact).

Gastelum believed that the threat that Hargrove was impeding the investigation and that he might speak with others within the home established an exigency.  See Pltfs.' Response to Defs.' MSJ ¶ 10, at 3 (asserting this fact)(citing Gastelum Interview at 16:3-14).[12]  The Defendant

---

[12]The Defendants did not file a reply to the Pltfs.' Response to Defs.' MSJ.  Accordingly, the Defendants did not respond to this fact.  The record reflects, however, the fact.  See Gastelum Interview at 16:3-14.  Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ.

Officers entered the garage.  <u>See</u> Pltfs.' MSJ ¶ 16, at 4 (asserting this fact)(citing Gastelum Body Camera at 00:58); Defs.' Response to Pltfs.' MSJ ¶ 16, at 3 (admitting this fact).  Gastelum entered the garage, because he believes domestic disturbance calls to be unpredictable and did not know what was occurring inside the residence.  <u>See</u> Pltfs.' Response to Defs.' MSJ ¶ 15, at 3 (asserting this fact)(citing Gastelum Interview at 20:9-23).[13]  Gastelum had no evidence that anyone within the house was injured or had been struck.  <u>See</u> Pltfs.' Response to Defs.' MSJ ¶ 16, at 3 (asserting this fact)(citing Gastelum Interview at 22:5-12).[14]  Dale entered the garage, because he saw Hargrove commit a crime, <u>i.e.</u>, Hargrove ignored Gastelum's orders.  <u>See</u> Pltfs.' Response to Defs.' MSJ ¶ 17, at 3 (asserting this fact)(citing Dale Interview at 30:2-11).[15]  No emergency related to the domestic disturbance call led Dale to enter the garage.  <u>See</u> Pltfs.' Response to Defs.' MSJ

---

56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[13]The Defendants did not file a reply to the Pltfs.' Response to Defs.' MSJ.  Accordingly, the Defendants did not respond to this fact.  The record reflects, however, the fact.  <u>See</u> Gastelum Interview at 20:9-23.  Accordingly, the Court deems the fact undisputed.  <u>See</u> D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[14]The Defendants did not file a reply to the Pltfs.' Response to Defs.' MSJ.  Accordingly, the Defendants did not respond to this fact.  The record reflects, however, the fact.  <u>See</u> Gastelum Interview at 22:5-12.  Accordingly, the Court deems the fact undisputed.  <u>See</u> D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[15]The Defendants did not file a reply to the Pltfs.' Response to Defs.' MSJ.  Accordingly, the Defendants did not respond to this fact.  The record reflects, however, the fact.  <u>See</u> Dale Interview at 30:2-11.  Accordingly, the Court deems the fact undisputed.  <u>See</u> D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

¶ 18, at 3 (asserting this fact)(citing Dale Interview at 31:7-25; id. at 32:1-15).[16]  Gastelum told

Hargrove to stop and to come back to him.  See Pltfs.' Response to Defs.' MSJ ¶ 11, at 3 (asserting

this fact)(citing Gastelum Interview at 17:7-10).[17]  The Defendant Officers followed Hargrove,

who walked away from them within the garage and toward the door leading into the house.  See

Pltfs.' MSJ ¶¶ 17-18, at 4 (asserting this fact)(citing Gastelum Body Camera at 1:04-05); Defs.'

Response to Pltfs.' MSJ ¶ 18-19, at 4 (admitting this fact).  Gastelum believed that Hargrove was

trying to detain the Defendant Officers and to obstruct them.  See Pltfs.' Response to Defs.' MSJ

¶ 12, at 3 (asserting this fact)(citing Gastelum Interview at 17:11-23).[18]  Ward positioned herself

between the Defendant Officers and Hargrove, and she attempted to pull Hargrove from the

Defendant Officers and toward the house.  See Defs.' Response to Pltfs.' MSJ ¶ 46, at 10 (asserting

this fact)(citing Brackeen Body Camera at 1:20-1:31; Dale Body Camera at 1:00-1:09; Gastelum

---

[16]The Defendants did not file a reply to the Pltfs.' Response to Defs.' MSJ.  Accordingly, the Defendants did not respond to this fact.  The record reflects, however, the fact.  See Dale Interview at 31:7-25; id. at 32:1-15.  Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[17]The Defendants did not file a reply to the Pltfs.' Response to Defs.' MSJ.  Accordingly, the Defendants did not respond to this fact.  The record reflects, however, the fact.  See Gastelum Interview at 17:7-10.  Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[18]The Defendants did not file a reply to the Pltfs.' Response to Defs.' MSJ.  Accordingly, the Defendants did not respond to this fact.  The record reflects, however, the fact.  See Gastelum Interview at 17:11-23.  Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Body Camera at 00:56-1:10).[19]   The Defendant Officers pursued and arrested Hargrove.  See Defs.'

Response to Pltfs.' MSJ ¶ 47, at 10-11 (asserting this fact)(citing Gastelum Body Camera at 00:56-

1:30).[20]  Gastelum and Brackeen put Halgrove in handcuffs.  See Pltfs.' MSJ ¶ 19, at 4 (asserting

this fact)(citing Gastelum Body Camera at 1:07-21); Defs.' Response to Pltfs.' MSJ ¶ 18-19, at 4

(admitting this fact).  The Defendant Officers observed no blood or injuries either on Hargrove or

on Ward.  See Pltfs.' Response to Defs.' MSJ ¶¶ 13-14, at 3 (asserting this fact)(citing Gastelum

Interview at 19:7-13; id. at 19:16-20-1).[21]

---

[19]The Plaintiffs dispute the alleged undisputed fact in the text as immaterial and speculative.  See Pltfs. Reply to Pltfs. MSJ ¶ 14, at 42.  "The Court has previously held that a 'relevance argument . . . does not dispute the fact' and that 'relevance is a legal argument that is best left for the Analysis Section' of this opinion."  Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 2018 WL 3210531, at *1 (quoting SEC v. Goldstone, 2015 WL 5138242, at *27 n.95).  The alleged undisputed fact's relevance, therefore, does not make the fact disputed.  Further, the record, and particularly the Brackeen Body Camera, the Dale Body Camera, and the Gastelum Body Camera, reflect the alleged undisputed fact in the text.  See Brackeen Body Camera at 1:20-1:31; Dale Body Camera at 1:00-1:09; Gastelum Body Camera at 00:56-1:10.  Accordingly, the fact is not speculative, and the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[20]The Plaintiffs dispute the relevance of the alleged undisputed fact in the text.  See Pltfs.' Reply to Pltfs.' MSJ ¶ 14, at 42.  "The Court has previously held that a 'relevance argument . . . does not dispute the fact' and that 'relevance is a legal argument that is best left for the Analysis Section' of this opinion."  Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 2018 WL 3210531, at *1 (quoting SEC v. Goldstone, 2015 WL 5138242, at *27 n.95).  Because the Plaintiffs do not controvert the fact but contest only the fact's relevance, the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[21]The Defendants did not file a reply to the Pltfs.' Response to Defs.' MSJ.  Accordingly, the Defendants did not respond to this fact.  The record reflects, however, the fact.  See Gastelum Interview at 19:7-13; id. at 19:16-25:20-1.  Accordingly, the Court deems the fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Ward resisted Dale's verbal and physical attempts to prevent her from entering the house, see Defs.' Response to Plaitniffs' MSJ ¶ 48, at 12 (asserting this fact)(citing Dale Body Camera at 1:05-2:15),[22] and went inside the house, see Pltfs.' MSJ ¶ 20, at 4 (asserting this fact)(citing Dale Body Camera at 4:20); Defs.' Response to Pltfs.' MSJ ¶ 20, at 4 (admitting this fact). Dale followed Ward into the house. See Pltfs.' MSJ ¶ 21, at 4 (asserting this fact)(citing Dale Body Camera at 1:10); Defs.' Response to Pltfs.' MSJ ¶ 21-22, at 4 (admitting this fact). Dale detained Ward briefly in a laundry room near a door leading to the garage before he returned with her to the garage. See Defs.' Response to Pltfs.' MSJ ¶ 49, at 11 (asserting this fact)(citing Dale Body Camera at 1:05-2:15);[23] Defs.' MSJ ¶ 4, at 3 (asserting this fact)(citing Brackeen Body Camera at 1:07-2:06, Gastelum Body Camera at 1:45-2:11); Pltfs.' Response to Defs.' MSJ ¶ 2, at 2 (not

---

[22]The Plaintiffs contend that the alleged undisputed fact in the text is immaterial and speculative. See Pltfs.' Reply to Pltfs.' MSJ ¶ 14, at 4. The record supports, however, this fact and reflects Ward doing what the Defendants describe in the alleged undisputed fact. "The Court has previously held that a 'relevance argument . . . does not dispute the fact' and that 'relevance is a legal argument that is best left for the Analysis Section' of this opinion." Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 2018 WL 3210531, at *1 (quoting SEC v. Goldstone, 2015 WL 5138242, at *27 n.95). Because the Plaintiffs do not controvert the fact but contest only the fact's relevance, the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[23]Ward objects to this alleged undisputed fact in the text as "immaterial and speculative." See Pltfs.' Reply to Pltfs.' MSJ ¶ 14, at 4. The record supports, however, what the Defendants describe in the Defs.' Response to Pltfs.' MSJ, and the Plaintiffs admit a similar fact in the Pltfs.' Response to Defs.' MSJ. See Pltfs.' Response to Defs.' MSJ ¶ 2, at 2. "The Court has previously held that a 'relevance argument . . . does not dispute the fact' and that 'relevance is a legal argument that is best left for the Analysis Section' of this opinion." Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 2018 WL 3210531, at *1 (quoting SEC v. Goldstone, 2015 WL 5138242, at *27 n.95). Because the Plaintiffs do not controvert the fact but contest only the fact's relevance, the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

disputing this fact).   Dale and Gastelum put Ward in handcuffs promptly after Dale and she

returned to the garage.   See Pltfs.' MSJ ¶ 22, at 4 (asserting this fact)(citing Gastelum Body Camera

Tr. at 1:12-1:56); Defs.' Response to Pltfs.' MSJ ¶ 21-22, at 4 (admitting this fact); Defs.' MSJ

¶ 5, at 3 (also asserting this fact)(citing Brackeen Body Camera at 1:07-2:06, Gastelum Body

Camera at 1:45-2:11); Pltfs.' Response to Defs.' MSJ ¶ 2, at 2 (not disputing this fact).   Dale

arrested Ward, because she grabbed Hargrove and tried to pull him from Gastelum.   See Pltfs.'

Response to Defs.' MSJ ¶ 19, at 4 (asserting this fact)(citing Dale Interview at 33:9-25).[24]   Dale's

process of arresting Ward took around one minute.   See Defs.' MSJ ¶ 6, at 3 (asserting this

fact)(citing Brackeen Body Camera at 1:07-2:06; Gastelum Body Camera at 1:45-2:11); Pltfs.'

Response to Defs.' MSJ ¶ 2, at 2 (not disputing this fact).

The Defendant Officers transported Ward and Hargrove to the City of Hobbs Detention

Facility, where they were booked.   See Pltfs.' MSJ ¶ 24, at 4 (asserting this fact)(citing Hobbs

Police Department Incident Report, filed January 8, 2091 (Doc. 12-6)); Defs.' Response to Pltfs.'

MSJ ¶ 24-26, at 4 (admitting this fact).   Dale charged Ward and Hargrove with resisting arrest.

See Pltfs.' MSJ ¶¶ 25-26, at 4-5 (asserting this fact)(citing generally Hobbs Police Department

Incident Report); Defs.' Response to Pltfs.' MSJ ¶ 24-26, at 4 (admitting this fact); id. ¶ 50, at 12

(also asserting this fact)(citing Criminal Complaint at 1, Hobbs Code § 9.04080, filed January 28,

_____

[24]The Defendants did not file a reply to the Pltfs.' Response to Defs.' MSJ.   Accordingly,
the Defendants did not respond to this fact.   The record reflects, however, the fact.   See Dale
Interview at 33:9-25.   Accordingly, the Court deems the fact undisputed.   See D.N.M.LR-Civ.
56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically
controverted.").

2019 (Doc. 19-11)).[25]  After being in custody, Hargrove admitted that he was intoxicated.  See

Defs.' Response to Pltfs.' MSJ ¶ 52, at 11 (asserting this fact)(citing Transcript of Sergeant

Mattock's Body Cam at 8:23-25, filed January 28, 2019 (Doc. 19-12)("Mattock Body Camera

Tr.")).[26]

Ward has no evidence of any injury more than a de minimis harm.  See Defs.' MSJ ¶ 7, at

3 (asserting this fact)(citing Brackeen Body Camera at 1:07-2:06; Gastelum Body Camera at 1:45-

2:11; Ward Criminal Complaint); Pltfs.' Response to Defs.' MSJ ¶ 2, at 2 (not disputing this fact).

"Hargrove only complained about temporary pain to his wrist and arm when the Officers detained

and handcuffed him."  Defs.' MSJ ¶ 2, at 3 (asserting this fact)(citing Brackeen Body Camera at

1:16-1:53).  See Pltfs.' Response to Defs.' MSJ ¶ 2, at 2 (not disputing this fact).  Brackeen

adjusted Hargrove's handcuffs to placate him.  See Defs.' MSJ ¶ 3, at 3 (asserting this fact)(citing

---

[25]The Plaintiffs make no comment on the alleged undisputed fact in the text but, rather, appear to have skipped responding to Defs.' Response to Pltfs.' MSJ ¶ 50, at 11, as they respond to ¶ 49, at 11, and then to ¶ 51, at 11.  See Pltfs.' Reply to Pltfs.' MSJ at 4.  The Plaintiffs assert, however, the same fact in their Pltfs.' MSJ.  See Pltfs.' MSJ ¶¶ 25-26, at 4-5.  Accordingly, the Court deems the alleged undisputed fact undisputed.

[26]Ward objects to this alleged undisputed fact in the text as "immaterial and speculative." Pltfs.' Reply to Pltfs.' MSJ ¶ 14, at 4.  The record supports, however, what the Defendants describe in the Defs.' Response to Pltfs.' MSJ, see Mattock Body Camera Tr. at 8:23-25, and the Plaintiffs admit a similar fact in the Pltfs.' Response to Defs.' MSJ.  See Pltfs.' Response to Defs.' MSJ ¶ 2, at 2.  Further, "the Court has previously held that a 'relevance argument . . . does not dispute the fact' and that 'relevance is a legal argument that is best left for the Analysis Section' of this opinion."  Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 2018 WL 3210531, at *1 (quoting SEC v. Goldstone, 2015 WL 5138242, at *27 n.95).  Because the Plaintiffs do not controvert the fact, but contest only the fact's relevance, the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Brackeen Body Camera at 2:20-3:18); Pltfs.' Response to Defs.' MSJ ¶ 2, at 2 (not disputing this fact).

<div align="center">**PROCEDURAL BACKGROUND**</div>

The Plaintiffs ask for relief on several grounds. First, in Counts I and II, Ward and Hargrove ask for relief against the Defendants pursuant to § 41-4-12 of the New Mexico Tort Claims Act, §§ 41-4-1 to -27 ("NMTCA"), for the battery that the Defendant Officers committed against Ward and Hargrove, specifically the Defendant Officers' "unlawfully and intentionally touch[ing] and appl[ying] force to [Ward and Hargrove] in a rude, insolent, or angry manner." Complaint ¶¶ 58, 63, at 6. See Complaint ¶¶ 73-84, at 7-8. Second, in Count III, the Plaintiffs asks for relief against the Defendant Officers, who, according to Todd, violated the Fourth Amendment to the Constitution of the United States when they entered her home "without a warrant, probable cause or exigency," Complaint ¶ 69, at 7, or consent, and the entry "was objectively unreasonable under the circumstances," Complaint ¶ 71, at 7. See id. ¶¶ 67-72, at 7. Third, in Counts IV and V, Ward and Hargrove ask for relief against the Defendant Officers for the Fourth Amendment violation that resulted from the Defendant Officers' searching, detaining, arresting, and charging Ward and Hargrove. See Complaint ¶¶ 57-66, at 6-7. Both parties now seek summary judgment on Counts III through IV, and the Defendants seek summary judgment on Counts I and II. See generally Pltfs.' MSJ; Defs.' MSJ.

**1.       The Pltfs.' MSJ.**

In the Pltfs.' MSJ, the Plaintiffs request summary judgment on their Counts III, IV, and V. See Pltfs.' MSJ at 1. The Plaintiffs first contend that the Defendant Officers did not have an exigency that justified entry into Todd's home, because established law reflects that a report of

domestic violence alone does not establish an exigency.  See Pltfs.' MSJ at 8-10.  The Plaintiffs

cite for support first United States v. Davis, 290 F.3d 1239 (10th Cir. 2002), wherein the United

States Court of Appeals for the Tenth Circuit found no exigency where a 911 caller reported

domestic violence, the defendant lied about his wife's presence at the home, the defendant insisted

that the officers remain outside his home, and the defendant committed no violence toward the

officer.  See Pltfs.' MSJ at 8-9.  The Plaintiffs also cite Storey v. Taylor, 696 F.3d 987 (10th Cir.

2012), wherein the Tenth Circuit held that reports of domestic verbal disputes without more do not

establish an immediate need to protect others and held that the officers had no justification for

pulling the defendant, who refused to leave his home, from the home, where the officer heard no

dispute at the home, and Storey refused to answer inquiries about the matter and refused to leave

his home.  See Pltfs.' MSJ at 9-10.  According to the Plaintiffs, here, the Defendant Officers relied

solely on a 911 call, and that they cannot rely on such evidence to enter a home is clearly

established.  See Pltfs.' MSJ at 10.

 The Plaintiffs next argue that the Defendant Officers' order to Hargrove to step out of the

garage was unlawful, because, based on Storey v. Taylor, clearly established law establishes that

officers cannot command people from their homes for probable cause for not obeying an unlawful

order, and that an order from the home is a seizure for which an officer, without probable cause,

must have an exigency.  See Pltfs.' MSJ at 10-11.  The Plaintiffs argue third that the Defendant

Officers could not arrest Ward and Hargrove for resisting, evading, or obstructing them, because

the charge requires that an officer have been acting in "'lawful discharge of his duties,'" and the

New Mexico Court of Appeals has stated that an officer merely acting in his or her employment

as an officer is not in the lawful discharge of his or her duties.  Pltfs.' MSJ at 11 (quoting State v.

Frazier, 1975-NMCA-075, ¶¶ 11-12, 15, 537 P.2d 711, 713). According to the Plaintiffs, the Defendant Officers did not act in lawful discharge of their duties when they violated the Fourth Amendment. See Pltfs.' MSJ at 11-12. Last, the Plaintiffs aver that the Defendant Officers cannot justify arresting Ward and Hargrove on the grounds that they resisted arrest, because, for the charge to adhere, the resistance must have been in response to an arrest based on probable cause. See Pltfs.' MSJ at 12 (citing Keylon v. City of Albuquerque, 535 F.3d 1210, 1216-17 (10th Cir. 2008)).

### 2. The Defs.' Response to Pltfs.' MSJ.

The Defendants respond. See Defs.' Response to Pltfs.' MSJ at 1-26. The Defendants begin their response to the Plaintiffs' argument regarding unlawful entry by summarizing Brigham City v. Stuart, 547 U.S. 398 (2006), wherein the Supreme Court of the United States of America held that officers' entry into a home was reasonable where the officers observed evidence creating "a reasonable basis to believe that [an] adult might need help and the fight might just be beginning." Defs.' Response to Pltfs.' MSJ at 15 (citing Brigham City v. Stuart, 547 U.S. at 406). The Defendants also summarize United States v. Najar, 451 F.3d 710 (10th Cir. 2006), wherein: (i) a police dispatcher received a 911 call followed by silence and a disconnect, could not return the call, and sent officers to a residence the occupant of which refused to permit the officers to enter; (ii) on the officers' arrival, the lights in the residence were on, and the officers could observe a person within the home, but no one answered the officers' persistent knocking; (iii) Richard Najar eventually opened the door, but denied that anyone else was home or that a 911 call had been made; and (iv) the officers entered the home and discovered an uninjured woman in a bedroom and a shotgun, and arrested Najar for being a felon in possession. See Defs.' Response to Pltfs.' MSJ at 15. According to the Defendants: (i) the Tenth Circuit concluded that the officers

could believe that an exigency existed; and (ii) the Tenth Circuit differentiated United States v. Davis, wherein the officers verified the defendant's wife's safety, from United States v. Najar's facts, in which a 911 call was made from the house, but the defendant insisted that he did not make a 911 call. See Defs.' Response to Pltfs.' MSJ at 15-16.

According to the Defendants, here, the Defendant Officers believed that they were responding to domestic violence involving a physical altercation, understood that Hargrove's family was in the house, saw an intoxicated Hargrove attempting to keep the Defendant Officers from the house, and Ward refusing to obey commands and pulling Hargrove into the house, and observed Hargrove inexplicably retreating into the house. See Defs.' Response to Pltfs.' MSJ at 17-19. The Defendants contend that the Defendant Officers entered the house, because the 911 dispatcher received a call about a domestic dispute that led them to believe that a physical altercation had occurred, did not know the female's identity or her physical state, knew that Hargrove's family was inside but did not know who that included, did not know Hargrove or Ward, or Hargrove's propensity for violence, and observed Ward's and Hargrove's evasive behavior. See Defs.' Response to Pltfs.' MSJ at 18-19. The Defendants explain that the Defendant Officers took Hargrove into custody to stop him from entering the house and arrested Ward, because she resisted Dale's attempts to stop her from entering the house. See Defs.' Response to Pltfs.' MSJ at 18. The Defendants contend that the Defendant Officers reasonably believed that not investigating further would risk leaving the unknown victim in harm's way, and that they could not engage in further investigation because of Hargrove's and Ward's conduct. See Defs.' Response to Pltfs.' MSJ at 19.

The Defendants add that the Defendant Officers also approached Ward and Hargrove in a reasonable manner. See Defs.' Response to Pltfs.' MSJ at 19-20. According to the Defendants, the Defendant Officers approached an open door, identified themselves, and did not enter until they attempted to stop Ward and Hargrove from entering the residence. See Defs.' Response to Pltfs.' MSJ at 19-20. According to the Defendants, the Defendant Officers did not search the residence, and sought only to end the imminent threat that they believed that Ward and Hargrove posed. See Defs.' Response to Pltfs.' MSJ at 20.

The Defendants distinguish United States v. Davis and Storey v. Taylor. See Defs.' Response to Pltfs.' MSJ at 20-24. According to the Defendants, in United States v. Davis, the officers responded to a possible domestic disturbance, but knew Davis was not wanted for criminal offenses and had interacted with him over minor, non-violent issues; furthermore, the officers saw Davis' partner, Desiree Coleman, at the door, and she told them that she and Davis had been arguing. See Defs.' Response to Pltfs.' MSJ at 20-21. Moreover, according to the Defendants, in United States v. Davis, Davis told Coleman to go outside and retreated inside with a child. See Defs.' Response to Pltfs.' MSJ at 21. The Defendants note that the Tenth Circuit decided United States v. Davis before the Supreme Court, in Brigham City v. Stuart, removed the requirementsthat a search not be motivated by an intent to arrest or seize evidence, and that an exigency arising from a need to protect lives or safety be based on knowledge approaching probable cause. See Defs.' Response to Pltfs.' MSJ at 22. According to the Defendants, unlike in United States v. Davis, where the officers had a report of a potential domestic disturbance, the officers claimed that they acted for their own safety, and the officers could verify Coleman's safety, here, the Defendant Officers had a report of a domestic disturbance, and reasonably believed that Hargrove might

- 24 -

injure someone within the house and could not verify whether someone was injured. See Defs.' Response to Pltfs.' MSJ at 21-22.

According to the Defendants, in Storey v. Taylor, after the officers arrived, Storey informed them that he and his wife had been arguing, and refused to permit the officers to enter the home. See Defs.' Response to Pltfs.' MSJ at 22. The Defendants describe that, when Storey's wife returned from the grocery store, the officers observed no risk to her safety, and they arrested her husband before they asked her to come to the door. See Defs.' Response to Pltfs.' MSJ at 23. The Defendants note that, in Storey v. Taylor, the officers received information of a loud argument from an anonymous caller, and saw no indication of violence or an argument, unlike here, where the officers did not know that they were dealing with a verbal argument, but responded to a male and female fighting outside, which an identified caller had reported, and could not verify the victim's safety. See Defs.' Response to Pltfs.' MSJ at 23-24. The Defendants summarize that existing precedent does not put beyond debate the question whether the Officer Defendants violated the Plaintiffs' Fourth Amendment rights on these facts, as the clearly established prong requires. See Defs.' Response to Pltfs.' MSJ at 24.

The Defendants attack the Plaintiffs' second argument by contending that, here, unlike in Storey v. Taylor, exigent circumstances existed to justify the orders to Ward and Hargrove. See Defs.' Response to Pltfs.' MSJ at 24 (citing Storey v. Taylor, 696 F.3d at 993). The Defendants, accordingly, focus their argument on whether the Defendant Officers had probable cause to arrest Ward and Hargrove for resisting, evading, or obstructing an officer in violation of the Hobbs Municipal Code 9.04.080. See Defs.' Response to Pltfs.' MSJ at 24-25. The Defendants aver that the lapel camera videos show that Ward and Hargrove "interfered with, opposed, obstructed and

resisted the Officers' lawful orders as they attempted to discharge their duty to investigate the call." Defs.' Response to Pltfs.' MSJ at 26. The Defendants note that Hargrove did not obey Gastelum's orders to keep open the screen door or to leave the garage; that both Ward and Hargrove evaded the Defendant Officers; and that Ward tried to prevent the Defendant Officers from stopping Ward. See Defs.' Response to Pltfs.' MSJ at 26. According to the Defendants, these actions gave the Defendant Officers probable cause for the arrests. See Defs.' Response to Pltfs.' MSJ at 26.

3.    **The Pltfs.' Reply to Pltfs.' MSJ.**

The Plaintiffs reply. See Pltfs.' Reply to Pltfs.' MSJ at 1-12. The Plaintiffs first aver that Storey v. Taylor stands for the proposition that officers must have more than a report of a domestic dispute to have probable cause or exigent circumstances. See Pltfs.' Reply to Pltfs.' MSJ at 4-5. The Plaintiffs reiterate Storey v. Taylor's facts and argue that they resemble this case, and note that the Defendants' arguments about Hargrove's intoxication and Ward's and Hargrove's belligerence must fail, and note that Storey v. Taylor indicates that belligerence and the possibility of a victim within the residence do not justify warrantless entry. See Pltfs.' Reply to Pltfs.' MSJ at 5. The Plaintiffs reiterate their arguments about United States v. Davis. See Pltfs.' Reply to Pltfs.' MSJ at 6. The Plaintiffs also cite Lundstrom v. Romero, 616 F.3d 1108 (10th Cir. 2010), wherein a 911 caller reported that a woman at Lundstrom's residence was beating a toddler, but stated that the caller could not see anything, and an officer, who arrived forty minutes later, heard "a high-pitched voice" at the house. Pltfs.' Reply to Pltfs.' MSJ at 6-7. According to the Plaintiffs, when the officer explained that she came to check on the child's welfare, Lundstrom responded that no children were at the residence and refused the officer entry to the home to verify that

statement.  See Pltfs.' Reply to Pltfs.' MSJ at 7.  The Plaintiffs explain that the Tenth Circuit concluded that the officer had no reasonable ground to believe that an imminent threat existed. See Pltfs.' Reply to Pltfs.' MSJ at 7.

The Plaintiffs attack the Defendants' arguments.  See Pltfs.' Reply to Pltfs.' MSJ at 7.  The Plaintiffs opine on Gastelum's reasons for entering Todd's home:

> It's as if Gastelum decided to throw onto paper all the reasons for entry that the Tenth Circuit has written are impermissible reasons.  Reason (a) is clearly insufficient on its own.  Reason (b) is the specific inference that *Davis* disallowed officers' making on a domestic disturbance call.  Reason (c) -- lack of objective evidence -- is a reason that entry is prohibited.  Reason (d) is wild speculation and hyperbole, unmoored from any of the facts known to Gastelum.  Defendants provide the Court with a slew of unsubstantiated possibilities as the basis for their entry in 9 Acoma Court.

Pltfs.' Reply to Pltfs.' MSJ at 8.  The Plaintiffs add that the Defendant Officers knew nothing about anyone in the house or if anyone was in the house, and indicate that, "[i]n U.S. v. Martinez, 686 F. Supp. 2d 1161 (D.N.M. 2009)(Browning, J.), aff'd, U.S. v. Martinez, 643 F.3d 1292, (10th Cir. 2011), the court held that to be concerned about the life or safety of someone in a house, officers must have a reasonable belief that someone is in the house."  Pltfs.' Reply to Pltfs.' MSJ at 8-9. The Plaintiffs indicate that, in Brigham City v. Stuart, the officers heard and saw the altercation in the house and that, in United States v. Najar, the dispatcher could not contact the person who initially made the 911 call, and the Tenth Circuit emphasized that, there, a person could reasonably believe that the defendant was trying to prevent a victim from communicating with the officers. See Pltfs.' Reply to Pltfs.' MSJ at 10.  According to the Plaintiffs, here, the Defendant Officers could see Ward and Hargrove, and Ward and Hargrove advised the Defendant Officers that no domestic violence had occurred.  See Pltfs.' Reply to Pltfs.' MSJ at 10.  The Plaintiffs conclude by repeating their arguments about probable cause.  See Pltfs.' Reply to Pltfs.' MSJ at 11.

### 4. **The Defs.' MSJ.**

In the Defs.' MSJ, the Defendants ask that the Court dismiss all the Plaintiffs' claims.  <u>See</u> Defs.' MSJ at 2.  The Defendants repeat their arguments from the Defs.' Response to Pltfs.' MSJ about Counts III, IV, and V, and request that the Court dismiss Counts III, IV, and V on qualified immunity grounds, or grant the Defendants summary judgment on those Counts.  <u>See</u> Defs.' MSJ at 6-21.  The Defendants contend that § 1983 does not provide for respondeat superior liability, so the City of Hobbs cannot be liable for the Defendant Officers' actions for Counts III through V.  <u>See</u> Defs.' MSJ at 22.

The Defendants then address the battery claims in Counts I and II.  <u>See </u>Defs.' MSJ at 22.  The Defendants explain that, during an arrest, an officer may use the amount of force deemed reasonably necessary in the circumstances.  <u>See</u> Defs.' MSJ at 23 (citing <u>Bledsoe v. Garcia</u>, 742 F.2d 1237, 1240 (10th Cir. 1984); <u>Mead v. O'Connor</u>, 1959-NMSC-077, ¶ 4, 66 N.M. 170, 172-73).  The Defendants indicate that, in analyzing battery during an arrest, New Mexico courts apply an objective reasonableness standard and defer to the federal courts' standards for objective reasonableness.  <u>See</u> Defs.' MSJ at 23-24.  The Defendants contend that the Defendant Officers used an objectively reasonable amount of force.  <u>See</u> Defs.' MSJ at 25.  According to the Defendants, Hargrove only complained briefly of pain in his wrists from the detention and the handcuffs, and the Defendant Officers adjusted Hargrove's handcuffs when he complained about them.  <u>See</u> Defs.' MSJ at 25.  The Defendants also note that Ward had no injury, and that Dale stopped her and handcuffed her quickly.  <u>See</u> Defs.' MSJ at 25.  The Defendants then add that, because the Plaintiffs cannot establish their battery claims, they cannot establish liability against the City of Hobbs under a respondeat superior theory.  <u>See</u> Defs.' MSJ at 26-27.

5. **The Pltfs.' Response to Defs.' MSJ.**

The Plaintiffs respond. See Pltfs.' Response to Defs.' MSJ at 1-16. The Plaintiffs first contend that the Defendant Officers' failure to read the CAD Report is unreasonable as a matter of law and undermines the Defendant Officers' probable cause. See Pltfs.' Response to Defs.' MSJ at 5-6 (citing Maresca v. Bernalillo Cty., 804 F.3d 1301, 1310 (10th Cir. 2015)). The Plaintiffs then address the Defendants' qualified immunity arguments. See Pltfs.' Response to Defs.' MSJ at 6-14. The Plaintiffs aver that United States v. Davis, Storey v. Taylor, and Lundstrom v. Romero establish a constitutional right against law enforcement's interference based on only a neighbor's call about a domestic disturbance. See MSJ Response at 7. The Plaintiffs aver that Lundstrom v. Romero and Storey v. Taylor present clearly established law on this situation, and that, although, in Storey v. Taylor, the officers had an unidentified caller on the 911 call, this fact does not sufficiently differentiate Storey v. Taylor from these facts as to make the clearly established law inapplicable here, and that, if the fact of an identified caller is relevant, it supports the Plaintiffs' position, because the Defendant Officers could have obtained information from that caller about the reported altercation. See Pltfs.' Response to Defs.' MSJ at 10. The Plaintiffs also repeat their contentions related to United States v. Davis. See Pltfs.' Response to Defs.' MSJ at 10-11. The Plaintiffs also argue that, in United States v. Martinez, the Court concluded that officers responded to 911 call, and, when the officers arrived at Martinez' home, they saw no one inside the home, no signs of forced entry, and although, through the home's glass door, the house looked disheveled and the sliding door was unlocked, the officers did not have an objectively reasonable belief that someone was within the home who needed assistance. See Pltfs.' Response to Defs.' MSJ at 11-12. The Plaintiffs also reiterate their arguments that Storey v. Taylor

establishes a right against being charged for asserting a right to remain within a home.  See Pltfs.'
Response to Defs.' MSJ at 13-14.  The Plaintiffs also note that they do not bring a respondeat
superior claim on Count III.  See Pltfs.' Response to Defs.' MSJ at 14 n.2.  Regarding the battery
claims in Counts I and II, the Plaintiffs contend that, because the Defendant Officers unlawfully
arrested Ward and Hargrove, the subsequent harm was also unlawful.  See Pltfs.' Response to
Defs.' MSJ at 14.  The Plaintiffs add that, because the Defendant Officers lacked probable cause
for Ward's and Hargrove's arrests, Ward and Hargrove are owed damages.  See Pltfs.' Response
to Defs.' MSJ at 15-16.

### 6.  **The Hearing.**

The Court began the hearing by noting that it did not see many disputed facts, and that it
could likely discuss both the Pltfs.' MSJ and the Defs.' MSJ in one Memorandum Opinion and
Order.  See Draft Transcript of Hearing at 2:9-15 (taken February 28, 2019)(Court)("Tr.").[27]  The
Court also indicated that the analysis might proceed past the clearly established prong and that the
Court might decide the constitutional issues.  See Tr. at 4:10-13 (Court).  The Plaintiffs indicated
that the only disputed fact is what information the Defendants Officers had, but noted that the
Plaintiffs could not produce evidence to dispute the Defendants' contentions that they received
only the information from the dispatcher.  See Tr. at 4:23-5:4 (Kennedy).  The Plaintiffs
summarized the case's facts, and then described their arguments about United States v. Davis and
Storey v. Taylor.  See Tr. at 5:6-7:10 (Kennedy).  The Plaintiffs also cited cases establishing that,
where a person moves toward a home, such an act does not establish probable cause that the person

_____

[27]The Court's citations to the transcript of the hearing refer to the court reporter's original,
unedited version.  Any final transcript may contain slightly different page and/or line numbers.

- 30 -

committed a crime and is not a person resisting, because citizens have a right to walk to their homes. See Tr. at 7:10-8:5 (Kennedy). The Court asked whether, if the Defendant Officers had arrived at Todd's house with knowledge that a fight had occurred, that changed the analysis, and whether a jury should consider what information the Defendant Officers had about the fight. See Tr. at 8:6-17 (Court). The Plaintiffs explained that those facts do not change the analysis, because Storey v. Taylor and Lundstrom v. Romero reflect that officers need more than a 911 call about a fight to establish an exigency, because the word "fight" can mean a physical or a verbal fight, and because the Tenth Circuit and the Supreme Court have suggested that such cases turn on reasonableness. See Tr. at 8:18-10:15 (Kennedy). In answer to the Court's next question about writing one Memorandum Opinion and Order, the Plaintiffs confirmed that they envision no problem with the Court issuing one Memorandum Opinion and Order both on the Pltfs.' MSJ and on the Defs.' MSJ. See Tr. at 10:16-25 (Court, Kennedy).

The Defendants agreed that they see no undisputed facts and that the Court can issue a combined Memorandum Opinion and Order. See Tr. at 11:8-12:14 (Robles, Court). The Defendants explained that the Defendant Officers' lapel videos establish the facts here and, after the Court asked whether the Defendants took the position that the Court has to decide this case as a matter of law based on the lapel videos, the Defendants replied that the Court should decide the Pltfs.' MSJ and the Defs.' MSJ. See Tr. at 11:22-12:15 (Robles, Court). The Defendants also agreed with the Court that the exigency that the parties are debating is the exigency to protect life and limb. See Tr. at 12:16-13:2 (Court, Robles).

The Defendants then began arguing qualified immunity; they averred that the Defendant Officers would not know that the law here is clearly established, and contended that United States

v. Najar provides the closest case to these facts because, in that case, the officers had only "hangups" as evidence that a fight had occurred. Tr. at 18:22 (Robles). See Tr. at 13:8-19:4 (Robles). The Defendants contended that, here, the Defendant Officers were aware that a male and female had been fighting outside and, for safety reasons, the Defendant Officers would not have looked at the full CAD Report while driving. See Tr. at 19:5-20:1 (Robles). The Defendants added that the Defendant Officers had no obligation to engage in further investigation here, where, by communicating with Ward and Hargrove, the Defendant Officers were performing the initial investigation before an arrest. See Tr. at 20:1-20 (Robles). The Defendants then repeated their interpretation of the events at issue. See Tr. at 20:20-23:14 (Robles). The Defendants emphasized that the initial attempt to arrest Ward and Hargrove grew from the Defendant Officers' need to control the scene for further investigation. See Tr. at 23:9-23 (Robles). The Defendants stated that, here, the Defendant Officers engaged only in judgment calls, explained that a court could "go . . . both ways," Tr. at 24:14 (Robles), see id. at 24:8-14 (Robles), concluded that the Court should ask whether the Defendant Officers acted "so far out of bounds" as to act "in a plainly incompetent manner," and urged that the Court conclude that qualified immunity protects the Defendant Officers, see Tr. at 24:14-25:3 (Robles).

The Court summarized its impression that the Defendants basically concede the Defendant Officers' constitutional violation, but emphasize that no clearly established law existed. See Tr. at 25:4-11 (Court). The Defendants stated that they largely agree with the Plaintiffs but want to address the "dangerously close," Tr. at 25:13 (Robles), element of the exigency and emphasized the clearly established argument, see Tr. at 25:12-26:12 (Robles). The Court asked whether the Defendant Officers had grounds to believe that someone was in immediate need of protection, see

Tr. at 26:19-25 (Court), and the Defendants indicated that the Defendants Officers knew that a family was inside, that, based on the suddenness with which Hargrove went to enter the house, the Defendant Officers could believe that Hargrove was doing something suspicious, and that Defendant Officers had to make a sudden decision, so that, in these circumstances, their decision was reasonable.  See Tr. at 27:1-29:19 (Robles).

The Plaintiffs commented in rebuttal that the Defendant Officers were supposedly well trained and should be able to apply legal principles, and had stated after the incident that they had no evidence that anyone was harmed or might be harmed, but saw Ward and Hargrove commit a misdemeanor by impeding the investigation.  See Tr. at 30:4-31:6 (Kennedy).  The Plaintiffs also noted that the Defendants basically admit that the Defendant Officers violated the Fourth Amendment.  See Tr. at 31:15-19 (Kennedy).  The Plaintiffs continued that, in Storey v. Taylor, the Tenth Circuit addressed whether an investigative detention was sufficient to justify entry into a home and the Tenth Circuit stated that an exigency is necessary, and noted that United States v. Davis involves a situation in which the defendant misled the police by telling them that his wife was not home and in which the wife later emerged to speak with the defendants and tried to stop Davis from shutting the house door on the defendants, and the Tenth Circuit still stated that Davis' rapid retreat into the home was not enough to establish an exigency.  See Tr. at 32:7-33:24 (Kennedy).  The Plaintiffs emphasized that, here, the Defendant Officers admitted that they entered the house to arrest Ward and Hargrove, and that they did not have a subjective belief in danger to anyone inside.  See Tr. at 33:25-34:6 (Kennedy).  The Court then concluded by indicating that it believes that the Defendant Officers violated the Fourth Amendment and that it is not sure how

much clearer the law needs to be to meet the clearly established requirement.  <u>See</u> Tr. at 34:15-20 (Court).

## <u>LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT</u>

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  <u>Herrera v. Santa Fe Pub. Sch.</u>, 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(alteration in <u>Herrera v. Santa Fe Pub. Sch.</u>)(quoting <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991)).  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)("<u>Celotex</u>").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323-25.  On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets omitted).

<u>Plustwik v. Voss of Nor. ASA</u>, No. 2:11CV00757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." <u>Celotex</u>, 477 U.S. at

331 (Brennan, J., dissenting)(emphasis in Celotex).[28]  Once the movant meets this burden, rule 56

requires the nonmoving party to designate specific facts showing that there is a genuine issue for

trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256

(1986)("Liberty Lobby").  A moving party may also obtain summary judgment in its favor without

itself introducing evidence by arguing that the nonmoving party, who bears the burden of proof,

has not produced sufficient evidence to establish a prima facie case.  See, e.g., Celotex, 477 U.S.

at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an

essential element of its case); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M.

2005)(Browning, J.)(granting summary judgment because the plaintiff lacked competent evidence

that the defendants defectively manufactured an oil distributor).   In American Mechanical

Solutions, LLC v. Northland Piping, Inc., 184 F. Supp. 3d 1030 (D.N.M. 2016)(Browning, J.), the

Court confronted such a situation, and granted summary judgment for the defendant when the

plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-

of-contract or breach-of-the-implied-warranty-of-merchantability claims.  See 184 F. Supp. 3d at

1075-78.  The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's

causation requirement nor the breach-of-the-implied-warranty-of-merchantability claim's

proximate-causation requirement with mere common or lay knowledge, and so New Mexico law

required that the plaintiff bolster its arguments with expert testimony, which the plaintiff had not

---

[28]Although the Honorable William J. Brennan, Jr., late Associate Justice of the Supreme
Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the
law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727,
at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent
both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how
the standard was applied to the facts of the case.").

provided.  See 184 F. Supp. 3d at 1067, 1073, 1075, 1079.  Without the requisite evidence, the plaintiff, the Court determined, failed to prove "'an essential element of the nonmoving party's case,'" rendering "'all other facts immaterial.'"  184 F. Supp. 3d at 1075 (quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  (quoting Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d at 1241).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Liberty Lobby, 477 U.S. at 259.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("'[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (quoting Coleman v. Darden, 595 F.2d 533,536 (10th Cir. 1979))).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill"); Vitkus v. Beatrice Co., 11 F.3d at 1539). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Liberty Lobby, 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Liberty Lobby, 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citing Adicks v. S. H. Kress & Co., 398 U.S. 144 , 158-59 (1970))). Fourth, the court cannot decide any issues of credibility. See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment is appropriate where video evidence clearly contradicted the plaintiff's version of the facts. See 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

       That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

       [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting *Scott*, 550 U.S. at 380); *see also Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty.,

third and fourth alterations in York v. City of Las Cruces).  "The Tenth Circuit, in *Rhoads v. Miller*,

[352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[29]] explained that the blatant

----

    [29]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion from the Tenth Circuit to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored.  However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."  United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Rhoads v. Miller, Lobozzo v. Colorado Department of Corrections, 429 F. App'x 707 (10th Cir. 2011)(unpublished), Wilson v.

contradictions of the record must be supported by more than other witnesses' testimony[.]" <u>Lymon v. Aramark Corp.</u>, 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), <u>aff'd</u>, 499 F. App'x 771 (10th Cir. 2012)(unpublished).

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

---

City of Lafayette, 510 F. App'x 775 (10th Cir. 2013)(unpublished), <u>United States v. Reed</u>, 195 F. App'x 815 (10th Cir. 2006)(unpublished), <u>United States v. Wilson</u>, 96 F. App'x 640 (10th Cir. 2004)(unpublished), <u>United States v. Ceballos</u>, 355 F. App'x 226 (10th Cir. 2009), <u>United States v. Aragones</u>, 483 F. App'x 415 (10th Cir. 2012)(unpublished), <u>United States v. Burciaga-Burciaga</u>, 147 F. App'x 725 (10th Cir. 2005)(unpublished), <u>United States v. Mongold</u>, 528 F. App'x 944 (10th Cir. 2013)(unpublished), <u>United States v. Jackson</u>, 139 F. App'x 83 (10th Cir. 2005)(unpublished), <u>Garrison v. City of Cushing</u>, 5 F.3d 545, 1993 WL 332284 (10th Cir. 1993)(unpublished table opinion), <u>Malone v. Board of County Commissioners for the County of Dona Ana</u>, 707 F. App'x 552 (10th Cir. 2017)(unpublished), <u>Rife v. Jefferson</u>, 742 F. App'x 377 (10th Cir. 2018)(unpublished), <u>Muller v. Culbertson</u>, 408 F. App'x 194 (10th Cir. 2011)(unpublished), <u>Beattie v. Smith</u>, 543 F. App'x 850 (10th Cir. 2013)(unpublished), <u>Hindbaugh v. Washita County Board of County Commissioners</u>, 329 F. App'x 818 (10th Cir. 2009), <u>United States v. Cook</u>, 344 F. App'x 473 (10th Cir. 2009)(unpublished), <u>Brown v. The City of Colo. Springs</u>, 709 F. App'x 906 (10th Cir. 2017)(unpublished), <u>Youbyoung Park v. Gaitan</u>, 680 F. App'x 724 (10th Cir. 2017)(unpublished), <u>Savage v. Troutt</u>, No. 18-6155, __ F. App'x __, 2019 WL 2592558 (10th Cir. June 25, 2019)(unpublished), and <u>Rudnick v. Raemisch</u>, No. 18-1260, __ F. App'x __, 2019 WL 2208288 (10th Cir. May 22, 2019)(unpublished), have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("'The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.'"  (quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006))).  The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.  See Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)("Because vicarious liability is inapplicable to Bivens[ v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 392 (1971)("Bivens")[30]] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.");  Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."  Garcia v. Casaus, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. 2011)(Browning, J.)(citing Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 689 (1978)("Monell")).  Supervisors

---

[30]In Bivens, the Supreme Court held that a violation of the Fourth Amendment "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."  403 U.S. at 389.

can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts. See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

1. **Color of State Law.**

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995). The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" West v. Atkins, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)). "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent." Jojola v. Chavez, 55 F.3d at 493. Accordingly, at a base level, to conclude that an action was taken under color of state law, the court must determine that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)).

The Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'" Jojola v. Chavez, 55 F.3d at 493 (quoting Lugar v. Edmondson Oil Co., 457 U.S. at

935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir. 1995)). Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant." Jojola v. Chavez, 55 F.3d at 493. Whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty. *Martinez* [v. Colon], 54 F.3d [980,] 986 [(1st Cir. 1995)]. Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties." *Id.*

David v. City & Cty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996).

### 2.    Individual Liability.

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations. Trask v. Franco, 446 F.3d at 1046. The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell, 436 U.S. at 663). "Thus, Defendants are liable for the harm proximately caused by their conduct." Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046). As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a

consequence of those deprivations. The recovery should be guided by common-law tort principles -- including principles of causation . . . ." Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).[31]

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm. Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct." Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry." 72 F.3d at 400. In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability. See, e.g., Warner v. Orange Cnty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 (1989).

Trask v. Franco, 446 F.3d at 1046. Thus, in the context of a claim under the Fourth Amendment, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability." Martinez v. Carson, 697 F.3d at 1255. The Tenth Circuit gave an example of a superseding-intervening cause, quoting the Honorable

---

[31]The Court clarified in Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d 1188 (D.N.M. 2014)(Browning, J.), that common-law causation standards do not necessarily hold in the municipal-liability context, and, in fact, "the causation standard for municipal liability cases is unclear in the Tenth Circuit." 41 F. Supp. 3d at 1273. The Court applied a traditional proximate cause analysis, and left open the possibility that there might be some greater, undefined causation requirement. See Herrera v. Santa Fe Pub. Sch., 41 F. Supp. 3d at 1281.

Samuel J. Alito, then-United States Circuit Judge for the United States Court of Appeals for the Third Circuit:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence. Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him. Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful? The obvious answer is "no." The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 ([Am. Law Inst.] 1965), that would limit the officer's liability. See id. § 440.

Bodine v. Warwick, 72 F.3d at 400. Additionally, "'[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not supersede the defendant's responsibility.'" Trask v. Franco, 446 F.3d at 1047 (quoting William Lloyd Prosser et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed.1984)). If

> the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. (Am. Law. Inst. 1965)).

**3.    Supervisory Liability.**

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless there is "'an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, . . . exercise of control or direction, or . . . failure to supervise.'" Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(alterations omitted in Gallagher v.

Shelton)(quoting Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997)).  Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "'deliberate or conscious choice.'"  Barney v. Pulsipher, 143 F.3d at 1307-08 (quoting City of Canton v. Harris,489 U.S. 378, 389 (1989)).  Cf. Bd. of Cty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."  (emphasis in Bd. of Cty. Comm'rs v. Brown)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casaus, 2011 WL 7444745, at *25-26 (citing Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal, 556 U.S. at 676.  The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

Dodds v. Richardson, 614 F.3d at 1199 (quoting 42 U.S.C. § 1983).  The Tenth Circuit noted that Ashcroft v. Iqbal "does not purport to overrule existing Supreme Court precedent," but stated that

"Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case." Dodds v. Richardson, 614 F.3d at 1200. It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis." Dodds v. Richardson, 614 F.3d at 1200. The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after Ashcroft v. Iqbal:

> A plaintiff may . . .succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)). The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined." Dodds v. Richardson, 614 F.3d at 1200 n.8. Relying on the Supreme Court's opinion in Board of County Commissioners v. Brown, the Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the third prong has been met also:

> We do not mean to imply that these are distinct analytical prongs, never to be intertwined. The Supreme Court explained in the context of § 1983 municipal liability:
>
> > Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward. Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably.

> Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cty. Comm'rs v. Brown, 520 U.S. at 404-05). The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law." Dodds v. Richardson, 614 F.3d at 1200 n.8. Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'" Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

4. **Municipal Liability.**

A municipality will not be held liable under § 1983 solely because its officers inflicted injury. See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006). Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged. See Graves v. Thomas, 450 F.3d at 1218. When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants. See Graves v. Thomas, 450 F.3d at 1218.

Establishing an informal policy or custom requires the plaintiff to show that the misconduct was "widespread" -- i.e., that it involved a "series of decisions." City of St. Louis v. Praprotnik,

485 U.S. 112, 127 (1988). Although the existence or nonexistence of such a policy, practice, or custom is a question of fact for the jury, see Powers v. Hamilton Cty. Pub. Def. Comm'n, 501 F.3d 592, 599 (6th Cir. 2007)("[T]he evidence showed at least a disputed question of fact as to the existence of its alleged policy or custom . . . ."); Surprenant v. Rivas, 424 F.3d 5, 21 (1st Cir. 2005)("O'Mara challenges the very existence of the interdicted policy, custom, or practice. Proving the existence of a policy, custom, or practice normally entails questions of fact."); Wallis v. Spencer, 202 F.3d 1126, 1136 (9th Cir. 1999)("In order to avoid summary judgment, a plaintiff need only show that there is a question of fact regarding whether there is a city custom or policy that caused a constitutional deprivation."); Gregory v. City of Rogers, 921 F.2d 750, 757 (8th Cir. 1990)("[A]ppellants have raised material questions of fact whether it was the custom of the Rogers Police Department that officers could use their discretion in deciding whether or not to arrest intoxicated individuals, despite the state statute requiring their arrest."); Fancher v. Barrientos, No. Civ. 11-118 LH/LAM, 2013 WL 8600085, at *4 (D.N.M. Aug. 19, 2013)(Hansen, J.)("[A]t this time the record is unclear and it remain a question of fact as to which policy was in place."); Jacobs v. Dujmovic, 752 F. Supp. 1516, 1525 (D. Colo. 1990)(Babcock, J.)("[T]he Jacobs have failed to meet their summary judgment burden of showing that it adopted a policy, custom or procedure that caused constitutional violations, or that there is a question of fact as to the existence of such a policy."), it is not a fact that can be baldly asserted at the pleading stage, see Young v. City of Albuquerque, 77 F. Supp. 3d 1154, 1187 (D.N.M. 2014)(Browning, J.); Atwell v. Gabow, Nos. 06-cv-02264-JLK, 07-cv-2063-JLK, 2008 WL 906105, at *6 (D. Colo. March 31, 2008)(Kane, J.). Pleading a municipal policy, custom, or practice is like pleading the breach element of negligence - - which is also ultimately a question of fact for the jury. The plaintiff cannot simply allege that

there is a policy in place, but, rather, must plead facts that, if true, would give rise to a plausible inference that such a policy exists. With formal or written policies, satisfying this pleading standard is easy; the plaintiff can simply allege what the policy is and where it is codified. With informal, unwritten policies, customs, or practices, the plaintiff can plead either a pattern of multiple similar instances of misconduct -- no set number is required, and the more unique the misconduct is, and the more similar the incidents are to one another, the smaller the required number will be to render the alleged policy plausible -- or use other evidence, such as a police officers' statements attesting to the policy's existence. The Tenth Circuit has not explicitly held that to be pleading requirements, but they have implied that district courts should analyze policies, practices, or customs under <u>Monell</u> as "legal conclusions" at the pleading stage -- which must evidence factual support, rather than conclusorily alleged -- and not "facts" in and of themselves, to be taken as true at face value:

> [T]he complaint alleges that the City of Denver Police Department had an official policy and plan to repress, vilify, and deny rights to Mexicanos, American Indians, and other "oppressed" national minorities, and that, pursuant to that plan, the Department formulated and issued a "get Martinez" policy and instructions. In furtherance of that policy, we are told, the Department kept a dossier on plaintiff, including reports, recordings, and other materials concerning his views, associations, and meetings. The Department also entered into a campaign to charge plaintiff and harass him and others advocating unpopular causes with unfounded prosecutions and to discourage him and others from asserting their rights. In or about October 1973, we are told, the Department, because of racial hatred and in order to chill the assertion of rights, obtained a warrant for the false and unfounded arrest of plaintiff, and, in or about November 1973, the Department "determined, in furtherance of its policy . . . as aforestated, to issue an order to all Denver Police Officers to 'shoot on sight' plaintiff."

> We think these allegations are clearly sufficient, as a matter of pleading, to satisfy the "policy" or "custom" requirement of <u>Monell</u>.

Martinez v. Winner, 771 F.2d 424, 443-44 (10th Cir. 1985)(citations to the complaint omitted).  If a conclusory assertion that the Denver Police Department had such a policy in place would have sufficed to clear the rule 12(b)(6) of the Federal Rules of Civil Procedure bar, the Court sees little reason for the Tenth Circuit to have gone into this detailed recitation.  The United States Courts of Appeals for the Seventh and Ninth Circuits have addressed this question squarely, and both have come down on the side that factual allegations giving rise to an inference that the policies exist must support the allegations of the existence of Monell policies.  See McCauley v. City of Chi., 671 F.3d 611, 618 (7th Cir. 2011)("In order to state a facially plausible equal-protection claim under Monell, the factual allegations in McCauley's complaint must allow us to draw the reasonable inference that the City established a policy or practice . . . ."); Svastics v. City of Beverly Hills, 178 F.3d 1300, 1999 WL 311217, at *1 (9th Cir. May 14, 1999)(unpublished table opinion)("The district court also properly dismissed the claims against the City because any allegations of an unconstitutional custom or policy, even after amendment of the complaint, remained too conclusory to support a claim pursuant to Monell."); Strauss v. City of Chi., 760 F.2d 765, 767 (7th Cir. 1985)("A complaint that tracks Monell's requirement of official policy with bare allegations cannot stand . . . .  The absence of any facts at all to support plaintiff's claim renders the allegations mere legal conclusions of Section 1983 liability devoid of any well-pleaded facts . . . ."  (footnote omitted)).

> [T]he mere allegation of a single act of unconstitutional conduct by a municipal employee will not support the inference that such conduct was pursuant to official policies.  On the other hand, where the plaintiff alleges a pattern or a series of incidents of unconstitutional conduct, then the courts have found an allegation of policy sufficient to withstand a dismissal motion.

Powe v. City of Chi., 664 F.2d 639, 650 (7th Cir. 1981). In Atwell v. Gabow, the Honorable

Thomas K. Kane, United States District Judge for the District of Colorado, dismissed a series of

Monell claims on this ground:

> From the inception of this litigation, I have admonished counsel regarding the import of Monell and its progeny for Plaintiffs' municipal liability claims and have explicitly ordered them to identify "***specific factual allegations*** supporting the conclusory allegations in the First Amended Complaint that Denver Health and/or Defendant Gabow acting in her official capacity made a policy decision, or engaged in a custom or practice of discrimination, for purposes of municipal liability.
>
> . . . .
>
> . . . Plaintiffs do not identify a custom, policy or practice applicable to all of them that would render Denver Health liable under Monell for the discrimination each claims to have suffered, and none pleads actual facts giving rise to a plausible inference that such a policy, custom or practice existed. Simply aggregating eight individual claims and calling them the result of a "custom or policy of discrimination" is insufficient, as are all of the other conclusory recitations of Canton or similar legal standards as "facts" supporting municipal liability. Plaintiffs' 42 U.S.C. §§ 1981 and 1983 claims against Denver Health or Gabow, Rossman and Alexander in their "official capacities" are therefore DISMISSED.

Atwell v. Gabow, 2008 WL 906105, at *6, *8 (emphasis in original). In Granato v. City & County

of Denver, Civil Action No. 11-cv-003047-MSK-BNB, 2011 WL 3820730 (D. Colo.

2011)(Krieger, J.), the Honorable Marcia S. Krieger, now-Senior United States District Judge for

the District of Colorado, ruled similarly:

> At a minimum, a party asserting a Monell claim must plead sufficient facts to identify the unconstitutional custom or policy that was promulgated and the means by which that custom or policy caused the constitutional violation.
>
> Here, Ms. Granato's allegations of an unconstitutional custom or policy maintained by Denver Health are entirely conclusory. She offers only the "formulaic recitation" of a Monell claim, alleging that Mr. Khazanov "act[ed] and/or fail[ed] to act pursuant to City or State policy, custom, decision, ordinance, regulation, habit, usage or practice in [his] conduct," but never identifies precisely what particular custom or policy of Denver Health Mr. Khazanov was acting

pursuant to . . . . As cases like <u>Twombly</u> and <u>Iqbal</u> make clear, such conclusory pleadings are insufficient to state a claim. Accordingly, Denver Health is entitled to dismissal of the <u>Monell</u> claim against it.

<u>Granato v. City & Cty. of Denver</u>, 2011 WL 3820730, at *8 (alterations in original)(footnote and citation omitted). Last, in <u>Young v. City of Albuquerque</u>, the Court dismissed a plaintiff's <u>Monell</u> claims on the same basis:

> [F]ar from asserting that the misconduct in this case was widespread, Young has not alleged any facts -- such as statistics, records of complaints filed with the city, or even anecdotal evidence -- that would indicate that the misconduct alleged in this case was more than an isolated incident. In fact, Young cannot point to another instance in which a City of Albuquerque employee has deprived another individual of his or her property rights without due process. A single incident is insufficient to establish the existence of a custom or practice. <u>See</u> <u>City of St. Louis v. Praprotnik</u>, 485 U.S. at 127 (explaining that a custom requires that the alleged misconduct is "widespread" -- <u>i.e.</u>, involving a "series of decisions").

<u>Young v. City of Albuquerque</u>, 77 F. Supp. 3d at 1187. These cases all stand for the same proposition: at the pleading stage, the existence of a <u>Monell</u> policy is a conclusion up to which a plaintiff must build, rather than a fact that a plaintiff may baldly assert.

When there is no formal written policy and the § 1983 plaintiff is relying upon a practice or custom, some courts appear to look for a specific number of prior similar incidents -- often saying that two or three instances will not suffice. <u>See</u> <u>Wilson v. Cook Cty.</u>, 742 F.3d 775, 780 (7th Cir. 2014)("Although this court has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident -- or even three incidents -- do not suffice."); <u>Andrews v. Fowler</u>, 98 F.3d 1069, 1076 (8th Cir. 1996)(holding that two instances of misconduct "do not indicate a 'persistent and widespread' pattern of misconduct that amounts to a city custom or policy of overlooking police misconduct"); <u>Eugene v. Alief Indep. Sch. Dist.</u>, 65 F.3d 1299, 1304 (5th Cir. 1995)(holding that two incidents of alleged excessive force

are insufficient to show policy or custom). Other courts require only that the plaintiff plead that the policy exists, reasoning that the usual rule of pleading -- that courts are to accept all allegations as true at the motion-to-dismiss stage -- applies in the context of pleading a <u>Monell</u> policy, practice, or custom. <u>See</u> <u>Bartholomew v. Fischl</u>, 782 F.2d 1148, 1152-53 (3d Cir. 1986)(holding that a plaintiff who pleaded "a single instance of illegality" had nonetheless sufficiently "pleaded the existence of an official policy or official conduct sufficient to support municipal liability"); <u>Estate of Bailey by Oare v. York Cty.</u>, 768 F.2d 503, 506-07 (3d Cir. 1985)(holding that courts are to accept allegations in the complaint as being true, including <u>Monell</u> policies, and writing that "a federal court reviewing the sufficiency of a complaint has a limited task").[32] The Court does not believe a pre-determined numerical pleading standard is best, nor does the Court think that pleading the facts of the plaintiff's individual case, and adding the conclusion "policy, practice, or custom," suffice. The plaintiff must plead what he or she knows -- whether it is a number of incidents or some other evidence -- that renders plausible the plaintiff's conclusion that there is a policy, custom, or practice in place. If a police officer says there is a policy, that allegation may be enough to plausibly suggest that the policy exists, even if the plaintiff can plead only one specific instance of conduct. If a police officer says he or she was told to do something down at the stationhouse, that allegation, too, may be enough. The expectation is that the plaintiff must tell the Court at the outset, in the complaint, (i) why he or she thinks a policy exists -- alleging specific facts; and (ii) what he or she thinks the policy is. The Court will then decide whether (i) plausibly suggests (ii). The plaintiff must tell the Court, however, what he or she has, or else

---

[32]These cases -- in addition to being from the Third Circuit -- were decided well before <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), and <u>Ashcroft v. Iqbal</u>.

the Court will disregard the alleged policy as a naked conclusion. See Griego v. City of Albuquerque, 100 F. Supp. 3d 1192, 1213-16 (D.N.M. 2015)(Browning, J.).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. April 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economou, 438 U.S. 478, 504 (1978). See Bivens, 403 U.S. at 392. "The qualified immunity analysis is the same whether the claims are brought under *Bivens* or pursuant to the post-Civil War Civil Rights Acts." Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized by Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

Under § 1983 and Bivens, a plaintiff may seek money damages from government officials who have violated his or her constitutional or statutory rights. To ensure, however, that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 (1987), the officials may claim qualified immunity; so long as they have not

violated a "clearly established" right, the officials are shielded from personal liability, <u>Harlow v.</u> <u>Fitzgerald</u>, 457 U.S. at 818.

> That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

<u>Camreta v. Greene</u>, 563 U.S. 692, 705 (2011).

Qualified immunity shields government officials from liability where "'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009)(quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. <u>Saucier</u> <u>v. Katz</u>, 533 U.S. 194, 205 (2001). When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. <u>See</u> <u>Riggins v. Goodman</u>, 572 F.3d 1101, 1107 (10th Cir. 2009). <u>See</u> <u>also</u> <u>Pueblo of Pojoaque v. New</u> <u>Mexico</u>, 214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.).

**1.      <u>Procedural Approach to Qualified Immunity</u>.**

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense. In <u>Pearson v. Callahan</u>, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236. The Supreme Court also noted that, while no longer mandatory,

_Saucier v. Katz_' protocol -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial. See _Pearson v. Callahan_, 555 U.S. at 241. In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district courts and Courts of Appeals with "what may seem to be an essentially academic exercise." 555 U.S. at 237. The Supreme Court also recognizes that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." 555 U.S. at 241 (alterations omitted). See _Reichle v. Howards_, 566 U.S. 658, 664 (2012)(affirming _Pearson v. Callahan_'s procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior caselaw "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[33] the clearly established prong of the qualified immunity analysis: when (i) the first,

---

[33]In _Camreta v. Greene_, the Supreme Court, somewhat confusingly, states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts." _Camreta v. Greene_, 563 U.S. at 707. In _Kerns v. Bader_, 663 F.3d 1173 (10th Cir. 2011), the Tenth Circuit interpreted _Camreta v. Greene_ to mean that district courts are restricted from considering the violation prong in seven particular circumstances. See _Kerns v. Bader_, 663 F.3d 1173, 1180-81 (10th Cir. 2011). The Supreme Court, however, has not stressed the seven circumstances as mandatory. Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim." _District of Columbia v. Wesby_, 138 S. Ct. 577, 589 n.7 (2018). This language suggests that the inquiry is still discretionary, although the Court's discretion should be exercised carefully.

constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced that the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "'it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right.'" Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely to face challenges only in the qualified immunity context. Camreta v. Greene, 563 U.S. at 706-07. See Kerns v. Bader, 663 F.3d at 1181.[34] "Courts should think carefully before expending 'scarce judicial

---

[34]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering

a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84. See Sanchez v. Labate, 564 F. App'x 371, 372 (10th Cir. 2014)(unpublished)("If dispositive of the claim, we ordinarily need address only the second element of qualified immunity, that is, whether the law supporting a constitutional violation was clearly established." (citing Kerns v. Bader, 663 F.3d at 1180)). The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5.

The Tenth Circuit does not always undertake the qualified immunity analysis before the constitutional violation analysis. See, e.g., Savage v. Troutt, No. 18-6155, __F. App'x __, 2019 WL 2592558, at *5 (10th Cir. June 25, 2019)(unpublished); Rudnick v. Raemisch, No. 18-1260, __ F. App'x __, 2019 WL 2208288, at *2 (10th Cir. May 22, 2019)(unpublished); Serrano v. United States, 766 F. App'x 561, 565 (10th Cir. 2019). Since Kerns v. Bader, the Tenth Circuit has commented:

> Although it is within the court's sound discretion to determine which of the two elements to address first, *Pearson*, 555 U.S. at 236 . . . , "the Supreme Court has recently instructed that courts should proceed directly to, 'should address only,' and should deny relief exclusively based on the second element" in certain circumstances, *Kerns*, 663 F.3d at 1180 (quoting *Camreta v. Greene*, 563 U.S. [at] 707 . . . )).

Serrano v. United States, 766 F. App'x 561, 565 (10th Cir. 2019)(unpublished). In Serrano v. United States, the Tenth Circuit stated that the district court addressed only the constitutional violation prong after concluding that Serrano had not establish a constitutional violation and approved the district court's analysis, because the district court "also had to consider the reasonableness of the team's use of force for purposes of Serrano's [Federal Tort Claim Act, 28 U.S.C. §§ 1291, 1346, 1402, 2401-02, 2411-12, 2671-60,] claims." Serrano v. United States, 766 F. App'x at 565.

The Court believes, as a general rule, that the constitutional violation analysis should receive more attention. On remand from Kerns v. Bader, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by [the Tenth Circuit's] statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil

remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:

> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment."  The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test.  See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated

remote for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . . These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives). In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering. See 547 U.S. at 596-97. Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress. It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights. It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, No. 13-0183, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.). See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments). Since Kerns v. Board of Commissioners, the Court has also observed:

> The unfortunate result of Kerns v. Bader is that nuanced factual distinctions can create a near-insurmountable hurdle for plaintiffs attempting to overcome a qualified immunity defense without a precisely analogous precedent.

resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37).[35] See Camreta v. Greene, 563 U.S. at 707 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones."). The Tenth Circuit will remand a case to the district court for further consideration when the district court has given only cursory treatment to qualified immunity's clearly established prong. See Kerns v. Bader, 663 F.3d at 1182. See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1082-83.

### 2.    Clearly Established Rights.

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee would understand that what he or she did violated a right. See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007). "A clearly established right is generally defined as a right so thoroughly

---

A secondary consequence of Kerns v. Bader is that constitutional protections are unlikely to develop in the Tenth Circuit beyond where they stood at the time the case was decided.

A.M. ex rel. Youngers v. N.M. Dep't of Health, 108 F. Supp. 3d 963, 1029 (D.N.M. 2015)(Browning, J.).

[35]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely and thoroughly -- at whether there is a constitutional right and whether there is a violation. It is difficult to review the facts, rights, and alleged violations in the comparative cases without looking at the facts, rights, and alleged violations on the merits in the case before the Court. Pearson v. Callahan sounds like a good idea in theory, but it does not work well in practice. The clearly established prong is a comparison between the case before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare before the Court fully understands what it is comparing. In practice, Saucier v. Katz works better.

developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d at 923. "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202). The Supreme Court has clarified that qualified immunity's clearly established prong is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. at 741. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 566 U.S. at 664 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741). "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" Mullenix v. Luna, 136 S. Ct. 305, 308 (2015)(quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

"The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. The

Supreme Court has stated: "[T]he clearly established right must be defined with specificity." <u>City of Escondido v. Emmons</u>, 139 S. Ct. 500, 503 (2019). "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." <u>Ashcroft v. al-Kidd</u>, 563 U.S. at 742. "[T]the clearly established law must[, rather,] be 'particularized' to the facts of the case," <u>White v. Pauly</u>, 137 S. Ct. 548, 552 (2017)(quoting <u>Anderson v. Creighton</u>, 483 U.S. at 640); under this view of the clearly established prong, a court should inquire whether clearly established law makes improper the actions that the officer took in the case's circumstances, <u>see City of Escondido v. Emmons</u>, 139 S. Ct. at 503 (directing the Court of Appeals to ask, in excessive force cases, "whether clearly established law prohibited the officers from stopping and taking down a man in these circumstances"). <u>See Ziglar v. Abbasi</u>, 137 S. Ct. 1843, 1866 (2017)("[T]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" (quoting <u>Mullenix v. Luna</u>, 136 S. Ct. at 308)); <u>District of Columbia v. Wesby</u>, 138 S. Ct. 577, 591 (2018)("Tellingly, neither the panel majority nor the partygoers have identified a single precedent -- much less a controlling case or robust consensus of cases -- finding a Fourth Amendment violation under similar circumstances.").

The Tenth Circuit has, however, emphasized the Supreme Court's statements that, in some situations, "clearly established general rules of law can provide notice of the unlawfulness of an official's conduct in appropriate circumstances." <u>A.N. by & through Ponder v. Syling</u>, No. 18-2112, __ F.3d __, 2019 WL 2910798, at *4 (10th Cir. July 8, 2019). The Tenth Circuit has commented: "'[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers' that their conduct violates a constitutional right, and that such statements

provide the required notice when 'the unlawfulness' of their conduct is 'apparent' from the pre-existing law." A.N. by & through Ponder v. Syling, 2019 WL 2910798,  at *4 (quoting White v. Pauly, 137 S. Ct. at 552).  According to the Tenth Circuit, "In other words, '[g]eneral statements of the law can clearly establish a right for qualified immunity purposes if they apply with obvious clarity to the specific conduct in question.'  And this is so 'even though the very action in question has not previously been held unlawful.'" A.N. by & through Ponder v. Syling, 2019 WL 2910798, at *4 (first quoting Halley v. Huckaby, 902 F.3d 1136, 1149 (10th Cir. 2018), and then quoting Hope v. Pelzer, 536 U.S. 730 (2002)).  The Tenth Circuit has cautioned that such an approach is inappropriate where a case involves "relevant ambiguities." Colbruno v. Kessler, No. 18-1056, __ F.3d __, 2019 WL 2751434, at *6 (10th Cir. July 2, 2019)(citing Aldaba v. Pickens, 844 F.3d 870, 879 (10th Cir. 2016)("Aldaba II"); Wilson v. City of Lafayette, 510 F. App'x 775, 778 (10th Cir. 2013)(unpublished); Thomson v. Salt Lake Cty., 584 F.3d at 1315-17.

Although the Tenth Circuit has recognized a sliding scale for qualified immunity's clearly established inquiry, see Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("We have therefore adopted a sliding scale to determine when law is clearly established."), the Tenth Circuit may have since walked back its holding that a sliding-scale is the appropriate analysis, see Aldaba v. Pickens, 844 F.3d at 876.  In Aldaba II, the Tenth Circuit reconsidered its ruling from Aldaba v. Pickens, 777 F.3d 1148 (10th Cir. 2015)("Aldaba I"), that officers were entitled to qualified immunity after the Supreme Court vacated its decision in light of Mullenix v. Luna.  In concluding that it had previously erred in Aldaba I, the Tenth Circuit determined:

> We erred . . . by relying on excessive-force cases markedly different from this one.  Although we cited *Graham v. Connor*, 490 U.S. 386 (1989) to lead off our clearly-established-law discussion, we did not just repeat its general rule and conclude that the officers' conduct had violated it.  Instead, we turned to our

circuit's sliding-scale approach measuring degrees of egregiousness in affirming the denial of qualified immunity. We also relied on several cases resolving excessive-force claims. But none of those cases remotely involved a situation as here.

Aldaba II, 844 F.3d at 876. The Tenth Circuit further noted that its sliding-scale approach may have fallen out of favor, because the sliding-scale test relies, in part, on Hope v. Pelzer, 536 U.S. at 739-41, and the Supreme Court's most recent qualified immunity decisions do not invoke that case. See Aldaba II, 844 F.3d at 874 n.1. See also Lowe v. Raemisch, 864 F.3d 1205, 1211 n.10 (10th Cir. 2017). The Tenth Circuit explained:

> To show clearly established law, the *Hope* Court did not require earlier cases with "fundamentally similar" facts, noting that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741 . . . . This calls to mind our sliding-scale approach measuring the egregiousness of conduct. *See Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012). But the Supreme Court has vacated our opinion here and remanded for us to reconsider our opinion in view of *Mullenix*, which reversed the [United States Court of Appeals for the] Fifth Circuit after finding that the cases it relied on were "simply too factually distinct to speak clearly to the specific circumstances here." 136 S. Ct. at 312. We also note that the majority opinion in *Mullenix* does not cite *Hope v. Pelzer* . . . . As can happen over time, the Supreme Court might be emphasizing different portions of its earlier decisions.

Aldaba II, 844 F.3d at 874 n.1. Since Aldaba II, the Supreme Court has reversed, per curiam, another Tenth Circuit qualified immunity decision. See White v. Pauly, 137 S. Ct. at 551. In White v. Pauly, the Supreme Court explained: "The panel majority misunderstood the 'clearly established' analysis: It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment." White v. Pauly, 137 S. Ct. at 552.[36] The Supreme Court's per curiam reversals appear to have the Tenth

---

[36]The Supreme Court signals to the lower courts that a factually identical or a highly similar factual case is required for the law to be clearly established, and the Tenth Circuit is now sending

those signals to the district courts, see Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x 552, 556 (10th Cir. Sept. 8, 2017)(unpublished)(reversing the Court's judgment that the case should proceed where a deceased plaintiff was backing away from the police and was not raising his gun when shot, because "the parties do not cite, nor could we find, any Supreme Court or Tenth Circuit case that is sufficiently close factually to the circumstances presented here to establish clearly the Fourth Amendment law that applies"). Factually identical or highly similar factual cases are not, however, the way the real world works. Cases differ. Many cases have so many facts that are unlikely to ever occur again in a significantly similar way. See York v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established prong] does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity wherever we have a new fact pattern."). The Supreme Court's view of the clearly established prong assumes that officers are routinely reading Supreme Court and Tenth Circuit opinions in their spare time, carefully comparing the facts in these qualified immunity cases with the circumstances they confront in their day-to-day police work. It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that police officers are endeavoring to parse opinions. It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case. It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?" Thus, when the Supreme Court grounds its clearly-established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018), yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting). The Court concludes that the Supreme Court is doing the latter, crafting its recent qualified immunity jurisprudence to effectively eliminate § 1983 claims against state actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong. See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

The Court disagrees with the Supreme Court's approach. The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy. As the Cato Institute noted in a recent amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based." Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2, White v. Pauly, 137 S. Ct. 548 (2017)(No. 17-1078)("Cato Brief"). "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials." Cato Brief at 2. "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of

Circuit stepping lightly around qualified immunity's clearly established prong, see, e.g., Choate v. Huff, No. 18-3157, 2019 WL 3228928, at *2 (10th Cir. July 18, 2019)(unpublished); Perry v. Durborow, 892 F.3d 1116, 1123-27 (10th Cir. 2018); Rife v. Jefferson, 742 F. App'x 377, 381-88 (10th Cir. 2018)(unpublished); Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x 552, 555-56 (10th Cir. 2017)(unpublished); Brown v. City of Colo. Springs, 709 F. App'x 906, 915 (10th Cir. 2017)(unpublished); Aldaba II, 844 F.3d at 874, and willing to reverse district court decisions should the district court conclude that the law is clearly established, but see A.N. by & through Ponder v. Syling, 2019 WL 2910798, at *5 (concluding that the publication of information about an arrested and detained juvenile violated clearly established equal protection law prohibited treating the juvenile differently than similarly situated juveniles); Matthews v. Bergdorf, 889 F.3d 1136, 1149-50 (10th Cir. 2018)(holding that a child caseworker

---

qualified immunity is unmoored from any lawful justification." Cato Brief at 2. See generally William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect). Further, as the Honorable Clarence Thomas, Associate Justice for the Supreme Court, has argued, because the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in 'interpret[ing] the intent of Congress in enacting' the Act." Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(quoting Malley v. Briggs, 475 U.S. at 342). "Our qualified immunity precedents instead represent precisely the sort of 'freewheeling policy choice[s]' that we have previously disclaimed the power to make." Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(quoting Rehberg v. Paulk, 566 U.S. 356,363 (2012)). The judiciary should be true to § 1983 as Congress wrote it.

Moreover, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive. If the citizens of New Mexico decide that state actors used excessive force or were deliberately indifferent, the verdict should stand, not be set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision. Finally, to always decide the clearly established prong first and then to always say that the law is not clearly established could be stunting the development of constitutional law. See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015).

was not entitled to qualified immunity, because a caseworker would know that "child abuse and neglect allegations might give rise to constitutional liability under the special relationship exception"); McCoy v. Meyers, 887 F.3d 1034, 1052-53 (10th Cir. 2018)(concluding that there was clearly established law even though the three decisions invoked to satisfy that prong were not "factually identical to this case," because those cases "nevertheless made it clear that the use of force on effectively subdued individuals violates the Fourth Amendment").

## LAW REGARDING FOURTH AMENDMENT SEIZURES

For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests. See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000). See also Dorato v. Smith, 108 F. Supp. 3d 1064, 1118 (D.N.M. 2015)(Browning, J.)(noting that investigative stops are seizures); United States v. Young, 347 F. Supp. 3d 747, 770 (D.N.M. 2018)(Browning, J.)(describing an arrest as a seizure). "A police officer may seize someone either by physical force or a show of authority." United States v. Roberson, 864 F.3d 1118, 1121 (10th Cir. 2017)(citing United States v. Salazar, 609 F.3d 1059, 1064 (10th Cir. 2010)). "[W]hen an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submits to the assertion of authority.'" United States v. Salazar, 609 F.3d at 1064 (quoting California v. Hodari D., 499 U.S. 621, 626 (1991)). "'[T]he test for existence of a show of authority is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.'" United States v. Salazar, 609 F.3d at 1064 (quoting California v. Hodari D., 499 U.S. at

628).  "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." United States v. Ojeda-Ramos, 455 F.3d 1178, 1183 (10th Cir. 2006)(quoting United States v. Drayton, 536 U.S. 194, 201 (2002)).  See California v. Hodari D., 499 U.S. at 627-28 ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980))).  The standard for submission is also objective, see United States v. Salazar, 609 F.3d at 1064 (citing United States v. Cardoza, 129 F.3d 6, 14 n.4 (1st Cir. 1997)), but "[s]ubmission 'requires, at minimum, that a suspect manifest compliance with police orders,'" United States v. Roberson, 864 F.3d at 1122 (quoting United States v. Mosley, 743 F.3d 1317, 1326 (10th Cir. 2014)).

### 1.  Consensual Encounters.

A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally may "go to a person's home to interview him."  United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990).  "It is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business," 1 Wayne LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 475 (3d ed. 1996).

### 2.  Investigative Stops.

In United States v. King, 990 F.2d 1552 (10th Cir. 1993), the Tenth Circuit noted: "Terry was the first case to recognize that 'the Fourth Amendment governs "seizures" of the person . . . [other than] arrests' and created a 'narrowly drawn' exception to the probable cause

requirement for lesser government intrusions into an individual's liberty." United States v. King, 990 F.2d at 1557 (first quoting Terry v. Ohio, 392 U.S. 1, 16 (1968); and then quoting Terry v. Ohio, 392 U.S. at 27). The Tenth Circuit has recognized that, in Terry v. Ohio, the Supreme Court identified two police actions: (i) an investigative detention -- a "stop"; and (ii) a protective search -- a "frisk." United States v. King, 990 F.2d at 1557 (citing United States v. Sokolow, 490 U.S. 1, 7 (1989); Adams v. Williams, 407 U.S. 143, 147-48 (1972)). The Tenth Circuit explained:

> Terry has come to stand for two distinct propositions -- an investigative detention ("stop") in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, . . . and a protective search ("frisk") which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.

United States v. King, 990 F.2d at 1557. When evaluating either of these actions, a court asks whether the action was reasonable under the Fourth Amendment. See United States v. Wilson, 96 F. App'x 640, 643 (10th Cir. 2004)(unpublished); United States v. King, 990 F.2d at 1557.

### a.        Investigative Detentions and Reasonable Suspicion.

A police-citizen encounter that is not consensual may be a constitutional investigative detention. See Dorato v. Smith, 108 F. Supp. 3d at 1118. An investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information." Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. at 146). Such brief investigative detentions must meet two distinct requirements to be "reasonable" under the Fourth Amendment. Dorato v. Smith, 108 F. Supp. 3d at 1118. First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Second, the investigative detention that

follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct'; he or she simply must possess 'some minimal level of objective justification' for making the stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)). Information "falling 'considerably short' of a preponderance standard" will meet the standard for reasonable suspicion. United States v. Winder, 557 F.3d at 1134 (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)). See Illinois v. Wardlow, 528 U.S. 119, 123 (2000)(noting that "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence").

In United States v. Johnson, 364 F.3d 1185 (10th Cir. 2004), the Tenth Circuit held that an officer had reasonable suspicion to continue questioning and to frisk a suspect after: (i) the officer had responded to a call from a citizen who gave his telephone number, and gave a detailed and accurate description of possible criminal activity and of the suspect; (ii) the contact occurred in Albuquerque's highest-crime area; and (iii) the suspect displayed nervous behavior. See 364 F.3d at 1194. The Tenth Circuit noted that the officer's experience and training allowed him to make inferences, based on a combination of the surrounding circumstances, that criminal activity was afoot. See 364 F.3d at 1194 ("His suspicions were particularized to [the suspect], and were based on how his training and experience taught him to interpret a number of objectively reasonable

details."). While many of the factors that the Tenth Circuit considered would not, without more, have given rise to reasonable suspicion, the combination of circumstances was sufficient. See 364 F.3d at 1193 (noting that the district court had erred, because "[a]ll of these factors, mitigating and aggravating, should have been analyzed as part of the totality of the circumstances faced by [the officer] at the inception of the detention").

In United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009)(unpublished), the police officer observed a young girl walking down the street at night. See 355 F. App'x at 227-28. A truck pulled alongside the girl, the driver of the truck and the girl spoke briefly, then the truck drove ahead, and the girl continued on her walk. See 355 F. App'x at 228. Rather than leave, however, the truck drove ahead and parked with its lights off at a dark spot on the road by which the girl would have to walk. See 355 F. App'x at 228. The officer spoke to the girl, who seemed unconcerned and told him that the man in the truck had asked only if she needed a ride; she had refused. See 355 F. App'x at 228. Not investigating any particular crime or suspected crime, and admittedly acting on a "hunch," the officer turned on his emergency lights and pulled behind the truck. 355 F. App'x at 228, 229. Upon talking to the truck's driver, Ceballos, the officer discovered that Ceballos' breath smelled of alcohol, that he did not have a driver's license, and that he had a gun and other items in his vehicle. See 355 F. App'x at 227-29. The Tenth Circuit concluded that the facts available to the officer would have led a reasonable officer to conclude that reasonable suspicion existed and that the officer's "subjective characterization of his actions is irrelevant." 355 F. App'x at 229. The Tenth Circuit explained, in an opinion that the Honorable Michael R. Murphy, now-Senior United States Circuit Judge for the Tenth Circuit, wrote and the Honorable Mary Beck Briscoe, United States Circuit Judge for the Tenth Circuit, and the

Honorable Robert H. McWilliams, the late United States Circuit Judge for the Tenth Circuit,

joined:

> A review of the totality of the circumstances shows Gallegos was not acting on an unparticularized hunch; during his testimony he articulated specific facts that caused him to suspect Ceballos intended to assault or abduct the teenage pedestrian. Specifically, at the time Gallegos initiated the traffic stop, he had observed Ceballos slow his vehicle as he passed a teenage girl walking alone late at night. He then observed Ceballos alter his route by making a U-turn and following the girl down a narrow, nearly deserted residential street. Ceballos pulled alongside the girl, who he did not know, and asked her if she wanted a ride. She refused, telling him she lived up the street. Ceballos then drove further down the road, pulled into a driveway as if to turn around and return to the main road, but instead backed out and drove a few feet further east, in the same direction the girl was walking. He parked in a dark location and turned off his lights.
>
> . . . .
>
> We agree with the Government that Officer Gallegos had reasonable suspicion to stop and detain Ceballos. Ceballos showed an interest in a teenage girl he did not know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home. The facts found by the district court, viewed in totality, amply support the constitutionality of the investigative detention.

355 F. App'x at 229. The Tenth Circuit did not require the officer to identify the particular crime

of which the officer had reasonable suspicion or even to acknowledge having reasonable suspicion.

See 355 F. App'x at 229. The Tenth Circuit was content to find that a reasonable officer would

have reasonable suspicion that "Ceballos intended to assault or abduct the teenage pedestrian."

355 F. App'x at 229. The Tenth Circuit demanded only that an officer have facts from which a

reasonable officer could form a reasonable suspicion that criminal conduct was occurring or was

about to occur. See 355 F. App'x at 229.

In United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012)(unpublished), the Tenth

Circuit found reasonable suspicion based upon an officer's knowledge of the defendant's

> (1) gang tattoo; (2) presence in a high crime area; (3) abrupt move away from the officer as soon as [the defendant] saw [the officer]; (4) glancing about in a manner consistent with an attempt to find a route to flee; and, (5) approach to [a private] home's back door without conversing with the residents visible inside.

483 F. App'x at 417.  At the district court level, in ruling on the motion to suppress, the Honorable Martha A. Vázquez, United States District Court Judge for the District of New Mexico, had concluded that, because the defendant's conduct in standing outside a private residence and looking in was "'consistent with the most benign of conduct, including a visit to a friend's house or calling upon a neighbor for assistance,'" and that the officer did not have reasonable suspicion at the time of the stop and should have waited longer to rule out innocent conduct.  483 F. App'x at 418 (quoting United States v. Aragones, No. CR 10-2453 MV, 2011 WL 13174481, at *19 (D.N.M. June 10, 2011)(Vázquez, J.)).  The Tenth Circuit disagreed, however, stating: "The problem is that conduct giving rise to reasonable suspicion sufficient to support an investigative detention can be -- and often is -- consistent with innocent behavior."  United States v. Aragones, 483 F. App'x at 418.  The Tenth Circuit noted that, moreover, the defendant's conduct was not necessarily innocent, because an Albuquerque public ordinance prohibits "[e]ntering upon any private property and looking into any occupied dwelling without the consent of the occupant or owner of the dwelling."  483 F. App'x at 417 (quoting Albuquerque, N.M., Ordinance § 12-2-21(B)).  The Tenth Circuit, thus, reversed Judge Vázquez' decision, disagreeing with her conclusion that the officer lacked reasonable suspicion of unlawful activity, and concluded that "a reasonable officer could have suspected that [the defendant] wasn't a welcome guest and did not have consent to look into the home."  483 F. App'x at 417.

b. **Frisks.**

A "frisk" is "a protective search . . . which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection." United States v. King, 990 F.2d at 1557 (citing Adams v. Williams, 407 U.S. at 147-48)). An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry v. Ohio, 392 U.S. at 29. In evaluating the validity of the stop-and-frisk, a court should consider the totality of the circumstances. See Florida v. Bostick, 501 U.S. 429, 436 (1991).

c. **Traffic Stops.**

"'A traffic stop is a seizure within the meaning of the Fourth Amendment . . . .'" United States v. Holt, 264 F.3d at 1220 (quoting United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998)). "'For the duration of a traffic stop, . . . a police officer effectively seizes everyone in the vehicle, the driver and all passengers.'" United States v. White, 584 F.3d 935, 945 (10th Cir. 2009)(quoting Arizona v. Johnson, 555 U.S. 323, 327 (2009)). "This seizure implicates a passenger's Fourth Amendment interests to the same degree as the driver's." United States v. Wilson, 96 F. App'x at 643 (citing United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989)). "Therefore, both the driver and passenger have standing to challenge the constitutionality of the

initial stop." United States v. White, 584 F.3d at 945. See United States v. Wilson, 96 F. App'x at 643 ("Wilson does not assert any such interest in the truck or its contents[;] [n]evertheless, Wilson may, as he does here, 'contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention.'" (quoting United States v. Nava-Ramirez, 210 F.3d at 1131; and citing United States v. Gama-Bastidas, 142 F.3d 1233, 1239 (10th Cir. 1998); United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996))). The Tenth Circuit "reject[s] any notion that a vehicular stop detains for Fourth Amendment purposes only the driver simply because the passenger may be free to depart." United States v. Erwin, 875 F.2d at 270.

The Terry v. Ohio framework applies whether the traffic stop is based on probable cause or reasonable suspicion. See United States v. Holt, 264 F.3d at 1230. "[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" Kentucky v. King, 563 U.S. 452, 459 (2011)(quoting Brigham City v. Stuart, 547 U.S. at 403), courts

> assess the reasonableness of a routine traffic stop under the principles laid out for investigative detentions in Terry v. Ohio, 392 U.S. 1 (1968), considering "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."

United States v. Wilson, 96 F. App'x at 643 (quoting United States v. Holt, 264 F.3d at 1220). A court must examine "both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d at 1230, "keeping in mind that an officer may extend the duration and scope of the initial detention based on 'an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring,'" United States v. Wilson, 96 F. App'x at 643 (quoting United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001)). "When the stop is extended based on reasonable suspicion, the further detention must, like the original traffic stop, 'be temporary,

lasting no longer than necessary to effectuate the purpose of the [further detention], and the scope of the [further] detention must be carefully tailored to its underlying justification.'" United States v. Wilson, 96 F. App'x at 644 (alterations in original)(quoting United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997)). "A traffic stop is justified at its inception if an officer has . . . reasonable articulable suspicion that a particular motorist has violated any of the traffic . . . regulations of the jurisdiction." United States v. Winder, 557 F.3d at 1134.

### 3.     **Arrests.**

An arrest is a seizure that is "characterized by highly intrusive or lengthy search or detention," Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)); a police-citizen encounter that goes beyond the limits of a stop under Terry v. Ohio is an arrest, see United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent."). The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest.[37]  United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994).  See Florida v. Royer, 460 U.S. 491, 499 (1983).

---

[37]The use of handcuffs, however, does not always elevate a detention into an arrest. See United States v. Albert, 579 F.3d 1188, 1195 (10th Cir. 2009)("[W]e have approved the use of handcuffs in the context of a Terry stop."); Pierre-Louis v. Schake, No. CIV 12-0527 JB/RHS, 2014 WL 1954783, at *44-49 (D.N.M. April 30, 2014)(Browning, J.)(concluding that the defendant police officer acted reasonably in handcuffing the plaintiff, whom he suspected had recently assaulted a person on the side of the road by threatening him with a gun); United States v. Reyes-Vencomo, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning J.)("The use of handcuffs . . . does not always elevate a detention into an arrest.").

"Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause."  United States v. Rodriguez, 836 F. Supp. 2d 1258, 1288 (D.N.M. 2011)(Browning, J.).      See  Wilson v. Jara,  866  F. Supp. 2d  1270,  1292  (D.N.M. 2011)(Browning, J.)("Probable cause must support an arrest, 'characterized by highly intrusive or lengthy search or detention.'" (quoting Oliver v. Woods, 209 F.3d at 1185)), aff'd, 512 F. App'x 841 (10th Cir. 2013)(unpublished).  "Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'"  United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001); and citing Draper v. United States, 358 U.S. 307, 313 (1959)).  Although "[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require 'more than mere suspicion.'"  United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(quoting United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir. 1998)).  The Supreme Court has made the following distinction between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio, and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard.  See Beck v. Ohio, 379 U.S. 89, 96 (1964).  "The subjective belief of an individual officer as to whether there was probable cause

for making an arrest is not dispositive." United States v. Valenzuela, 365 F.3d at 896-97 (citing Florida v. Royer, 460 U.S. at 507; United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir. 2002)). Thus, the primary consideration is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the 'information possessed by the [arresting] offic[er].'" Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(alterations in Olsen v. Layton Hills Mall)(quoting Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)).

### a.   **When a Detention Becomes an Arrest.**

The Tenth Circuit has held that a police-citizen encounter which goes beyond an investigative stop's limits is an arrest that probable cause or consent must support to be valid. See United States v. Perdue, 8 F.3d at 1462 ("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent."). "Terry stops must be limited in scope to the justification for the stop . . . [and] the intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the circumstances." United States v. Perdue, 8 F.3d at 1462. "The government has the burden of demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'" United States v. Perdue, 8 F.3d at 1462 (quoting Florida v. Royer, 460 U.S. at 500).

This Court has also engaged in the balancing act of deciding when a detention becomes an arrest. In United States v. Perea, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J.), aff'd sub nom. United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005)(unpublished), the Court had to determine whether the police transformed the investigative detention into an arrest

by drawing their weapons on the suspect, handcuffing him, and placing him in the back of a police car.  See United States v. Perea, 374 F. Supp. 2d at 976.  In that case, the Court determined that such measures were appropriate and did not elevate the investigative detention to the level of an arrest.  See 374 F. Supp. 2d at 976.  The Court recognized that, "[i]n 'most scenarios,' when officers effectuate what would otherwise be considered a Terry stop by pointing guns at a suspect, that stop is elevated to an arrest, which requires probable cause."  374 F. Supp. 2d at 974 (quoting United States v. Perdue, at 1463).  See United States v. Burciaga-Burciaga, 147 F. App'x at 730 (affirming the Court's determination in United States v. Perea that the officers had reasonable suspicion to believe that the suspect might be armed and dangerous, justifying the officers' use of firearms and not transforming the vehicle stop into a formal arrest requiring probable cause); United States v. Gama-Bastidas, 142 F.3d at 1240 ("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'" (quoting United States v. Perdue, 8 F.3d at 1462)).

There "exist[s], however, a limited set of circumstances in which officers may draw their guns at a suspect without transforming the stop into an arrest.  'The use of guns in connection with a stop is permissible where the police reasonably believe the weapons are necessary for their protection.'"  United States v. Perea, 374 F. Supp. 2d at 974 (quoting United States v. Perdue, at 1462).  See United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(upholding reasonableness of stop when officers detained the defendant at gunpoint, and placed him in handcuffs where suspect had threatened to kill someone and was pounding interior of truck with his fists); United States v. Lechuga, 925 F.2d 1035, 1040 (7th Cir. 1991)(holding that the officer's "drawing his gun but keeping it pointed to the street" was not "unreasonably intrusive"); United

States v. Alexander, 907 F.2d 269, 272-73 (2d Cir. 1990)(holding that the law enforcement officers did not convert the stop into an arrest by "unholstering their guns and frisking" the defendant when they suspected that the defendant had "just completed a narcotics purchase," there were a number of "innocent bystanders on the crowded city street," and stopping a vehicle "is especially hazardous and supports the need for added safeguards").   Similarly, there are circumstances in which a seizure is not an arrest merely because the subject of the detention is placed in handcuffs. See United States v. Merkley, 988 F.2d at 1064; United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992)("Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a Terry stop."); United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989)("The handcuffing of Hastamorir constituted a Terry stop, and was a reasonable action designed to provide for the safety of the agents.").   United States v. Perea was one of those unique cases, because the police had reasonable cause to believe that the person whom they were detaining was the suspect whom they sought to arrest -- a man wanted for murder who, it was believed, might be armed and dangerous.  See 374 F. Supp. 2d at 976.  The Tenth Circuit affirmed the Court's determination that the stop was not an arrest:

> The officers' conduct during the felony stop was appropriate in relation to the perceived threat.  The measures taken during a Terry stop must be "reasonably related in scope to the circumstances which justified the interference in the first place" and may not go beyond what is necessary for officer safety.  United States v. King, 990 F.2d 1552, 1563 (10th Cir. 1993)(quoting Terry v. Ohio, 392 U.S. 1, 20 . . . (1968)).  The felony stop was justified by suspicion that someone in the Escalade might have a gun, or at least was dangerous.  The officers displayed their weapons only as long as necessary to ensure that the vehicle and its occupants posed no threat.   The officers put their guns away as soon as they handcuffed Mr. Burciaga, placed him in the back of a police car, and confirmed that no one else was in the car.

United States v. Burciaga-Burciaga, 147 F. App'x at 730.

### b. Officers Have a Duty to Investigate Easily Accessible Evidence Before Making an Arrest.

"[T]he Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." Romero v. Fay, 45 F.3d at 1476-77. Police officers "may not ignore easily accessible evidence and thereby delegate their duty to investigate [to others]." Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259 (10th Cir. 1998). However, "[o]nce probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect." Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *49 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Cortez v. McCauley, 478 F.3d 1108, 1121 n.18 (10th Cir. 2007)).

In Romero v. Fay, the Tenth Circuit confronted the issue of when an officer must conduct further investigation before arresting an individual. In that case, law enforcement officers interviewed two individuals -- Stella Gutierrez and Manuel Duran -- who implicated the plaintiff in a murder. See 45 F.3d at 1474. Approximately four hours later, without conducting additional investigation or obtaining a warrant, an officer arrested the plaintiff for murder. See 45 F.3d at 1474. After he was taken into custody, the plaintiff told the officer that he was innocent and that he had an alibi. See 45 F.3d at 1474. The plaintiff stated that three individuals would establish that he was asleep at home when the murder occurred. See 45 F.3d at 1474. The officer refused the plaintiff's offer of names of alibi witnesses and said that the witnesses "were of little significance because they would lie to protect" the plaintiff. 45 F.3d at 1474. The officer never interviewed the alibi witnesses. See 45 F.3d at 1474. The plaintiff was incarcerated for three months before the government dismissed the case and he was released. See 45 F.3d at 1474.

The plaintiff brought a 42 U.S.C. § 1983 action for, among other things, violations of his Fourth Amendment rights. See Romero v. Fay, 45 F.3d at 1474. The plaintiff argued that, regardless whether the officers' interviews of Gutierrez and of Duran established probable cause, under clearly established law, a reasonable officer would have investigated his alibi witnesses before arresting him. See 45 F.3d at 1476. The Tenth Circuit disagreed, in an opinion that the Honorable Bobby R. Baldock, now-Senior United States Circuit Judge for the Tenth Circuit, authored, and the Honorable Deanall Reece Tacha, former-United States Circuit Judge for the Tenth Circuit, and the Honorable Monroe G. McKay, Senior United States Circuit Judge for the Tenth Circuit joined. See 45 F.3d at 1476. The Tenth Circuit stated that the Fourth Amendment requires officers to only "reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless detention." 45 F.3d at 1476-77. The Tenth Circuit determined:

> Once [the defendant] concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause. Thus, [the defendant's] failure to investigate Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

In Baptiste v. J.C. Penney Co., officers arrested the plaintiff for shoplifting after: (i) receiving reports from store security guards that they witnessed her shoplifting on store surveillance; and (ii) watching a video of the surveillance footage on which the security officers relied in reaching their conclusion -- which supported the plaintiff's story that she had not stolen anything. See 147 F.3d at 1254-55. The Tenth Circuit, in an opinion that Judge Murphy, authored, and the Honorable Stephen Hale Anderson, Senior United States Circuit Judge for the Tenth

Circuit, and the Honorable James Kenneth Logan, the late United States Circuit Judge for the Tenth Circuit joined, concluded that qualified immunity did not apply.  See 147 F.3d at 1257-59.  The Tenth Circuit asserted that the security guards' allegations were based solely on the plaintiff's conduct, "which was memorialized in its entirety on the videotape."  147 F.3d at 1257.  The Tenth Circuit stated that the police officers "viewed the very same conduct on the videotape, which this court has concluded failed to establish probable cause."  147 F.3d at 1257.  The Tenth Circuit held that, consequently, "it was . . . not reasonable for the officers to rely on the security guards' allegations."  147 F.3d at 1257.  The Tenth Circuit added that

> police officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation. . . .  Here, [the defendants] did conduct some investigation by viewing the videotape and questioning [the plaintiff].  They argue, however, that they should be allowed to rely on the statement of the guards for probable cause to arrest.  Because the officers knew that the allegations of the guards were based on observations of conduct captured and preserved on an available videotape, to credit this argument would allow a wholesale delegation of police officers' duty to investigate and make an independent probable cause determination.

Baptiste v. J.C. Penney Co., 147 F.3d at 1259.

In Cortez v. McCauley, officers responded to a call from a nurse stating that a woman had brought her two-year-old daughter to the hospital asserting that the child had complained that her babysitter's boyfriend had molested her.  See 478 F.3d at 1113.  Without (i) interviewing the girl, her mother, the nurse, or the attending physician; (ii) inspecting the girl's clothing for signs of sexual assault; or (iii) waiting for the results of the child's medical examination, the officers arrested the boyfriend.  See 478 F.3d at 1113.  The Tenth Circuit, in an en banc opinion that the Honorable Paul Joseph Kelly Jr., now-Senior United States Circuit Judge for the Tenth Circuit, authored, explained that,

whether we view it as a need for more pre-arrest investigation because of insufficient information, . . . or inadequate corroboration, what the officers had fell short of reasonably trustworthy information indicating that a crime had been committed by [the defendant].  See BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986)("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest.  Reasonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place.").  Based on the facts above, [the defendant] was arrested without probable cause.

Cortez v. McCauley, 478 F.3d at 1116 (footnotes and citations omitted).  The Tenth Circuit further

held that

it was established law that "the probable cause standard of the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention."  Romero, 45 F.3d at 1476-77 (footnote omitted); see also Baptiste v. J.C. Penney, Co., 147 F.3d . . . [at] 1259 . . . ("[P]olice officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation.").  In the present case, witnesses were readily available for interviews, physical evidence was available, and a medical diagnosis was forthcoming.  Defendants, however, . . . conducted no investigation.  Instead, the Defendants relied on the flimsiest of information conveyed by a telephone call.

Cortez v. McCauley, 478 F.3d at 1117-18 (footnotes omitted).  The Tenth Circuit concluded,

therefore, that qualified immunity did not apply.  See Cortez v. McCauley, 478 F.3d at 1118-22.

In Garcia v. Casuas, a detective with the City of Rio Rancho, New Mexico -- Monica

Casuas -- arrested the plaintiff, Mitchell Garcia, for sexual penetration of a minor.  See 2011 WL

7444745, at *8.  The plaintiff was ultimately exonerated, and subsequently filed a § 1983 claim

against the arresting officer and Rio Rancho for, among other things, unlawfully arresting him in

violation of his Fourth Amendment rights.  See 2011 WL 7444745, at *12.  The Court concluded

that the officer had probable cause to arrest the plaintiff based on information gleaned from other

officers' interviews of the plaintiff, the victim -- K.J., the victim's mother -- Audrey Odom, and a

witness at the scene on the night of the incident -- Jennifer Katz.  See 2011 WL 7444745, at *43-46.  Garcia argued that, by failing to re-interview Odom and Katz, and instead choosing to rely on the other officers' interviews of them, Casuas "fail[ed] to interview readily accessible witnesses." 2011 WL 7444745, at *15.  Garcia contended that, moreover, Casuas should have known that failing to personally interview him, Odom, Katz, K.J., and Katz' neighbors before arresting him violated his constitutional rights.  See 2011 WL 7444745, at *15.  Garcia argued that, had Casuas interviewed him before arresting him, she would have discovered Katz' and Odom's motivations to lie.  See 2011 WL 7444745, at *15.

Finding that the defendant's failure to conduct further investigation before arresting the plaintiff did not constitute a Fourth Amendment violation, the Court explained:

> Although Garcia cites Romero v. Fay and cases from several other circuits for the general proposition that officers must interview witnesses at the scene, Garcia points to no case law which would establish that, after the officers at the scene have interviewed witnesses, the Constitution requires the investigating detective to interview those witnesses again. . . . Here, the responding police officers . . . interviewed every adult alleged to be involved in the incident and briefly spoke with K.J. . . .

> Garcia also states that, if Casuas had investigated further, she would have known that there was no semen on the bedding, and she would have discovered Katz' and Odom's motivation if she spoke to him. . . . The Tenth Circuit's discussion of probable cause in Romero v. Fay also undercuts Garcia's assertion that Casuas was required to do more after [K.J.'s interview] solidified the existence of probable cause.  In Romero v. Fay, the Tenth Circuit held:

>> Plaintiff contends that regardless of whether the statements by Duran and Guiterrez supplied probable cause for Defendant Fay to arrest Plaintiff, under clearly established law a reasonable police officer would have investigated his alibi witnesses before arresting him, and the exculpatory information possessed by them would have negated the probable cause to arrest.  We disagree.

45 F.3d at 1466. In <u>Baptiste v. J.C. Penney Co.</u>, the Tenth Circuit also recognized that "officers are not required to conduct full investigations before making an arrest." 147 F.3d at 1257 n.8.

. . . .

These cases establish that Casuas was not required to speak to [Katz' neighbors], because they did not appear to be material witnesses. Garcia has made no allegations and presented no facts suggesting that the neighbors were ever around K.J. Garcia has also not presented any facts demonstrating that [the neighbors] have shed light on the motivations of Katz or Odom. Garcia only speculates that Casuas *might* have found something. An officer is not required to exhaust every possible lead to satisfy the Fourth Amendment. In <u>Romero v. Fay</u>, the Tenth Circuit held:

> Once Defendant Fay concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause. Thus, Defendant Fay's failure to investigation Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

. . . .

Furthermore, Garcia's other statements belie the fact that, if Casuas had interviewed him before his arrest, he would have explained that Katz and Odom were biased or trying to frame him. When [another officer] interviewed Garcia on the night of the incident, he asked Garcia whether Katz and Odom had a reason to beat him up, and informed him that he was being accused of choking K.J. . . . Garcia responded that Katz and Odom had no reason to beat him up, and denied hurting K.J., never mentioning that Katz and Odom might have beat him up or encouraged K.J. to accuse him because they were romantically interested in him. . . . . During his interrogation after his arrest, Garcia never mentioned that Katz and Odom might have improper motives. The cases that Garcia cites establish only that the police may not ignore available material witnesses. Here, Thacker spoke with Garcia; Garcia denied doing wrong and never related that he may have been framed. Garcia presents no cases, and the Court could find none, suggesting that Casuas was required to repeat the steps other officers had already taken and re-interview all witnesses. . . . Finally, waiting for the laboratory results would not have substantially altered the probable-cause determination, because, while the New Mexico Department of Public Safety Forensic Laboratory found no semen, it

does not have the capabilities to detect the presence of urine in or on a substance . . . .

Once probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect. See Cortez v. McCauley, 478 F.3d at 1121 n.18 (citing Baker v. McCollan, 443 U.S. 137, 145-46 (1979)). The Court has already determined that Casuas had probable cause to arrest Garcia and that there was a substantial basis for the issuance of the arrest warrant after the safe-house interview. Casuas was not required to investigate further after that determination.

Garcia v. Casuas, 2011 WL 7444745, at *47-49 (alterations added).

## RELEVANT FOURTH AMENDMENT LAW

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Fourth Amendment rights are enforceable against state actors through the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States. See Mapp v. Ohio, 367 U.S. 643, 655 (1961)("Since the Fourth Amendment's right of privacy has been declared enforceable against the States through the Due Process Clause of the Fourteenth, it is enforceable against them by the same sanction of exclusion as used against the Federal Government."); United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1225 n.1 (10th Cir. 2008)("[T]he Fourth Amendment applies against state law enforcement officials as incorporated through the Due Process Clause of the Fourteenth Amendment."). "Not all searches require a warrant. The hallmark of the Fourth Amendment is reasonableness." United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.). See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("'[T]he ultimate touchstone of the Fourth Amendment is reasonableness.'" (quoting Brigham City v. Stuart, 547 U.S. at 403)). Cf. United States v. Sharpe, 470 U.S. 675, 691 (1985)(Marshall, J., concurring)(underlining that investigatory stops "do . . . not constitute the sort of arrest that the

Constitution requires be made upon probable cause," because of their lower degree of intrusiveness); United States v. Brignoni-Ponce, 422 U.S. 873, 881-82 (1975)(discussing the importance of allowing officers with reasonable suspicion of criminal activity to conduct a brief investigative stop); Terry v. Ohio, 392 U.S. at 27 (allowing officers who have "reason to believe" a person is armed and dangerous to stop the person, and to conduct a brief protective search for weapons). The Supreme Court has stated that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967)(footnote omitted).

1.    **The Fourth Amendment "Standing" Analysis.**

"The Tenth Circuit has referred to the test whether a particular search implicates a defendant's Fourth Amendment interests -- whether the search violates the defendant's reasonable privacy expectation -- as one of 'standing.'" Ysasi v. Brown, 3 F. Supp. 3d 1088, 1125 (D.N.M. 2014)(Browning, J.)(citing United States v. Creighton, 639 F.3d 1281, 1286 (10th Cir. 2011)("The Defendant has the burden of establishing . . . standing, or, in other words, a subjective expectation of privacy in the [place searched] that society is prepared to recognize as reasonable."); United States v. Poe, 556 F.3d 1113, 1121 (10th Cir. 2009)("[A] defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search."); United States v. Shareef, 100 F.3d at 1499 ("A Defendant has standing to challenge a search only if he or she has a reasonable expectation of privacy in the area being searched.")). Accordingly, the Court, following the Tenth Circuit's lead, has also referred to this reasonable-expectation-of-privacy test as one of standing. See, e.g., United States v. Harmon, 785 F. Supp. 2d at 1157 ("Standing requires

the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'" (quoting United States v. Poe, 556 F.3d at 1121)).  The Supreme Court's decisions suggest, however, that the "standing" test has now expressly been incorporated into the substantive Fourth Amendment search analysis. See United States v. Sweeney, No. 14-CR-0020, 2014 WL 2514926, at *2 (E.D. Wis. June 4, 2014)(Adelman, J.)("Once referred to as 'standing,' this requirement is actually part of substantive Fourth Amendment law.").

In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court disapproved of labeling the inquiry whether a search implicates a defendant's personal Fourth Amendment interests "as one of standing, rather than simply recognizing it as one involving the substantive question of whether or not the proponent of the motion to suppress had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge." 439 U.S. at 133.  Dispensing with this label, the Supreme Court noted:

> Had we accepted petitioners' request to allow persons other than those whose own Fourth Amendment rights were violated by a challenged search and seizure to suppress evidence obtained in the course of such police activity, it would be appropriate to retain [the Jones v. United States, 362 U.S. 257 (1960),] use of standing in Fourth Amendment analysis.  Under petitioners' target theory, a court could determine that a defendant had standing to invoke the exclusionary rule without having to inquire into the substantive question of whether the challenged search or seizure violated the Fourth Amendment rights of that particular defendant.  However, having rejected petitioners' target theory and reaffirmed the principle that the "rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure," Simmons v. United States, 390 U.S. [377, 389 (1968)], the question necessarily arises whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim.  We can think of no decided cases of this Court that would have come out differently had we concluded, as we do now, that the type of standing requirement discussed in Jones and reaffirmed today is more properly subsumed under substantive Fourth Amendment doctrine.

Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded. The inquiry under either approach is the same. But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing. The Court in *Jones* also may have been aware that there was a certain artificiality in analyzing this question in terms of standing because in at least three separate places in its opinion the Court placed that term within quotation marks.

Rakas v. Illinois, 439 U.S. at 138-39 (footnote omitted)(second alteration in original). The

Supreme Court emphasized:

[N]othing we say here casts the least doubt on cases which recognize that, as a general proposition, the issue of standing involves two inquiries: first, whether the proponent of a particular legal right has alleged "injury in fact," and, second, whether the proponent is asserting his own legal rights and interests rather than basing his claim for relief upon the rights of third parties. *See, e.g., Singleton v. Wulff*, 428 U.S. 106, 112 . . . (1976); *Warth v. Seldin*, 422 U.S. 490, 499 . . . (1975); *Data Processing Service v. Camp*, 397 U.S. 150, 152-153 . . . (1970). But this Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing. *Cf. id.,* at 153, and n.1 . . . ; *Barrows v. Jackson*, 346 U.S. 249, 256 n.4 . . . (1953); *Hale v. Henkel*, 201 U.S. 43, 69-70 . . . (1906).

Rakas v. Illinois, 439 U.S. at 139-40 (citations omitted). In Minnesota v. Carter, 525 U.S. 83

(1998), the Supreme Court recognized that Rakas v. Illinois put an end to the practice of conducting

a Fourth Amendment standing analysis separate from the substantive Fourth Amendment search

analysis:

The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of "standing" doctrine, an analysis that this Court expressly rejected 20 years ago in *Rakas* . . . . Central to our analysis [in Rakas v. Illinois] was the idea that in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." [Rakas v. Illinois, 439 U.S. at 140.]

Minnesota v. Carter, 525 U.S. at 87-88.  The Supreme Court has, thus, noted that the analysis under either approach -- the substantive Fourth Amendment doctrine that the rights that the Amendment secures are personal versus the separate notion of "standing" -- is the same.  Rakas v. Illinois, 439 U.S. at 139.

### 2.    Whether a Fourth Amendment Search Occurred.

A court cannot suppress evidence unless the search was a search for the Fourth Amendment's purposes.  See Mapp v. Ohio, 367 U.S. at 654-55 (holding that "evidence obtained by searches and seizures in violation of the Constitution is" inadmissible).  A Fourth Amendment search occurs either where the government, to obtain information, trespasses on a person's property or where the government violates a person's subjective expectation of privacy that society recognizes as reasonable to collect information.  See United States v. Jones, 565 U.S. 400, 404-08 (2012).  "[T]he Katz reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test."  United States v. Jones, 565 U.S. at 409 (emphasis in United States v. Jones).

### a.    The Trespass-Based Analysis.

In Florida v. Jardines, 569 U.S. 1 (2013), the Supreme Court explained that the Fourth Amendment "establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'"  Florida v. Jardines, 569 U.S. at 5 (quoting United States v. Jones, 565 U.S. at 406 n.3).  "[A]n actual trespass," however, "is neither necessary nor sufficient to establish a constitutional violation."  United States v. Jones, 565 U.S. at 408 n.5

(emphasis omitted)(quoting <u>United States v. Karo</u>, 468 U.S. 705, 713 (1984)).  In determining whether a search has occurred, "[t]respass alone does not qualify, but there must be conjoined with that . . . an attempt to find something or to obtain information."  <u>United States v. Jones</u>, 565 U.S. at 408 n.5.  The Supreme Court has also noted that "[p]hysically invasive inspection is simply more intrusive than purely visual inspection."  <u>Bond v. United States</u>, 529 U.S. 334, 337 (2000).  Moreover, the Supreme Court, in <u>Florida v. Jardines,</u> suggested that the trespass-based analysis applies only where the trespass occurs in one of the four places or things listed in the Fourth Amendment:

> The Fourth Amendment "indicates with some precision the places and things encompassed by its protections": persons, houses, papers, and effects. *Oliver v. United States,* 466 U.S. 170, 176 . . . (1984). The Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to *Katz*) gather information in what we have called "open fields" -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text. *Hester v. United States,* 265 U.S. 57, 44 . . . (1924).

> But when it comes to the Fourth Amendment, the home is first among equals.

<u>Florida v. Jardines</u>, 569 U.S. at 6.[38]

---

[38]The Honorable Elena Kagan, Associate Justice for the Supreme Court, filed a separate concurring opinion, in which the Honorable Ruth Ginsburg, Associate Justice for the Supreme Court, and the Honorable Sonia Sotomayor, Associate Justice for the Supreme Court, joined, adding "further thoughts, suggesting that a focus on Jardines' privacy interests would make 'an easy cas[e] easy' twice over," but "join[ing] the Court's opinion in full." 569 U.S. at 16 (Kagan, J., concurring)(first alteration in original).  "The Court today treats this case under a property rubric; I write separately to note that I could just as happily have decided it by looking to Jardines' privacy interests."  569 U.S. at 13 (Kagan, J., concurring).  Justice Kagan analogized the government's conduct in using a drug sniffing dog on Jardines' porch to a stranger coming to the front door, who "doesn't knock or say hello," but instead, peers through the windows "into your home's furthest corners" with "super-high-powered binoculars," and, "[i]n just a couple of minutes, his uncommon behavior allows him to learn details of your life you disclose to no one." 569 U.S. at 12 (Kagan, J.,

In United States v. Alabi, 943 F. Supp. 2d 1201 (D.N.M. 2013)(Browning, J.), aff'd, 597 F. App'x 991 (10th Cir. 2015), the Court analyzed whether the Secret Service's digital scan of electronic information in the defendants' credit and debit cards' magnetic strips was a Fourth Amendment search under a trespass-based analysis, concluding that it was not, because the Secret Service properly possessed the credit and debit cards, and the additional act of scanning the cards to read the virtual data contained on the strips did not involve a physical intrusion or physical penetration of space. See 943 F. Supp. 2d at 1264-65. The Court noted that, "[e]ven if the

_____

concurring). This conduct, she posited, is a trespass which exceeds any implied license and is also an invasion of reasonable expectations of privacy; she argued that, like her analogy, the facts in Florida v. Jardines likewise involved a trespass and a violation of privacy expectations:

> That case is this case in every way that matters. Here, police officers came to Joelis Jardines' door with a super-sensitive instrument, which they deployed to detect things inside that they could not perceive unassisted. The equipment they used was animal, not mineral. But contra the dissent, see [569 U.S. at 16-17] (opinion of Alito, J.)(noting the ubiquity of dogs in American households), that is of no significance in determining whether a search occurred.

569 U.S. at 12 (Kagan, J., concurring). According to Justice Kagan, had she written the majority opinion based on the Katz v. United States reasonable-expectations-of-privacy search test,

> [a] decision along those lines would have looked . . . well, much like this one. It would have talked about "'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" [Florida v. Jardines, 569 U.S. at 6] (quoting Silverman v. United States, 365 U.S. 505, 511 . . . (1961)). It would have insisted on maintaining the "practical value" of that right by preventing police officers from standing in an adjacent space and "trawl[ing] for evidence with impunity." [Florida v. Jardines, 569 U.S.] at 1414. It would have explained that "'privacy expectations are most heightened'" in the home and the surrounding area. [Florida v. Jardines, 569 U.S. at 7] (quoting California v. the Ciraolo, 476 U.S. [at] 213 . . .). And it would have determined that police officers invade those shared expectations when they use trained canine assistants to reveal within the confines of a home what they could not otherwise have found there. See [Florida v. Jardines, 569 U.S. at 8-9], and n.2-3.

Florida v. Jardines, 569 U.S. at 13 (Kagan, J., concurring).

Supreme Court were to extend the trespass-based analysis for Fourth Amendment searches to virtual invasions, the Secret Service's conduct scanning the thirty-one credit and debit cards still would not amount to a Fourth Amendment search," because the magnetic strip, as opposed to the credit or debit card separately, is not a constitutionally protected area. 943 F. Supp. 2d at 1267-68.

> When a law enforcement officer sees only the exterior of a credit or debit card, however, given that the financial institution which issues the card places the same information on the magnetic strip as embossed on the card's exterior, the only instances in which the information inside the credit or debit card is not information already seen by and known to the officer is when the information has been reencoded for unlawful purposes. In these instances, not only does the person asserting his or her Fourth Amendment right not own or otherwise lawfully possess the information contained inside the card on the magnetic strip, but the person has stolen the information with the intent to use that information to steal further from the person whose information is on the magnetic strip. Protecting this area from law enforcement search and seizure would thus not further the Fourth Amendment's express purpose of protecting "[t]he right of the people to be secure in *their* persons, houses, papers, and effects . . . ." U.S. Const. amend IV.

United States v. Alabi, 943 F. Supp. 2d at 1273 (alteration in original).

### b. **Katz v. United States' Reasonable-Expectation-of-Privacy Test Remains Good Law.**

The Court has noted that, in light of the Supreme Court's recent decisions in Florida v. Jardines and United States v. Jones, both of which the Honorable Antonin Scalia, the late Associate Justice for the Supreme Court, wrote for the majority, and both of which analyze whether government conduct constituted a Fourth Amendment search using the trespass-based approach, "the question arises whether the *Katz v. United States* reasonable-expectation-of-privacy test is still good law." United States v. Alabi, 943 F. Supp. 2d at 1242. Justice Scalia consistently criticized this "notoriously unhelpful test":

In my view, the only thing the past three decades have established about the *Katz* test (which has come to mean the test enunciated by [the Honorable John Marshall Harlan's, late Associate Justice of the Supreme Court,] separate concurrence in *Katz,* see *id.,* at 360 . . . ) is that, unsurprisingly, those "actual (subjective) expectation[s] of privacy" "that society is prepared to recognize as 'reasonable,'" *id.,* at 361 . . . , bear an uncanny resemblance to those expectations of privacy that this Court considers reasonable. When that self-indulgent test is employed (as the dissent would employ it here) to determine whether a "search or seizure" within the meaning of the Constitution has *occurred* (as opposed to whether that "search or seizure" is an "unreasonable" one), it has no plausible foundation in the text of the Fourth Amendment. That provision did not guarantee some generalized "right of privacy" and leave it to this Court to determine which particular manifestations of the value of privacy "society is prepared to recognize as 'reasonable.'" *Ibid.* Rather, it enumerated ("persons, houses, papers, and effects") the objects of privacy protection to which the *Constitution* would extend, leaving further expansion to the good judgment, not of this Court, but of the people through their representatives in the legislature.

Minnesota v. Carter, 525 U.S. at 97-98 (Scalia, J., concurring)(emphasis and alteration in

Minnesota v. Carter). In both United States v. Jones and Florida v. Jardines, however, Justice

Scalia never stated that the Supreme Court was substituting the trespass-based analysis for Katz v.

United States' reasonable-expectation-of-privacy analysis. Rather, his majority opinions assert

that the Katz v. United States reasonable-expectation-of-privacy analysis adds to the trespass-

based analysis. See Florida v. Jardines, 569 U.S. at 11 ("The *Katz* reasonable-expectations test

'has been *added to*, not *substituted for*,' the traditional property-based understanding of the Fourth

Amendment . . . ." (emphasis in original)(quoting United States v. Jones, 565 U.S. at 409)). The

Court concluded in United States v. Alabi that

as the Supreme Court now stands, [the Honorable Samuel Alito, Associate Justice for the Supreme Court; the Honorable Stephen Breyer, Associate Justice for the Supreme Court; the Honorable Elena Kagan, Associate Justice for the Supreme Court; the Honorable Ruth Ginsburg, Associate Justice for the Supreme Court; and the Honorable Sonia Sotomayor, Associate Justice for the Supreme Court,] still adhere to application of the *Katz v. United States* reasonable-expectation-of-privacy Fourth Amendment analysis, at least as a possible approach alongside of the trespass-based approach.

United States v. Alabi, 943 F. Supp. 2d at 1243.

In June, 2013, Justice Scalia dissented from the Supreme Court's decision in Maryland v. King, 569 U.S. 435 (2013), in which the Supreme Court held that "DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure." 569 U.S. at 465. Justice Scalia criticized the majority opinion for analogizing DNA testing to taking an arrestee's photograph by citing to Katz v. United States and pointing out that "we have never held that merely taking a person's photograph invades any recognized 'expectation of privacy.'" Maryland v. King, 569 U.S. at 477 (Scalia, J., dissenting). Justice Scalia also notes that a person's "privacy-related concerns" in his or her body are weighty:

> We are told that the "privacy-related concerns" in the search of a home "are weighty enough that the search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee." But why are the "privacy-related concerns" not also "weighty" when an intrusion into the *body* is at stake? (The Fourth Amendment lists "persons" *first* among the entities protected against unreasonable searches and seizures.)

Maryland v. King, 569 U.S. at 469 (Scalia, J., dissenting)(emphasis in Maryland v. King). Justice Scalia also suggested that the Founders would have shared these privacy-related concerns:

> Today's judgment will, to be sure, have the beneficial effect of solving more crimes; then again, so would the taking of DNA samples from anyone who flies on an airplane (surely the Transportation Security Administration needs to know the "identity" of the flying public), applies for a driver's license, or attends a public school. Perhaps the construction of such a genetic panopticon is wise. But I doubt that the proud men who wrote the charter of our liberties would have been so eager to open their mouths for royal inspection.

Maryland v. King, 569 U.S. at 482 (Scalia J., dissenting).

The Supreme Court's recent decision in Carpenter v. United States, 138 S. Ct. 2206 (2018), underscores that the "reasonable-expectation-of-privacy test has been *added to*, not *substituted for*,

the common-law trespassory test." United States v. Jones, 565 U.S. at 409. In Carpenter v. United States, the Honorable John Roberts, Chief Justice for the Supreme Court, writing for the majority, relied on the Katz v. United States test to determine that the United States violated the defendant's Fourth Amendment rights by obtaining his cell-site records without a warrant. See Carpenter v. United States, 138 S. Ct. at 2217-19. Chief Justice Roberts wrote that "'what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected,'" Carpenter v. United States, 138 S. Ct. at 2217 (quoting Katz v. United States, 389 U.S. at 351-52), and that "[a] majority of this Court has already recognized that individuals have a reasonable expectation of privacy in the whole of their physical movements," 138 S. Ct. at 2217 (citing United States v. Jones, 565 U.S. at 430 (Alito, J., concurring in judgment); id. at 415 (Sotomayor, J., concurring)). Chief Justice Roberts concluded that "historical cell-site records present even greater privacy concerns than the GPS monitoring of a vehicle we considered in *Jones*" and allowing the government warrantless access to this information contravenes individuals' reasonable expectation of privacy in the whole of their physical movements. Carpenter v. United States, 138 S. Ct. at 2217-18. The Court, therefore, concludes that the Supreme Court still relies on a person's privacy expectation when determining whether a search is reasonable for Fourth Amendment purposes, although Justice Scalia would not have turned to the expectations prong until after he ran the facts through the trespass prong.

c.      **Katz v. United States' Reasonable-Expectations-of-Privacy Analysis.**

"'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.'" Rakas v. Illinois, 439 U.S. at 133-34 (quoting Alderman v. United States, 394 U.S. 165, 174 (1969)). "A district court cannot suppress evidence unless the

movant proves that a search implicates *personal* Fourth Amendment interests." <u>United States v. Jones</u>, 44 F.3d 860, 871 (10th Cir. 1995)(emphasis in original). "'[N]o interest legitimately protected by the Fourth Amendment' is implicated by governmental investigative activities unless there is an intrusion into a zone of privacy, into 'the security a man relies upon when he places himself or his property within a constitutionally protected area.'" <u>United States v. Miller</u>, 425 U.S. 435, 440 (1976)(quoting <u>Hoffa v. United States</u>, 385 U.S. 293, 301-02 (1966)). The Tenth Circuit has, thus, noted that "[a]n illegal search or seizure only harms those with legitimate expectations of privacy in the premises searched." <u>United States v. Jones</u>, 44 F.3d at 871 (citing <u>United States v. Roper</u>, 918 F.2d 885, 886-87 (10th Cir. 1990)). Thus, "[t]he proper inquiry" to determine whether a search implicates a defendant's Fourth Amendment interests still depends, after conducting a trespass-based analysis, on "whether the defendant had an expectation of privacy in the place searched and whether that expectation was objectively reasonable." <u>Kerns v. Bd. of Comm'rs of Bernalillo Cty.</u>, 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.).

"Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." <u>Illinois v. Caballes</u>, 543 U.S. 405, 409 (2005)(quoting <u>United States v. Jacobsen</u>, 466 U.S. 109, 123 (1984)). The Supreme Court has, thus, recognized that, rather than determining whether law enforcement's conduct was a search, it sometimes proves easier to "assess . . . when a search is not a search." <u>Kyllo v. United States</u>, 533 U.S. 27, 32 (2001).

> In assessing when a search is not a search, we have applied somewhat in reverse the principle first enunciated in *Katz v. United States*. *Katz* involved eavesdropping by means of an electronic listening device placed on the outside of a telephone booth -- a location not within the catalog ("persons, houses, papers, and effects") that the Fourth Amendment protects against unreasonable searches. We held that the Fourth Amendment nonetheless protected Katz from the warrantless eavesdropping because he "justifiably relied" upon the privacy of the telephone booth. As Justice Harlan's oft-quoted concurrence described it, a Fourth

Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.

Kyllo v. United States, 533 U.S. at 32-33 (citation omitted). The Supreme Court, thus, articulated the Katz v. United States rule -- which Wayne R. LaFave, professor at the University of Illinois College of Law, has noted is "somewhat inaccurately stated as the 'reasonable expectation of privacy' test," Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.1(b), at 435 (4th ed. 2004) -- which posits: "[A] Fourth Amendment search does *not* occur . . . unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'" Kyllo v. United States, 533 U.S. at 33 (emphasis and second alteration in original)(quoting California v. Ciraolo, 476 U.S. 207, 211 (1986)).

A "reasonable expectation of privacy" is "said to be an expectation 'that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" United States v. Jones, 565 U.S. at 408 (quoting Minnesota v. Carter, 525 U.S. at 88). See United States v. Harmon, 785 F. Supp. 2d at 1157 ("To decide whether a reasonable expectation of privacy existed, the court consider concepts of real or personal property law . . . ."). In analyzing whether an expectation of privacy is reasonable in the Fourth Amendment context based on property law, "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control." Rakas v. Illinois, 439 U.S. at 143 & n.12. Although ownership or lawful possession is not determinative under the Katz v. United States reasonable-expectation-of-privacy test, it is often a dispositive factor; because the Fourth Amendment provides a personal right, a defendant bears the burden of demonstrating "that he gained possession [of the area searched] from the owner or

someone with the authority to grant possession." <u>United States v. Arango</u>, 912 F.2d 441, 445 (10th Cir. 1990).

<div align="center">

**i.      Subjective Expectation of Privacy.**

</div>

A defendant maintains a subjective expectation of privacy when he or she "'has shown that 'he sought to preserve something as private.'" <u>Ysasi v. Brown</u>, 3 F. Supp. 3d at 1132 (quoting <u>Bond v. United States</u>, 529 U.S. at 338).  Thus, there is no reasonable expectation of privacy in otherwise private information disclosed to a third party.  <u>See</u> <u>United States v. Miller</u>, 425 U.S. at 443.  "[T]he Fourth Amendment protects people, not places.  What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection."  <u>Katz v. United States</u>, 389 U.S. at 351.  The Supreme Court has noted:

> This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

<u>United States v. Miller</u>, 425 U.S. at 443.

The Supreme Court has recognized, however, that subjective expectations of privacy do not always coincide with the interests that the Fourth Amendment is universally thought to protect.  In <u>Smith v. Maryland</u>, 442 U.S. 735 (1979), for instance, the Supreme Court identified situations in which it would not follow the subjective approach:

> Situations can be imagined, of course, in which *Katz*' two-pronged inquiry would provide an inadequate index of Fourth Amendment protection.  For example, if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation or [sic] privacy regarding their homes, papers, and effects.  Similarly, if a refugee from a totalitarian country, unaware of this Nation's traditions, erroneously assumed that police were continuously monitoring his telephone conversations, a subjective expectation of

privacy regarding the contents of his calls might be lacking as well. In such circumstances, where an individual's subjective expectations had been "conditioned" by influences alien to well-recognized Fourth Amendment freedoms, those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection was. In determining whether a "legitimate expectation of privacy" existed in such cases, a normative inquiry would be proper.

Smith v. Maryland, 442 U.S. at 740 n.5. In United States v. Jones, Justice Sotomayor commented that, given the reality of technology in the twenty-first century, it may no longer be sound to universally hold to the third-party disclosure rule to determine whether a subjective expectation of privacy exists:

[I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties. This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks. People disclose the phone numbers that they dial or text to their cellular providers; the URLs [(Uniform Resource Locator)] that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers. Perhaps, as Justice Alito notes, some people may find the "tradeoff" of privacy for convenience "worthwhile," or come to accept this "diminution of privacy" as "inevitable," and perhaps not. I for one doubt that people would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year. But whatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment jurisprudence ceases to treat secrecy as a prerequisite for privacy. I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.

United States v. Jones, 565 U.S. at 417 (Sotomayor, J., concurring)(citations omitted). Most recently, in Carpenter v. United States, the Supreme Court recognized the third-party doctrine's application to "telephone numbers and bank records," but declined to extend it to cover cell-site location records. 138 S. Ct. at 2216-17. Chief Justice Roberts, writing for the majority, wrote:

> Given the unique nature of cell phone location records, the fact that the information is held by a third party does not by itself overcome the user's claim to Fourth Amendment protection. Whether the Government employs its own surveillance technology as in [United States v.] *Jones* or leverages the technology of a wireless carrier, we hold that an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through the CSLI[39].

Carpenter v. United States, 138 S. Ct. at 2217. The Court notes, however, that, regardless what the Supreme Court decides to do with social media on the internet, only the most ignorant or gullible think that what they post on the internet is or remains private. See United States v. Meregildo, 883 F. Supp. 2d 523, 526 (S.D.N.Y. 2012)(Pauley III, J.)(holding that a person posting to his Facebook profile had "no justifiable expectation that his 'friends' would keep his profile private").

### ii. Privacy Expectation That Society Is Prepared to Recognize as Reasonable.

Under the second step of Katz v. United States' reasonable-expectation-of-privacy approach, courts must determine "whether society is prepared to recognize that [subjective privacy] expectation as objectively reasonable." United States v. Ruiz, 664 F.3d 833, 838 (10th

---

[39]The Supreme Court uses "CSLI" as an abbreviation for "cell-site location information." Carpenter v. United States, 138 S. Ct. at 2211. The Supreme Court explains:

> Cell phones continuously scan their environment looking for the best signal, which generally comes from the closest cell site. Most modern devices, such as smartphones, tap into the wireless network several times a minute whenever their signal is on, even if the owner is not using one of the phone's features. Each time the phone connects to a cell site, it generates a time-stamped record known as cell-site location information (CSLI). The precision of this information depends on the size of the geographic area covered by the cell site. The greater the concentration of cell sites, the smaller the coverage area.

Carpenter v. United States, 138 S. Ct. at 2211.

Cir. 2012)(quoting <u>United States v. Allen</u>, 235 F.3d 482, 489 (10th Cir. 2000)).  The Supreme

Court has cautioned: "The concept of an interest in privacy that society is prepared to recognize as

reasonable is, by its very nature, critically different from the mere expectation, however well

justified, that certain facts will not come to the attention of the authorities."  <u>United States v.

Jacobsen</u>, 466 U.S. at 122.  "Determining whether society would view the expectation as

objectively reasonable turns on whether the government's intrusion infringes on a legitimate

interest, based on the values that the Fourth Amendment protects."  <u>California v. Ciraolo</u>, 476 U.S.

at 212 (explaining that "'[t]he test of legitimacy is not whether the individual chooses to conceal

assertedly private activity,'" but instead "'whether the government's intrusion infringes upon the

personal and societal values protected by the Fourth Amendment'" (alteration in original)(quoting

<u>Oliver v. United States</u>, 466 U.S. at 182-83)).  This second factor of the <u>Katz v. United States</u>

reasonable-expectation-of-privacy analysis developed from Justice Harlan's attempt "to give

content to the word 'justifiably' in the majority's assertion that eavesdropping on Katz was a search

because it 'violated the privacy upon which he justifiably relied while using the telephone booth.'"

LaFave, <u>supra</u>, at § 2.1(d), at 439 (quoting <u>Katz v. United States,</u> 389 U.S. at 353).  Thus, whether

society will recognize a certain expectation of privacy does not turn on whether the hypothetical

reasonable person would hold the same expectation of privacy, but rather on whether the

expectation of privacy is justified or legitimate.  <u>See</u> <u>Smith v. Maryland</u>, 442 U.S. at 739.  The

Supreme Court has provided that, while no single factor determines legitimacy, whether society

recognizes a privacy interest as reasonable is determined based on our societal understanding

regarding what deserves protection from government invasion:

>    No single factor determines whether an individual legitimately may claim
> under the Fourth Amendment that a place should be free of government intrusion

not authorized by warrant.  In assessing the degree to which a search infringes upon individual privacy, the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion.

Oliver v. United States, 466 U.S. at 177-78 (citations omitted).

The Supreme Court has held that "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment."  Illinois v. Caballes, 543 U.S. at 408 (quoting United States v. Jacobsen, 466 U.S. at 123).  In United States v. Place, 462 U.S. 696 (1983), the Supreme Court held that the "canine sniff" of a drug-sniffing dog does "not constitute a 'search' within the meaning of the Fourth Amendment."  462 U.S. at 707.  The case arose when law enforcement seized the luggage of an airline passenger and transported it to another location, where a drug-sniffing dog could sniff it.  See 462 U.S. at 699.  The drug-sniffing dog alerted the officers that drugs were in the luggage, the officers obtained a search warrant, and, upon opening the bags, the officers found over one-thousand grams of cocaine.  See 462 U.S. at 699.  While recognizing that a person has a reasonable expectation of privacy in the contents of his or her luggage, the Supreme Court held that the dog's sniff test was not a Fourth Amendment search and emphasized the unique nature of the investigative technique, which could identify only criminal activity:

We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment.  A "canine sniff" by a well-trained narcotics detection dog, however, does not require opening the luggage.  It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage.  Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also

ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

In these respects, the canine sniff is *sui generis.* We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here -- exposure of respondent's luggage, which was located in a public place, to a trained canine -- did not constitute a "search" within the meaning of the Fourth Amendment.

United States v. Place, 462 U.S. at 707 (citation omitted).

In United States v. Jacobsen, the Supreme Court extended this holding to the chemical field test of a white powdery substance to reveal that the substance was cocaine. See 466 U.S. at 122-24. A Federal Express employee and supervisor opened a damaged package, and exposed four zip-lock plastic bags containing six and one-half ounces of white powder. See 466 U.S. at 111. The Federal Express employees then called the Drug Enforcement Agency ("DEA") and repacked the contents in the original packaging before they provided the package to the DEA officers. See 466 U.S. at 111. When the agents arrived, the agents removed the exposed plastic bags from the broken package, opened each of the four bags, and field-tested the white powder, identifying the powder as cocaine. See 466 U.S. at 111-12. The Supreme Court first held that removal of the plastic bags from the tube and the agent's visual inspection were not Fourth Amendment searches:

[T]he removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search. It infringed no legitimate expectation of privacy and hence was not a "search" within the meaning of the Fourth Amendment.

United States v. Jacobsen, 466 U.S. at 120 (footnote omitted). The Supreme Court noted: "The question remains whether the additional intrusion occasioned by the field test, which had not been conducted by the Federal Express agents and therefore exceeded the scope of the private search,

was an unlawful 'search' or 'seizure' within the meaning of the Fourth Amendment." 466 U.S. at 122. The Supreme Court, relying on United States v. Place, held that the additional digital scan of the white substance was not a Fourth Amendment search, because the test discloses only whether the substance is cocaine and "nothing [else] of special interest":

> The field test at issue could disclose only one fact previously unknown to the agent -- whether or not a suspicious white powder was cocaine. It could tell him nothing more, not even whether the substance was sugar or talcum powder. We must first determine whether this can be considered a "search" subject to the Fourth Amendment -- did it infringe an expectation of privacy that society is prepared to consider reasonable?
>
> . . . .
>
> A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy. This conclusion is not dependent on the result of any particular test. It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised. But even if the results are negative -- merely disclosing that the substance is something other than cocaine -- such a result reveals nothing of special interest. Congress has decided -- and there is no question about its power to do so -- to treat the interest in "privately" possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably "private" fact, compromises no legitimate privacy interest.
>
> . . . .
>
> Here, as in *Place*, the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment.

United States v. Jacobsen, 466 U.S. at 122-24 (footnote omitted).

Most recently, where a "dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation," the Supreme Court, again relying on United States v. Place and also on United States v. Jacobsen, held that "[a]ny intrusion on respondent's privacy

expectations does not rise to the level of a constitutionally cognizable infringement." Illinois v. Caballes, 543 U.S. at 409.[40] The Supreme Court reasoned that the dog sniff in Illinois v. Caballes fell squarely in line with the series of cases holding "that any interest in possessing contraband cannot be deemed 'legitimate,' and th[at], governmental conduct that *only* reveals the possession of contraband 'compromises no legitimate privacy interest.'" Illinois v. Caballes, 543 U.S. at 408 (emphasis in original)(quoting United States v. Jacobsen, 466 U.S. at 123). The Supreme Court explained: "This is because the expectation 'that certain facts will not come to the attention of the authorities' is not the same as an interest in 'privacy that society is prepared to consider reasonable.'" Illinois v. Caballes, 543 U.S. at 408-09 (quoting United States v. Jacobsen, 466 U.S. at 122). The Supreme Court in Illinois v. Caballes noted that its decision was consistent with Kyllo v. United States, as the thermal imaging device in Kyllo v. United States could detect lawful, "intimate details" in a home:

> This conclusion is entirely consistent with our recent decision that the use of a thermal-imaging device to detect the growth of marijuana in a home constituted an unlawful search. *Kyllo v. United States*, 533 U.S. 27 . . . (2001). Critical to that decision was the fact that the device was capable of detecting lawful activity -- in that case, intimate details in a home, such as "at what hour each night the lady of the house takes her daily sauna and bath." *Id.*, at 38 . . . . The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car. A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.

Illinois v. Caballes, 543 U.S. at 409-10.

---

[40]The Honorable John Paul Stevens, late Associate Justice of the Supreme Court, penned the majority's opinion in Illinois v. Caballes. Out of the current Supreme Court Justices, Justice Thomas and Justice Breyer joined Justice Stevens' majority opinion, while Justice Ginsburg dissented. See 543 U.S. at 405.

In United States v. Alabi, the defendants possessed thirty-one credit and debit cards, "many of them in their own names, several of which had information on the magnetic strips that related to persons other than the Defendants." 943 F. Supp. 2d at 1275. The Court reluctantly accepted the defendants' assertion that they "subjectively intended not to disclose this information to a third party -- i.e., intended not to use the cards," 943 F. Supp. 2d at 1275, but determined that "a privacy expectation in the account information stored on credit and debit cards' magnetic strips -- separate and beyond the credit and debit cards themselves -- is not objectively reasonable," 943 F. Supp. 2d at 1280. The Court explained that the Secret Service's scan of the cards' magnetic strips "reveals only the same information revealed in a private search when the card is used as intended," and, further, that, even if the cards had never been used, the scan "discloses only information known by viewing the outside of the card, or information that the cards and account information are possessed unlawfully." 943 F. Supp. 2d at 1281. Noting the Supreme Court's decision in Rakas v. Illinois, in which the Supreme Court "reasoned that society is not prepared to recognize as reasonable an expectation of privacy in a burglar robbing a summer cabin during the offseason," the Court concluded that society would not recognize "as reasonable a privacy expectation which, at least in contemporary society, would benefit only criminals." United States v. Alabi, 943 F. Supp. 2d at 1287.

3.   **Search Warrants Require Probable Cause.**

"The Supreme Court requires that a magistrate judge be provided information sufficient to determine the existence of probable cause before he or she issues a warrant." United States v. Romero, 743 F. Supp. 2d 1281, 1302 (D.N.M. 2010)(Browning, J.)(citing Illinois v. Gates, 462 U.S. 213, 239 (1983)). Probable cause requires "more than mere suspicion but less evidence than

is necessary to convict." United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980). To establish probable cause to justify a search of a home, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000). "Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched." United States v. Corral-Corral, 899 F.2d 927, 937 (10th Cir. 1990). The task of the judge issuing the search warrant

> "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."

United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(unpublished)(quoting Illinois v. Gates, 462 U.S. at 238). See United States v. Glover, 104 F.3d 1570, 1578 (10th Cir. 1997)(concluding that, in determining whether an affidavit supports a finding of probable cause, the court must review the affidavit as a whole and look to the totality of the information contained therein). In making his or her determination, the Magistrate Judge "may draw reasonable inferences from the material provided in the warrant application." United States v. Rowland, 145 F.3d at 1205.

"A reviewing court should accord great deference to a magistrate's determination of probable cause . . . ." United States v. Reed, 195 F. App'x at 822. The court's duty is "simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." Illinois v. Gates, 462 U.S. at 238-39 (alteration in Illinois v. Gates)(quoting Jones v. United States, 362 U.S. at 271). This deference is appropriate to further the Fourth Amendment's strong preference for warrants. See Massachusetts v. Upton, 466 U.S. 727, 733 (1984); Aguilar v.

Texas, 378 U.S. 108, 110-11 (1964)("An evaluation of the constitutionality of a search warrant should begin with the rule 'that the informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried action of officers . . . .'" (quoting United States v. Lefkowitz, 285 U.S. 452, 464 (1932)).  Because of the strong preference for warrants, "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall."  United States v. Ventresca, 380 U.S. 102, 106 (1965).

"The deference accorded a magistrate judge's probable cause determination, however, is not boundless."  United States v. Alabi, 943 F. Supp. 2d at 1253-54 (citing United States v. Leon, 468 U.S. 897, 914 (1984)).  "The court should not defer to a magistrate judge's probable-cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause."  United States v. Sedillo, 297 F. Supp. 3d 1155, 1180 (D.N.M. 2017)(Browning, J.)(citing United States v. Danhauer, 229 F.3d at 1006).  Specifically, the court should not defer to a Magistrate Judge's "probable cause determination if it is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances."  United States v. Reed, 195 F. App'x at 822 (citing United States v. Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. at 734; Illinois v. Gates, 462 U.S. at 239).

**LAW REGARDING EXIGENT CIRCUMSTANCES**

Exigent circumstances may overcome "[t]he presumption of unconstitutionality for warrantless searches."  United States v. Mongold, 528 F. App'x 944, 948 (10th Cir. 2013)(unpublished).  Exigencies may arise from threats to a person's physical safety, the likely

destruction of evidence, and the "'hot pursuit,'" United States v. Mongold, 528 F. App'x at 948 (quoting Kentucky v. King, 563 U.S. at 460), of suspects, see United States v. Mongold, 528 F. App'x at 948 (citing Kentucky v. King, 563 U.S. at 460). In such situations, "'the exigencies . . . make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.'" United States v. Mongold, 528 F. App'x at 948 (alteration in original)(quoting Kentucky v. King, 563 U.S. at 460, and citing United States v. Martinez, 643 F.3d 1292, 1296 (10th Cir. 2011)).

"'The existence of exigent circumstances is a mixed question of law and fact.'" United States v. Martinez, 643 F.3d at 1296 (quoting United States v. Anderson, 981 F.2d 1560, 1567 (10th Cir. 1992)). "The government bears the burden of proving that exigent circumstances rendered a warrantless search reasonable." United States v. Martinez, 643 F.3d at 1296 (citing United States v. Anderson, 154 F.3d at 1233). "'[W]hen the exception must justify the warrantless entry of a home,'" the government's burden is "'especially heavy.'" United States v. Martinez, 643 F.3d at 1296 (quoting United States v. Najar, 451 F.3d at 717).

When an exigency involves a "risk of personal danger," United States v. Najar, 451 F.3d at 718, the Tenth Circuit requires that the government satisfy a two-part test: "'(1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable,'" United States v. Martinez, 643 F.3d at 1296 (quoting United States v. Najar, 451 F.3d at 718). The Tenth Circuit adopted this test after the Supreme Court, in Brigham City v. Stuart, 547 U.S. at 406-07, held officers' subjective motivations irrelevant and probable cause unnecessary for the emergency-aid exception. See United States v. Najar, 451 F.3d at 718. This holding upturned the Tenth Circuit's

earlier three-part test, which required that "'the search must not be motivated by an intent to arrest or seize evidence,'" and that "'there must be some reasonable basis, approaching probable cause, to associate the emergency with the place to be searched.'" United States v. Najar, 451 F.3d at 718 (quoting United States v. Thomas, 372 F.3d 1173, 1177 (10th Cir. 2004)). Accordingly, now, to satisfy "[t]he emergency aid exception," the government must demonstrate "'an objectively reasonable basis for believing that a person within the house is in need of immediate aid,' not on an officer's subjective belief." United States v. Martinez, 643 F.3d at 1296 (quoting Michigan v. Fisher, 558 U.S. 45, 47 (2009)).

That the Supreme Court rejected probable cause for the emergency-aid exception has not affected the Tenth Circuit's test for the destruction-of-evidence exception. See United States v. Mongold, 528 F. App'x at 949 (applying the test from United States v. Aquino, 836 F.2d 1268 (10th Cir. 1988), for the destruction-of-evidence exception, which includes a probable cause requirement). Cf. United States v. Najar, No. CR 03-0735 JB, 2004 WL 3426123, at *6 (D.N.M. Sept. 3, 2004)(Browning, J.)("For probable cause in the usual sense not to be needed, the police must be responding to a true emergency rather than a crime, *and* the police must reasonably believe a person inside needs immediate assistance, and entry is needed to protect or preserve life, or to avoid serious injury." (emphasis in original)), aff'd, 451 F.3d 710 (10th Cir. 2006). In the Tenth Circuit, the government must meet a four-part test for such an exception:

> An exception to the warrant requirement that allows police fearing the destruction of evidence to enter the home of an unknown suspect should be (1) pursuant to clear evidence of probable cause, (2) available only for serious crimes and in circumstances where the destruction of the evidence is likely, (3) limited in scope to the minimum intrusion necessary to prevent the destruction of evidence, and (4) supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse.

United States v. Aquino, 836 F.2d at 1272. "The second element includes two components: (a) the exception is only available for serious crimes; and (b) destruction of evidence must be likely." United States v. Mongold, 528 F. App'x at 949.

The Brigham City v. Stuart holding likewise did not affect the hot-pursuit exception. "Hot pursuit occurs when an officer is in 'immediate or continuous pursuit' of a suspect from the scene of a crime." United States v. Jackson, 139 F. App'x 83, 86 (10th Cir. 2005)(unpublished)(quoting Welsh v. Wisconsin, 466 U.S. at 753). "In order for the hot pursuit doctrine to apply, the suspect must have been in a public place 'when the police first sought to arrest' the suspect," Schinagel v. City of Albuquerque, No. CIV 07-0481 LH/RLP, 2008 WL 11399547, at *6 (D.N.M. Dec. 18, 2008)(Hansen, J.)(quoting United States v. Santana, 427 U.S. 38, 42 (1976)), and the police must have had probable cause to arrest the suspect in the public place, see Schinagel v. City of Albuquerque, 2008 WL 11399547, at *7 (citing United States v. Santana, 427 U.S. at 43 ("We thus conclude that a suspect may not defeat an arrest which has been set in motion in a public place, and is therefore proper under [United States v. Watson, 423 U.S. 411 (1976)], by the expedient of escaping to a private place.")). Hot pursuit then requires a chase from that public place. See Garrison v. City of Cushing, 5 F.3d 545, 1993 WL 332284, at *1, *4 (10th Cir. 1993)(unpublished table opinion)(declining to apply the hot-pursuit exception where law enforcement officers entered a home pursuant only to a tip as to a suspect's location). During the chase, if a defendant "seeks to avoid arrest by retreating into a home, an officer may enter to complete the arrest when in 'hot pursuit.'" Gutierrez v. Cobos, No. CIV 12-0980 JH/GBW, 2015 WL 13239104, at *6 (D.N.M. Aug. 25, 2015)(Herrera, J.)(quoting United States v. Santana, 427 U.S. at 42).

The hot-pursuit exception is closely related to the destruction-of-evidence exception. See United States v. Aquino, 836 F.2d at 1271. In United States v. Santana, the Supreme Court reasoned, in part, that the hot-pursuit exception protects against "the significant risk that the [evidence] would no longer be in the [suspect's] possession if the police waited until a warrant could be obtained." United States v. Aquino, 836 F.2d at 1271 (alteration in original)(citing United States v. Santana, 427 U.S. at 44 (Stevens, J., concurring)). Since the Supreme Court has separately recognized the destruction-of-evidence exception, courts have grounded the hot pursuit exception on "the suspect's flight, which frustrates police efforts to make a legitimate warrantless arrest." United States v. Aquino, 836 F.2d at 1271 (citing United States v. Santana, 427 U.S. at 43). "[A] suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place." United States v. Shelton, No. CR 18-2045 KG, 2018 WL 6069160, at *9 (D.N.M. Nov. 20, 2018)(Gonzales, J.)(quoting United States v. Santana, 427 U.S. at 43).

## LAW REGARDING INTERPRETING STATE LAW

When a federal district court sits in diversity jurisdiction, or in federal question jurisdiction and interprets state law, the court looks to the same principles that govern under Erie R.R. v. Tompkins, 304 U.S. 64 (1938)("Erie"), and applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v. Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance

Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M.

2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin with

the statute's text, a court formulating an Erie prediction should look first to the words of the state

supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[41] If

the Court finds only an opinion from the Court of Appeals of New Mexico, while "certainly [the

Court] may and will consider the Court of Appeal[s'] decision in making its determination, the

Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by

a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332

(D.N.M. 2010)(Browning, J.)(noting that, where the only opinion on point is "from the Court of

---

[41]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (2014)(Browning, J.). Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts. The factors to which a federal court should look before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times. See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17. In short, a state supreme court case that a federal court that Erie predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

Appeals, . . . the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it" (citing <u>Wade v. EMCASCO Ins.</u>, 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do" and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).[42]   The Court may also rely on Tenth Circuit decisions interpreting New Mexico

---

[42]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

> The highest state court is the final authority on state law (<u>Beals v. Hale</u>, 4 How. 37, 54, 11 L.Ed. 865 [(1846)]; <u>Erie Railroad Co. v. Tompkins</u>, 304 U.S. [at] 78, 58 . . . ), but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.   <u>See</u> <u>Ruhlin v. New York Life Insurance Co.</u>, 304 U.S. 202, 209 [(1938)].   An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.   We have declared that principle in <u>West v. American Telephone and Telegraph Co.</u>, 311 U.S. 223 [(1940)], decided this day.   It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

> We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court (<u>Erie Railroad Co. v. Hilt</u>, 247 U.S. 97, 100, 101 [(1918)]; <u>Erie Railroad Co. v. Duplak</u>, 286 U.S. 440, 444 [(1932)]), and we think that the decisions of the Court of Chancery are entitled to like respect as announcing the law of the State.

> . . . .

law.  See Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1243 & n.30

(D.N.M. 2014)(Browning, J.).[43]  Ultimately, "the Court's task is to predict what the state supreme

---

The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Moore's")("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions."(emphasis and title case omitted)).

[43]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state-law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court.  This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This consideration pulls the Court toward according Tenth Circuit precedent less weight and according state court decisions issued in the ensuing years more weight.  On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation.  Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law.  This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law -- at least provides consistency at the federal level, so long as federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest

court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other.  In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges.  Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system.  More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal.  All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would.  Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency.  When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law.  Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' decisions are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do.  Accordingly, Tenth Circuit precedent can lag behind state law developments -- developments that the district courts may be nimble enough to perceive and adopt. Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted.  Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit.  Every federal judicial district in the nation, except the District of Wyoming, covers at most one state.  It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.  The Tenth Circuit used to follow this rationale in applying a clearly erroneous standard of review to district judge decisions of state law with no controlling state supreme court precedent. See Weiss v. United States, 787 F.2d 518, 525 (10th Cir. 1986); Rawson v. Sears, Roebuck, & Co., 822 F.2d 908, 923 (10th Cir. 1987)(McKay, J., dissenting)(collecting cases).  Since the mid-1980s, however, the Tenth Circuit has abandoned that rationale and applied a de novo standard of review to district judge decisions applying state law with no governing state supreme court precedent.  See Rawson v. Sears, Roebuck, & Co., 822 F.2d at 908.  See also id. at 923 (McKay, J., dissenting)(noting that the majority had abandoned the "sanctified" clearly erroneous standard or,

the "so-called local-judge rule" in its analysis).  The Court regrets the Tenth Circuit's retreat from the clearly erroneous standard.

Having outlined the relevant considerations, the Court concludes that the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the Constitution of the United States of America possess.  A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases available to and considered by the Tenth Circuit, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that $x$ is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is $x$.  Its holdings are descriptive and not prescriptive -- interpretive and not normative.  Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court concludes that the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law.  The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate.  The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms.  Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum.  For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue."  Moore's § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (citation and internal quotation marks omitted))).  This statement may not be the most precise formulation if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, the late United States District Judge for the Northern District of Illinois, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Labs. v. Granite State Ins., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(Shadur, J.)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court

than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. See Allstate Ins. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale. New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone. The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree. In Wankier v. Crown Equipment Corp., 353 F.3d 866 (10th Cir. 2003), the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*. Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d at 866. From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court." The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that"). A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue" -- might additionally compel the

court would do." <u>Wade v. EMCASCO Ins.</u>, 483 F.3d at 666. <u>Accord</u> <u>Mosley v. Titus</u>, 762 F. Supp. 2d at 1332 (citation omitted).

---

determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether the Honorable Michael W. McConnell's, then-United States Circuit Judge for the Tenth Circuit, limitation in <u>Wankier v. Crown Equip. Corp.</u> of "intervening decision" to cases from the highest state court was an oversight or intentional. Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts. Even <u>Koch v. Koch Industries, Inc.</u>, 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which <u>Wankier v. Crown Equipment Corp.</u> relies, uses the more inclusive definition. In fact, <u>Wankier v. Crown Equipment Corp.</u> quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." <u>Koch v. Koch Indus., Inc.</u>, 203 F.3d at 1231.

<u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d at 867.

Regardless whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it. In <u>Kokins v. Teleflex, Inc.</u>, 621 F.3d 1297 (10th Cir. 2010), the Tenth Circuit, quoting <u>Wankier v. Crown Equipment Corp.</u>, refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law. <u>See</u> <u>Kokins v. Teleflex, Inc.</u>, 621 F.3d at 1297 ("[T]he Colorado Court of Appeals decided *Biosera*[, Inc. v. Forma Scientific, Inc., 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'" (emphasis in <u>Kokins v. Teleflex, Inc.</u>)(quoting <u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d at 866)).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the <u>Erie</u> doctrine. More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior case law. <u>Moore's</u> lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive." <u>Moore's</u> § 124.22[4] (citing <u>State Farm Mut. Auto. Ins. v. Travelers Indem. Co.</u>, 433 F.2d 311, 312 (10th Cir. 1970)). Still, the Court is bound to abide by the Tenth Circuit's interpretation of <u>Erie</u>.

# LAW REGARDING THE NMTCA

The New Mexico Legislature enacted the NMTCA, because it recognized "the inherent unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity." N.M. Stat. Ann. § 41-4-2(A). The New Mexico Legislature, however, also recognized

> that while a private party may readily be held liable for his torts within the chosen ambit of his activity, the area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done.

N.M. Stat. Ann. § 41-4-2(A). As a result, it was "declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act and in accordance with the principles established in that act." N.M. Stat. Ann. § 41-4-2(A). The NMTCA is also "based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty." N.M. Stat. Ann. § 41-4-2(C). The NMTCA is the

> exclusive remedy against a governmental entity or public employee for any tort for which immunity has been waived under the Tort Claims Act and no other claim, civil action or proceeding for damages, by reason of the same occurrence, may be brought against a governmental entity or against the public employee or his estate whose act or omission gave rise to the suit or claim.

N.M. Stat. Ann. § 41-4-17(A).

A plaintiff may not sue a New Mexico governmental entity or its employees or agents unless the plaintiff's cause of action fits within one of the exceptions that the NMTCA grants for governmental entities and public employees. See Begay v. State, 1985-NMCA-117, ¶ 10, 723 P.2d 252, 256 ("Consent to be sued may not be implied, but must come within one of the

exceptions to immunity under the Tort Claims Act.").[44]  "A plaintiff also may not sue a governmental entity or its employees for a damage claim arising out of violations of rights under the New Mexico Constitution unless the NMTCA contains a waiver of immunity."  Lymon v. Aramark Corp., 728 F. Supp. 2d at 1251.  Accord Barreras v. State of N.M. Corr. Dep't, 2003-NMCA-027, ¶ 24, 62 P.3d 770, 776 ("In the absence of affirmative legislation, the courts of this state have consistently declined to permit individuals to bring private lawsuits to enforce rights guaranteed by the New Mexico Constitution, based on the absence of an express waiver of immunity under the Tort Claims Act.");[45] Chavez v. City of Albuquerque, 1998-NMCA-004, ¶ 8, 952 P.2d 474, 477 (noting that a plaintiff cannot seek damages for violations of rights under the New Mexico Constitution against a city or its employees or agents unless the NMTCA waives

---

[44]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with Begay v. State, that, for a plaintiff to sue a governmental entity, the entity must come within one of the NMTCA's exceptions, and that a plaintiff may not imply the governmental entity's consent to suit.  Section 41-4-2 provides in part: "[I]t is declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act."  N.M. Stat. Ann. § 41-4-2.  The NMTCA also states that governmental entities and public employees acting in the scope of their duties shall be immune from liability for torts except as the NMTCA waives.  See N.M. Stat. Ann. § 41-4-4.  The Supreme Court of New Mexico has consistently reaffirmed that, for a plaintiff to sue a governmental entity or public employee acting within the scope of his or her duties, an NMTCA immunity waiver must apply.  See, e.g., Thompson v. City of Albuquerque, 2017-NMSC-021, ¶ 6, 397 P.3d 1279, 1281; Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't, 1996-NMSC-021, ¶ 6, 916 P.2d at 1313.

[45]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with Barreras v. State of New Mexico Corrections Department that, absent affirmative legislation, New Mexico courts do not permit private lawsuits to enforce New Mexico constitutional rights if no NMTCA immunity waiver applies.  See supra n.44.

immunity);[46] <u>Rubio v. Carlsbad Mun. Sch. Dist.</u>, 1987-NMCA-127, ¶ 11, 744 P.2d 919, 922

(holding that no waiver of immunity exists for damages arising out of alleged educational

malpractice claim against a school board);[47] <u>Begay v. State</u>, 1985-NMCA-117, ¶ 14, 723 P.2d at

257 (finding that no waiver existed in NMTCA for suit for damages under Article II, § 11 of the

New Mexico Constitution -- a provision that protects the "free exercise of religion").[48]   The

NMTCA does not limit the availability of many forms of equitable relief.  <u>See</u> N.M. Stat. Ann.

§ 41-4-17(A) ("Nothing in this section shall be construed to prohibit any proceedings for

mandamus, prohibition, habeas corpus, certiorari, injunction or quo warranto."); <u>El Dorado Utils.</u>

<u>Inc. v. Eldorado Area Water & Sanitation Dist.</u>, 2005-NMCA-036, ¶ 28, 109 P.3d 305, 312 ("The

Tort Claims Act would not bar a claim for injunctive relief.").[49]

---

[46]For the reasons discussed <u>supra</u> note 44, the Court concludes that the Supreme Court of New Mexico would, if presented with the issue, agree with this assertion in <u>Chavez v. City of Albuquerque</u>.

[47]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with the result in <u>Rubio v. Carlsbad Municipal School District</u>, because none of the express waivers under §§ 41-4-5 to -12 permit recovery for damages arising out of educational malpractice claims, and § 41-4-4(A) clearly exempts governmental entities and public employees acting within the scope of their duties from liability except as waived in §§ 41-4-5 to -12.  <u>See</u> N.M. Stat. Ann. §§ 41-4-5 to -12.  As discussed <u>supra</u> n.39, the Supreme Court of New Mexico requires an express NMTCA immunity waiver to permit an NMTCA suit against a governmental entity or a public employee acting within the scope of his or her duties.

[48]<u>See</u> <u>supra</u> n.44.

[49]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with <u>El Dorado Utilities, Inc. v. Eldorado Area Water & Sanitation District</u>, that nothing in the NMTCA bars a separate claim for injunctive relief.  While the Supreme Court of New Mexico has clarified that the NMTCA is "the exclusive remedy for any action for damages against the government," <u>Bd. of Cty. Comm'rs of San Miguel Cty. v. Risk Mgmt. Div.</u>, 1995-NMSC-046, ¶ 14, 899 P.2d 1132, 1135, the Act only limits damages brought against the state or state employees acting within the scope of their duty and does not limit plaintiffs from seeking

## RELEVANT NEW MEXICO LAW REGARDING BATTERY

New Mexico has little caselaw on the intentional tort of battery. See N.M.R.A. Civ. UJI 13-1624 (declining to include jury instructions on the tort of battery, because "[i]t was finally concluded that there was insufficient New Mexico law on assault and battery to guide the committee on this subject and that too much reliance had been placed upon the law of other jurisdictions"). The Court has concluded that:

> [u]nder New Mexico law, wherein the Restatement of Torts reigns, one commits battery when "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive contact with the person of the other directly or indirectly results." Desmare v. New Mexico, No. CIV 07-0199 JB/RHS, 2007 WL 5231690, at *4 (D.N.M. Aug. 14, 2007)(Browning, J.)(quoting Restatement (Second) of Torts § 18 (1965)).[50] See Garcia v. United States, No. CIV 08-0295 JB/WDS, 2009 WL 1300938, at *14 (D.N.M. March 30, 2009)(Browning, J.); Taylor v. Hudson, No. CIV 02-0775 JB/RHS, Court's Instructions to the Jury, Instruction No. 16, at 20, filed December 11, 2003 (Doc. 90)(using standard battery elements for the crime of Battery upon a Peace Officer); N.M. Stat. Ann. § 30-3-4 (defining criminal battery); N.M.R.A. Crim. UJI 14-320 (instructing on essential elements of criminal battery: intentional touching or applying force to plaintiff, acting in a rude, insolent, or angry manner, and the act occurring at a certain time or place in New Mexico).

---

other forms of injunctive relief, see Bd. of Cty. Comm'rs of San Miguel Cty. v. Risk Mgmt. Div., 1995-NMSC-046, ¶ 14, 899 P.2d at 1135.

[50]The Court expects that the Supreme Court of New Mexico would agree that New Mexico follows the Restatement of Torts. The Supreme Court of New Mexico has frequently cited approvingly the Restatement of Torts. See, e.g., Baldonado v. El Paso Nat. Gas Co., 2008-NMSC-005, ¶ 26, 176 P.3d 277, 283 (noting that New Mexico has adopted the Restatement (Second) of Tort's test for intentional infliction of emotional distress claims); Chavarria v. Fleetwood Retail Corp., 2006-NMSC-046, ¶ 30, 143 P.3d 717, 727 (adopting the Restatement (Second) of Tort's provisions on a corporation's liability for employees' fraudulent conduct); Schmitz v. Smentowski, 1990-NMSC-002, ¶ 49, 785 P.2d 726, 736 ("We have also been very willing to adopt the view of the Restatement of Torts to assist our development of new tort areas.").

Sisneros v. Fisher, 685 F. Supp. 2d 1188, 1220-21 (D.N.M. 2010)(Browning, J.). Pursuant to the Restatement (Second) of Torts, bodily harm is "any physical impairment of the physical condition of another's body, or physical pain or illness," and an impairment of the physical condition of another's body" occurs "if the structure or function of any part of the other's body is altered to any extent even though the alteration causes no other harm." Restatement (Second) of Torts § 15 cmt.[51] A contact that causes no bodily harm may be an offensive bodily contact, Restatement (Second) of Torts § 15 cmt., "if it offends a reasonable sense of personal dignity," Restatement (Second) of Torts § 19 cmt.[52] Accord Selmeczki v. N.M. Dep't of Corr., 2006-NMCA-024, ¶ 29, 129 P.3d 158, 167 ("It is black-letter law that causing an offensive touching, even indirectly to another's clothing and not resulting in injury, is the tort of battery.").[53]

> As to the intent required to commit a battery, the Restatement (Second) of Torts is ambiguous whether intent means showing merely an intent to touch that person -- and that the touching turns out to be offensive or harmful need not be intended -- or if the plaintiff must also show that the harm or offense was intended. It is clear, however, that an intent to touch in a way that the defendant understands is not consented to is sufficient, as is an actual intent to harm.

---

[51]The Court predicts that the Supreme Court of New Mexico would follow the Restatement (Second) of Torts. See supra n.50.

[52]The Court predicts that the Supreme Court of New Mexico would follow the Restatement (Second) of Torts. See supra n.50.

[53]The Court predicts that the Supreme Court of New Mexico would agree with this statement, because the statement follow the Restatement (Second) of Torts, which the Court expects that the Supreme Court of New Mexico would follow. See supra n.50.

Peña v. Greffet, 108 F. Supp. 3d 1030, 1048 (D.N.M. 2015)(Browning, J.). See also Restatement (Second) of Torts § 16.[54]

## LAW REGARDING SUPPLEMENTAL JURISDICTION

It is a fundamental precept of American law that the federal courts are "courts of limited jurisdiction." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005). Federal courts "possess only that power authorized by [the] Constitution and statute." Kokkonen v. Guardian Life Ins. of Am., 511 U.S. 375, 377 (1994). Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal-question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction. See 28 U.S.C. §§ 1331-32.

1.      **Congressional Authority.**

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. at 552. The Supreme Court has long subscribed to the concept of

---

[54]The Court predicts that the Supreme Court of New Mexico would follow the Court's statement and the Restatement (Second) of Torts, because the Court predicts that the Supreme Court of New Mexico would adopt the Restatement (Second) of Torts' approach. See supra n.50.

supplemental jurisdiction recognized in three common-law doctrines -- pendent,[55] ancillary,[56] and pendent-party[57] jurisdictions -- the former two of which survive today. The term "supplemental jurisdiction" is now used to refer collectively to the doctrines of ancillary jurisdiction and pendent jurisdiction. 28 U.S.C. § 1367, statutorily codifying Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365 (1978)(outlining the doctrine of ancillary jurisdiction), and United Mine Workers of Am. v. Gibbs, 383 U.S. 715 (1966)(outlining the doctrine of pendent jurisdiction), and invalidating Finley v. United States, 490 U.S. 545 (1989)(outlining the now-defunct doctrine of pendent-party jurisdiction). Federal courts may exercise pendent jurisdiction over state-law claims when "state and federal claims . . . derive from a common nucleus of operative fact." United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966). Supplemental jurisdiction gives federal courts the flexibility to hear a cause of action after the introduction of third parties whose insertion into the litigation lacks support of any independent grounds for federal jurisdiction, when those parties share a common interest in the outcome of the litigation and are logical participants in it. See Owen Equip. & Erection Co. v. Kroger, 437 U.S. at 375 n.18.

---

[55]Black's Law Dictionary defines "pendent jurisdiction" as: "A court's jurisdiction to hear and determine a claim over which it would not otherwise have jurisdiction, because the claim arises from the same transaction or occurrence as another claim that is properly before the court." Jurisdiction, Black's Law Dictionary (10th ed. 2014).

[56]Black's Law Dictionary defines "ancillary jurisdiction" as: "A court's jurisdiction to adjudicate claims and proceedings related to a claim that is properly before the court." Jurisdiction, Black's Law Dictionary, supra.

[57]Black's Law Dictionary defines "pendent-party jurisdiction" as: "A court's jurisdiction to adjudicate a claim against a party who is not otherwise subject to the court's jurisdiction, because the claim by or against that party arises from the same transaction or occurrence as another claim that is properly before the court." Jurisdiction, Black's Law Dictionary, supra.

In 1988, the Honorable William H. Rehnquist, late Chief Justice of the Supreme Court of the United States, created the Federal Courts Study Committee to analyze the federal court system and to recommend reforms. See James v. Chavez, No. CIV 09-0540 JB/CG, 2011 WL 6013547, at *5 (D.N.M. 2011)(Browning, J.)(citing 16 James Wm. Moore et al., Moore's Federal Practice § 106.04[5]). In response to the Committee's findings regarding "pendent" and "ancillary" jurisdiction, Congress codified the application of the two doctrines when it passed the Judicial Improvements Act of 1990[58]:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). See James v. Chavez, 2011 WL 6013547, at *5. In enacting 28 U.S.C. § 1367, Congress conferred upon federal district courts "supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on claim and party joinder to deal economically -- in single rather than multiple litigation -- with matters arising from the same transaction or occurrence." Report of the Federal Courts Study Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 Conn. L. Rev. 733, 787 (1990).

## 2. District Court Discretion.

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental jurisdiction, not as a litigant's right, but as a matter of judicial discretion. See Estate of Harshman

---

[58]The Judicial Improvements Act of 1990 is codified at: 5 U.S.C. § 8440c; 17 U.S.C. §§ 106A, 120; 28 U.S.C. §§ 178, 471-82, 1367, 1658; 47 U.S.C. § 303c.

v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(citing City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)). In circumstances where the supplemental jurisdiction statute may support supplemental jurisdiction, the district court retains discretion to decline to exercise that jurisdiction. The traditional analysis, based on the Supreme Court's opinion in United Mine Workers v. Gibbs, compelled courts to consider "judicial economy, convenience and fairness to litigants" when deciding whether to exercise supplemental jurisdiction. 383 U.S. at 726. Similarly, Congress' supplemental jurisdiction statute enumerates four factors that the court should consider:

(1)     the claim raises a novel or complex issue of State law,

(2)     the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)     the district court has dismissed all claims over which it has original jurisdiction, or

(4)     in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). In applying these factors, district courts should seek to exercise supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness, and comity." Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164.

Numerous courts have acknowledged that 28 U.S.C. § 1367(c) necessarily changed the district courts' supplemental jurisdiction discretion analysis and that, unless one of the conditions of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction. See Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir. 1998)("[S]ection 1367 has indeed altered *Gibbs*' discretionary analysis."); McLaurin v. Prater, 30 F.3d 982, 985 (8th Cir. 1994)("The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the

four instances described therein."); Palmer v. Hosp. Auth., 22 F.3d 1559, 1569 (11th Cir. 1994)("[S]upplemental jurisdiction must be exercised in the absence of any of the four factors of section 1367(c)."); Bonadeo v. Lujan, No. CIV 08-0812 JB/ACT, 2009 WL 1324119, at *9 (D.N.M. April 30, 2009)(Browning, J.)("28 U.S.C. § 1367(c) changed the district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c) exists."). Other district courts in the Tenth Circuit besides this Court have reached the same conclusion. See Gudenkauf v. Stauffer Commc'ns, Inc., 896 F. Supp. 1082, 1084 (D. Kan. 1995)(Crow, J.)("[A]ny exercise of discretion declining jurisdiction over pendent claims or parties cannot occur until 'triggered' by the existence of one of the four conditions enumerated." (quoting Exec. Software N. Am v. U.S. Dist. Court for Cent. Dist. of Cal., 24 F.3d 1545, 1557 (9th Cir. 1994))).

The Tenth Circuit has held that district courts should generally decline jurisdiction over state claims when federal claims no longer remain: "'When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.'" Koch v. City of Del City, 660 F.3d 1228, 1248 (10th Cir. 2011)(quoting Smith v. City of Enid ex rel. Enid City Comm'n, 149 F.3d 1151, 1156 (10th Cir. 1998)). The Supreme Court has also recognized:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

United Mine Workers of Am. v. Gibbs, 383 U.S. at 726. The Court has previously stated that a district court should usually decline to exercise supplemental jurisdiction when one of the

28 U.S.C. § 1367(c) factors applies.  See Armijo v. New Mexico, No. CIV 08-0335 JB/ACT, 2009 WL 3672828, at *4 (D.N.M. Sept. 30, 2009)(Browning, J.).  The Tenth Circuit has recognized that a district court does not "abuse discretion" when it declines to exercise supplemental jurisdiction over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it 'has dismissed all claims over which it has original jurisdiction.'"  Muller v. Culbertson, 408 F. App'x 194, 197 (10th Cir. 2011)(unpublished)(quoting 28 U.S.C. § 1367(c)(3)).  See Shay v. RWC Consulting Grp., No. CIV 13-0140 JB/ACT, 2014 WL 3421068, at *1 (D.N.M. June 30, 2014)(Browning, J.)(dismissing federal-question claims, and remanding state claims that were all which remained).

## ANALYSIS

The Court denies the Pltfs.' MSJ, and grants in part and denies in part the Defs.' MSJ. Although the Defendant Officers' entry into Todd's residence violates the Plaintiffs' constitutional rights as the Plaintiffs allege in Count III, qualified immunity protects the Defendant Officers against Count III.  See Complaint ¶¶ 67-72, at 7.  Clearly established law at the time of the violation does not reflect that the Defendant Officers' conduct violates the Constitution.  Likewise, the Defendant Officers violated Ward's and Hargrove's constitutional rights when the Defendant Officers arrested Ward and Hargrove as the Plaintiffs allege in Counts IV and V.  See Complaint ¶¶ 73-84, at 7-8.  Qualified immunity protects, however, the Defendant Officers from liability for Counts IV and V, because clearly established law at the time of the violation does not reflect that the Defendant Officers' conduct violated the Constitution.  The Court does not read the Complaint to reflect that the Plaintiffs bring § 1983 claims in Counts III, IV, and V against the City of Hobbs. See Complaint ¶¶ 67-84, at 7-8.  If the Plaintiffs intend to raise such claims against the City of Hobbs, the Court will grant summary judgment for the City of Hobbs, because a municipality

cannot be liable under § 1983 on a respondeat superior theory.  See Schneider v. City of Grand

Junction Police Dep't, 717 F.3d at 767 (quoting Brown v. Montoya, 662 F.3d at 1164).  Last, the

Court will not grant summary judgment for the Defendants on Counts I and II, because the

Defendant Officers' unlawfully arrested Ward and Hargrove.

I.    **ALTHOUGH NO EXIGENCY JUSTIFIED THE DEFENDANT OFFICERS' ENTRY INTO TODD'S RESIDENCE, QUALIFIED IMMUNITY PROTECTS THE DEFENDANT OFFICERS, AS NO CLEARLY ESTABLISHED LAW REFLECTS THAT THE DEFENDANT OFFICERS' ACTIONS VIOLATE THE FOURTH AMENDMENT.**

The Court concludes that the Defendant Officers are entitled to qualified immunity on

Count III.  To survive the Defendant Officers' qualified immunity argument, the Plaintiffs must

demonstrate: (i) that the Defendant Officers' actions violated their constitutional or statutory

rights; and (ii) that the rights were clearly established at the time of the Defendant Officers' alleged

misconduct.  See Riggins v. Goodman, 572 F.3d at 1107.  See also Pueblo of Pojoaque v. New

Mexico, 214 F. Supp. 3d at 1079.  The Plaintiffs show that the Defendant Officers violated the

Plaintiffs' constitutional rights, because the Defendant Officers did not have a warrant to search

Todd's residence or an exigency that justified a warrantless entry.  The Plaintiffs cannot, however,

show that clearly established law governs the situation, because no case on point reflects that no

exigency exists on these facts.

A.    **THE DEFENDANT OFFICERS VIOLATED THE PLAINTIFFS' CONSTITUTIONAL RIGHTS, BECAUSE NO EXIGENCY JUSTIFIED THE WARRANTLESS ENTRY INTO TODD'S RESIDENCE.**

The Court first determines that the Defendant Officers violated the Fourth Amendment's

prohibition against unreasonable searches.  The parties debate whether the Defendant Officers

could enter Todd's residence pursuant to an exigency that excepted the Defendant Officers from

the warrant requirement, because a threat existed to a person's physical safety.  See Defs.' Response to Pltfs.' MSJ at 9-10; Defs.' Response to Pltfs.' MSJ 15-19; Pltfs.' Reply to Pltfs.' MSJ at 1-10; Defs.' MSJ at 6-19.  The Court agrees with the Plaintiffs that the Defendant Officers did not "'have an objectively reasonable basis to believe there [was] an immediate need to protect the lives or safety of themselves or others.'"  United States v. Martinez, 643 F.3d at 1296 (quoting United States v. Najar, 451 F.3d at 718).  See Defs.' Response to Pltfs.' MSJ at 9-10; Pltfs.' Reply to Pltfs.' MSJ at 1-10.

Preliminarily, the Court addresses which of the Plaintiffs have standing to challenge the Defendant Officers' entry into the home.  See, e.g., United States v. Harmon, 785 F. Supp. 2d at 1157 ("Standing requires the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'" (quoting United States v. Poe, 556 F.3d at 1121)).  Cf. United States v. Sweeney, 2014 WL 2514926, at *2 ("Once referred to as 'standing,' this requirement is actually part of substantive Fourth Amendment law.").  The Court determines, nevertheless, that all the Plaintiffs had a reasonable expectation of privacy in the home.  See, e.g., United States v. Harmon, 785 F. Supp. 2d at 1157 ("Standing requires the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'" (quoting United States v. Poe, 556 F.3d at 1121)).  The residence belongs to Todd.  See Pltfs.' MSJ ¶ 4, at 3 (citing generally Todd Aff.); Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3.  As the homeowner, Todd has a reasonable expectation of privacy in her home.  See, e.g., Riley v. California, 573 U.S. 373, 403 (2014)("Our cases have recognized that the Fourth Amendment was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of

the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity."); Kentucky v. King, 563 U.S. at 459 ("'It is a basic principle of Fourth Amendment law,' we have often said, 'that searches and seizures inside a home without a warrant are presumptively unreasonable.'" (quoting Brigham City v. Stuart, 547 U.S. at 403)); Payton v. New York, 445 U.S. 573, 585-86 (1980)("[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" (quoting United States v. U.S. Dist. Court, 407 U.S. 297, 313 (1972))). She has, accordingly, standing to challenge the search.

During the events at issue, Ward and Hargrove were Todd's guests. See Pltfs.' MSJ ¶ 4, at 3 (citing generally Todd Aff.); Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3. The Tenth Circuit has concluded that "social guests" have a reasonable expectation of privacy within their hosts' homes when the guests have a "'degree of acceptance into the household'" and are at the residence during the search. United States v. Poe, 556 F.3d at 1122 (quoting United States v. Rhiger, 315 F.3d 1283, 1286 (10th Cir. 2003))). See Hindbaugh v. Washita Cty. Bd. of Cty. Comm'rs, 329 F. App'x 818, 821 (10th Cir. 2009)(unpublished)("A social guest has Fourth Amendment standing to challenge a search of his host's home."). See also United States v. Cook, 344 F. App'x 473, 476 (10th Cir. 2009)(unpublished)(noting that a social guest must be present at a search to have a reasonable expectation of privacy in the area searched). In United States v. Poe, the Tenth Circuit concluded that a guest had the requisite degree of acceptance in the household where, at the time of the search, the guest had for hours been at the hosts' home, had lived at the home for a year and a half, had the previous month moved from the home, had visited regularly the home after moving, and had a key to the house. See United States v. Poe, 556 F.3d at 1122. See also United States v.

Thomas, 372 F.3d at 1176 (concluding that a nephew who challenged a search of his aunt and uncle's home was a social guest where he had planned to celebrate New Year's Eve at the residence, and to stay the night at the home after the celebration); United States v. Rhiger, 315 F.3d at 1286-87 (concluding that a defendant was a social guest where the defendant regularly visited the host's home, stayed overnight at the home, comfortably entered the home unannounced, and stored some receipts in the home).  Here, although the parties do not discuss the facts, the record reflects that both Ward and Hargrove were Todd's social guests.  Todd is Hargrove's biological mother, and Ward is Todd's girlfriend.  See Todd Aff. ¶¶ 3-4, at 1.  Both Ward and Hargrove kept personal belongings at Todd's house, had keys and permission to enter the house at any time, regularly stayed overnight at the house, and did not pay rent at the house.  See Todd Aff. ¶¶ 6-9, at 1-2.  Accordingly, all three Plaintiffs can challenge the Defendant Officers' entry into Todd's residence.

The Court next notes that a search occurred when Gastelum pushed open the screen door on the garage's screen and when the Defendant Officers entered the garage.  See Gastelum Body Camera at 00:46-00:48; Dale Body Camera at 00:48-1:00; Brackeen Body Camera at 1:15-1:22.  Ward and Hargrove had a reasonable expectation of privacy in using the closed screen door to prevent unwanted visitors from entering the garage.  See Brigham City v. Stuart, 547 U.S. 398, 400-02 (2006)(treating, without discussing the question of the screen, an entry though a screen door as a search); United States v. Walker, 474 F.3d 1249, 1253 (10th Cir. 2007)(recognizing that opening a screen door in some circumstances intrudes on a reasonable expectation of privacy); United States v. Arellano-Ochoa, 461 F.3d 1142, 1145 (9th Cir. 2006)("Where the solid door is wide open, the screen door is what protects the privacy of the people inside -- not just their visual

privacy, which it protects only partially, but also their privacy from undesired intrusion."); <u>Sparing v. Vill. of Olympia Fields</u>, 266 F.3d 684, 690 (7th Cir. 2001)(describing that officers would need to consent to enter a home through a screen door to complete an arrest).  <u>Cf.</u> <u>Serby v. Town of Hempstead</u>, No. 04CIV.901(DRH)(MLO), 2006 WL 2853869, at *8 (E.D.N.Y. Sept. 30, 2006)(Hurley, J.)(describing that a reasonable expectation of privacy does not exist on the walkway or driveway leading to the house or the screen door before the house's inner door, because that area is open to the public).  Gastelum violated this expectation when he shoved back open the door of the garage, and crossed the garage's threshold, which the screen cordoned from public access.[59]  <u>See</u> Gastelum Body Camera at 00:46-00:48; Dale Body Camera at 00:48-1:00; Brackeen Body Camera at 1:15-1:22.  <u>Cf.</u> <u>Payton v. New York</u>, 445 U.S. at 585-86 ("[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" (quoting <u>United States v. U.S. Dist. Court.</u>, 407 U.S. at 313).  Gastelum entered the garage as he ordered Hargrove to step outside the house, <u>see</u> Dale Body Camera at 00:48-1:00; Dale followed closely behind Gastelum; and Brackeen followed Dale, <u>see</u> Brackeen Body Camera at 1:15-1:22.

---

[59]The Court considered whether that someone can see through the screen means that no reasonable expectation of privacy exists.  The Court decided against this result, because the caselaw that the Court cites in the text counsels against this conclusion, and because a difference exists between a reasonable expectation that someone will not see the contents of a home and a reasonable expectation that someone will not enter a home.  The screen here protects the later form of privacy -- someone entering a home.  The Court sees no difference between a screen door and windows.  Just because someone can see through a home's windows does not mean that the home is open to the public and that no reasonable expectation of privacy against someone walking into the home exists.  An open window by a Christmas tree is not an invitation for public access to inspect the Christmas tree.  The Defendant Officers violated the expectation that someone will not enter the home; they were the person who climbed through the open window to examine the Christmas tree.

The Court now turns to whether exigent circumstances justified the Defendant Officers'

search and concludes that no exigent circumstances existed. Exigent circumstances may overcome

"[t]he presumption of unconstitutionality for warrantless searches." United States v. Mongold,

528 F. App'x at 948. When an exigency involves a "risk of personal danger," United States v.

Najar, 451 F.3d at 718, the Tenth Circuit requires that the government satisfy a two-part test:

"'(1) the officers have an objectively reasonable basis to believe there is an immediate need to

protect the lives or safety of themselves or others, and (2) the manner and scope of the search is

reasonable,'" United States v. Martinez, 643 F.3d at 1296 (quoting United States v. Najar, 451

F.3d at 718).

Here, at the moment that Gastelum pushed open the screen door, the Defendant Officers

had no objectively reasonable basis to believe that there was an immediate need to protect others'

lives. The 911 caller's report of a verbal altercation and the subsequent dispatcher communication

about a domestic dispute do not suffice as grounds for a reasonable belief that such an exigency

existed. Cf. Pltfs.' MSJ ¶ 1, at 2; Defs.' Response to Pltfs.' MSJ ¶ 1, at 4 (citing CAD Report at

1; 911 Call at 00:52-00:59; 911 Call Tr. at 3:8-12); Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3; Defs.'

Response to Pltfs.' MSJ ¶ 2, at 4 (citing 911 Call at 00:03-00:18; 911 Call Tr. at 22:2-6); Pltfs.'

Reply to Pltfs.' MSJ ¶ 1, at 3; Defs.' Response to Pltfs.' MSJ ¶ 3, at 4 (citing 911 Call at 00:03-

00:18, 911 Call Tr. at 2:2-6); Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3; Pltfs.' MSJ ¶ 2, at 2 (CAD

Report at 1); Defs.' Response to Pltfs.' MSJ ¶ 4, at 5 (citing 911 Call at 00:332-00:43; 911 Call

Tr. at 2:18-19); Pltfs.' Reply to Pltfs MSJ ¶ 1, at 3; Defs.' Response to Pltfs.' MSJ ¶ 5, at 5 (citing

911 Call at 00:42-00:48; 911 Call Tr. at 2:25-3:4); Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3; Defs.'

Response to Pltfs.' MSJ ¶ 6, at 5 (citing 911 Call at 01:06-01:18; 911 Call Tr. at 3:16-19); Pltfs.'

Reply to Pltfs.' MSJ ¶ 1, at 3; Defs.' Response to Pltfs.' MSJ ¶ 7, at 6 (citing 911 Call at 02:31-02:33; 911 Call Tr. at 5:7); Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3; Defs.' Response to Pltfs.' MSJ ¶ 9, at 5 (citing CAD Report at 1); Pltfs.' Reply to Pltfs.' MSJ ¶ 2, at 3; Defs.' Response to Pltfs.' MSJ ¶ 12, at 5-6 (citing HPD Dispatch Call at 00:00-00:16, HPD Dispatch Tr. at 2:1-65; CAD Report, at 1); Defs.' Response to Pltfs.' MSJ ¶ 13, at 6 (citing HPD Dispatch Call at 00:08-00:16; HPD Dispatch Tr. at 2:3-5; CAD Report, at 1); Defs.' Response to Pltfs.' MSJ ¶ 15, at 6 (citing HPD Dispatch Call at 00:30-00:39; HPD Dispatch Tr.at 2:8-10); Pltfs.' Reply to Pltfs.' MSJ ¶ 3, at 3. Cf. Storey v. Taylor, 696 F.3d at 994 ("A report of a domestic argument -- standing alone -- does not demonstrate exigent circumstances per se." (citing United States v. Davis, 290 F.3d at 1244)). That the dispatcher communication let the Defendant Officers believe that a violent domestic dispute had occurred does not change this analysis. Cf. Defs.' Response to Pltfs.' MSJ ¶ 13, at 6 (citing HPD Dispatch Call at 00:08-00:16; HPD Dispatch Tr. at 2:3-5; CAD Report, at 1); Pltfs.' Reply to Pltfs.' MSJ ¶ 3, at 3; Defs.' Response to Pltfs.' MSJ ¶ 15, at 6 (citing HPD Dispatch Call at 00:30-00:39; HPD Dispatch Tr.at 2:8-10); Pltfs.' Reply to Pltfs.' MSJ ¶ 3, at 3; Defs.' Response to Pltfs.' MSJ ¶ 16, at 6 (citing Brackeen Aff. ¶ 5, at 2; Dale Aff. ¶ 5, at 2; Gastelum Aff. ¶ 5, at 2). See, e.g., Lundstrom v. Romero, 616 F.3d at 1125 (concluding that no exigency existed where an officer responded to a call about a woman yelling at and beating a toddler, and evidence at the scene suggested that no child was in the home).

No other evidence could lead a reasonable person to believe that someone was in imminent danger. Like the officers in Storey v. Taylor, the Defendant Officers saw no evidence of an ongoing dispute -- verbal or physical -- as they approached Todd's residence. See Storey v. Taylor, 696 F.3d at 994; Pltfs.' Response to Defs.' MSJ ¶¶ 3-4, at 2 (citing Dale Interview at 15:14-

16; id. at 15:10-13); Pltfs.' Response to Defs.' MSJ ¶¶ 5-7, at 2 (citing Gastelum Interview at 7:6-18; id. at 7:22-24; id. at 10:11-15). The garage's screen revealed Ward and Hargrove sitting and settled in the garage, and displaying no signs of recent, ongoing, or potential violence. See Defs.' Response to Pltfs.' MSJ ¶ 20, at 7 (citing Brackeen Body Camera at 00:14-00:42; Dale Body Camera at 00:03-00:20, Gastelum Body Camera at 00:02-00:23); Pltfs.' Reply to Pltfs.' MSJ ¶ 6, at 3; Pltfs.' MSJ ¶ 6, at 3 (citing Gastelum Body Camera at 00:17, and citing generally Ward Criminal Complaint); Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3; Defs.' Response to Pltfs.' MSJ ¶ 23, at 7-8 (citing Gastelum Body Camera at 00:01-00:47); Pltfs.' Reply to Pltfs.' MSJ ¶ 6, at 3; Defs.' Response to Pltfs.' MSJ ¶ 22, at 7 (citing Gastelum Body Camera at 00:14-00:32); Pltfs.' Reply to Pltfs.' MSJ ¶ 6, at 3; Defs.' Response to Pltfs.' MSJ ¶ 24, at 8 (citing Gastelum Body Camera at 00:01-00:47; 911 Call Tr. at 3:13-19); Pltfs.' Reply to Pltfs.' MSJ ¶ 6, at 3; Pltfs.' MSJ ¶ 5, at 3 (citing generally Gastelum Body Camera, Ward Criminal Complaint, Hargrove Criminal Complaint); Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3; Defs.' Response to Pltfs.' MSJ ¶ 25, at 8 (citing Gastelum Body Camera at 00:17-00:22; Gastelum Body Camera Tr. at 2:3); Pltfs.' Reply to Pltfs.' MSJ ¶ 6, at 3. Both Ward and Hargrove appeared unharmed and at no risk of harm. See Gastelum Body Camera at 00:35-1:00. Hargrove stated that he and Ward were "'just chilling,'" and the Gastelum Body Camera, Dale Body Camera, and Brackeen Body Camera show Ward and Hargrove casually seated in the garage. Pltfs.' MSJ ¶ 9, at 3 (quoting Gastelum Body Camera at 00:33; Gastelum Body Camera Tr. at 2:10-11). See Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3; id. ¶ 27, at 8 (citing Gastelum Body Camera at 00:28-00:34; Gastelum Body Camera Tr. at 2:7-11). The Defendants state that Hargrove was intoxicated. See Defs.' Response to Pltfs.' MSJ at 18-19. Hargrove was not, however, so intoxicated that his intoxication is readily apparent from

the Gastelum Body Camera, Dale Body Camera, or Brackeen Body Camera. See generally Gastelum Body Camera; Dale Body Camera; Brackeen Body Camera. Hargrove told the Defendant Officers that his family was inside Todd's house, see Pltfs.' MSJ ¶ 11, at 3 (citing Gastelum Body Camera at 00:37; Gastelum Body Camera Tr. at 2:15); Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3; id. ¶ 29, at 8 (citing Gastelum Body Camera at 00:34-00:41; Gastelum Body Camera Tr. at 2:15-16); Pltfs.' Reply to Pltfs.' MSJ ¶ 9, at 3; contra Lundstrom v. Romero, 616 F.3d at 1124 (noting that Lundstrom asserted that no child was in the house); United States v. Martinez, 643 F.3d at 1297-98 (concluding that no exigency existed where no evidence suggested that someone was in the house), but Ward and Hargrove informed the Defendant Officers that everything was alright and that no domestic violence had occurred, see Defs.' Response to Pltfs.' MSJ ¶ 21, at 7 (citing Gastelum Body Camera at 00:13-00:19; Gastelum Body Camera Tr. at 2:1-2); Pltfs.' Reply to Pltfs.' MSJ ¶ 6, at 3; Defs.' Response to Pltfs.' MSJ ¶ 25, at 8 (citing Gastelum Body Camera at 00:17-00:22; Gastelum Body Camera Tr. at 2:3); Pltfs.' Reply to Pltfs.' MSJ ¶ 6, at 3; Pltfs.' MSJ ¶ 8, at 3 (citing Gastelum Body Camera at 00:28, Gastelum Body Camera Tr. at 2:7-8); Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3; Pltfs.' MSJ ¶ 9, at 3 (citing Gastelum Body Camera at 00:33; Gastelum Body Camera Tr. at 2:10-11); Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3; id. ¶ 27, at 8 (citing Gastelum Body Camera at 00:28-00:34; Gastelum Body Camera Tr. at 2:7-11); cf. Lundstrom v. Romero, 616 F.3d at 1117-18 (considering as a factor counseling against an exigency that Lundstrom suggested that the alleged abuse had not occurred, because no child was in the house). Ward and Hargrove did not appear to attempt to hide anything; Hargrove sought to close the open door in the screen across the garage, but, if he had closed the door, the Defendant Officers would still have been able to see into the garage. See Pltfs.' MSJ ¶ 12, at 3 (citing

Gastelum Body Camera at 00:45); Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3.  Cf. Lundstrom v. Romero, 616 F.3d at 1117-18 (listing as a factor counseling against an exigency that the officers could see Lundstrom in his bedroom).

Moreover, no events after Gastelum forced open the door suggest an exigency that warranted the Defendant Officers' entry into the garage.  The Court disagrees with the Defendants' contentions that an exigency existed, because Ward disobeyed the Defendant Officers and because Hargrove retreated toward the house.  See Defs.' Response to Pltfs.' MSJ at 18-19.  Nothing suggests that Ward and Hargrove posed a threat to anyone.  Throughout the encounter, Ward and Hargrove denied that any domestic violence had occurred.  See Defs.' Response to Pltfs.' MSJ ¶ 37, at 9 (citing Dale Body Camera at 00:48-00:50; Gastelum Body Camera Tr. at 2:24-25); Pltfs.' Reply to Pltfs.' MSJ ¶ 12, at 4.  Cf. Lundstrom v. Romero, 616 F.3d at 1124 (treating that Lundstrom disputed that a domestic disturbance had occurred as a factor that counseled against finding an exigency).  After Gastelum expressed his interest in speaking with others in the house, Ward offered to retrieve Todd.  See Defs.' Response to Pltfs.' MSJ ¶ 38, at 9 (citing Dale Body Camera at 00:49-00:53; Gastelum Body Camera Tr. at 3:1-2); Pltfs.' Reply to Pltfs.' MSJ ¶ 12, at 4; Pltfs.' MSJ ¶ 14, at 4 (citing Gastelum Body Camera at 00:55; Gastelum Body Camera Tr. at 3:4); Defs.' Response to Pltfs.' MSJ ¶ 14, at 3.  Ward and Hargrove backed away from the Defendant Officers as they entered the garage, and no reasonable person would believe that their slow backing-away before or while the Defendant Officers crossed the threshold evidenced an imminent threat to someone in the home.  See Gastelum Body Camera at 00:57-1:15.  The Defendants present no rationale for believing that Ward posed anyone a threat.

Although the Defendants argue that Gastelum thought that Hargrove might be returning to finish beating his wife and did not know what was happening in Todd's house, see Defs.' Response to Pltfs.' MSJ at 18-19; Defs.' MSJ at 12-13, the Defendants' arguments do not convince the Court. No evidence suggests that Hargrove had beaten a woman or that he, after sitting in the garage, would choose the moment after the Defendant Officers arrived to continue beating anyone. Moreover, the Tenth Circuit rejected a similar argument in Storey v. Taylor, wherein the defendant argued that an exigency justified Storey's arrest, because Storey might return to the house and reignite a volatile situation with his wife. See Storey v. Taylor, 696 F.3d at 995. The Tenth Circuit explained:

> We do not find this particularly probative, however, given the presence of police officers and the absence of facts supporting an escalating situation. At best, this fact was "neutral" and did not significantly alter the exigent-circumstances equation since Taylor did not even ask Storey's wife to come to the door before he arrested Storey.

Storey v. Taylor, 696 F.3d at 995 (quoting United States v. Martinez, 643 F.3d at 1299). The Defendant Officers' argument likewise does not sway the Court. The Defendant Officers never asked Ward to retrieve Todd or requested to speak with Hargrove's family. Nothing suggested a dangerous situation on the Defendant Officers' arrival, see Pltfs.' Response to Defs.' MSJ ¶¶ 3-4, at 2 (citing Dale Interview at 15:14-16; id. at 15:10-13); Pltfs.' Response to Defs.' MSJ ¶¶ 5-7, at 2 (citing Gastelum Interview at 7:6-18; id. at 7:22-24; id. at 10:11-15), and, unlike in Storey v. Taylor, where the plaintiff admitted that a fight had occurred, here, Ward and Hargrove repeatedly and vehemently insisted that no domestic violence had occurred, see Defs.' Response to Pltfs.' MSJ ¶ 37, at 9 (citing Dale Body Camera at 00:48-00:50; Gastelum Body Camera Tr. at 2:24-25); Pltfs.' Reply to Pltfs.' MSJ ¶ 12, at 4. Although, unlike the officer in Storey v. Taylor, the

Defendant Officers believed that a physical and not simply a verbal dispute had occurred, the Court does not deem that, given the other facts in this case, this difference matters. See Defs.' Response to Pltfs.' MSJ ¶ 13, at 6 (citing HPD Dispatch Call at 00:08-00:16; HPD Dispatch Tr. at 2:3-5; CAD Report, at 1); Pltfs.' Reply to Pltfs.' MSJ ¶ 3, at 3; Defs.' Response to Pltfs.' MSJ ¶ 15, at 6 (citing HPD Dispatch Call at 00:30-00:39; HPD Dispatch Tr.at 2:8-10); Pltfs.' Reply to Pltfs.' MSJ ¶ 3, at 3; Defs.' Response to Pltfs.' MSJ ¶ 16, at 6 (citing Brackeen Aff. ¶ 5, at 2; Dale Aff. ¶ 5, at 2; Gastelum Aff. ¶ 5, at 2). Accordingly, the Court concludes that no reasonable person could believe that the Defendant Officers had an immediate need to protect someone.[60]

---

[60]The Defendants cite Brigham City v. Stuart and Najar v. United States to support their position that an exigency existed, but both cases are inapposite. See Defs.' Response to Pltfs.' MSJ at 14-16; Defs.' MSJ at 8-11. Brigham City v. Stuart involves a physical altercation that officers observed through a home's windows before entering the house. See 547 U.S. at 400-01. This case involves a domestic dispute that a 911 caller alleged to have occurred and no evidence of a physical dispute at the scene. See, e.g., Pltfs.' MSJ ¶ 1, at 2; Defs.' Response to Pltfs.' MSJ ¶ 1, at 4 (citing CAD Report at 1; 911 Call at 00:52-00:59; 911 Call Tr. at 3:8-12); Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3; Defs.' Response to Pltfs.' MSJ ¶ 2, at 4 (citing 911 Call at 00:03-00:18; 911 Call Tr. at 22:2-6); Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3; Defs.' Response to Pltfs.' MSJ ¶ 3, at 4 (citing 911 Call at 00:03-00:18, 911 Call Tr. at 2:2-6); Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3; Pltfs.' MSJ ¶ 2, at 2 (CAD Report at 1); Defs.' Response to Pltfs.' MSJ ¶ 4, at 5 (citing 911 Call at 00:32-00:43; 911 Call Tr. at 2:18-19); MSJ Reply ¶ 1, at 3; Defs.' Response to Pltfs.' MSJ ¶ 5, at 5 (citing 911 Call at 00:42-00:48; 911 Call Tr. at 2:25-3:4); Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3; Defs.' Response to Pltfs.' MSJ ¶ 6, at 5 (citing 911 Call at 01:06-01:18; 911 Call Tr. at 3:16-19); Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3; Defs.' Response to Pltfs.' MSJ ¶ 7, at 6 (citing 911 Call at 02:31-02:33; 911 Call Tr. at 5:7); Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3; Defs.' Response to Pltfs.' MSJ ¶ 9, at 5 (citing CAD Report at 1); Pltfs.' Reply to Pltfs.' MSJ ¶ 2, at 3; Defs.' Response to Pltfs.' MSJ ¶ 12, at 5-6 (citing HPD Dispatch Call at  00:00-00:16, HPD Dispatch Tr. at 2:1-65; CAD Report, at 1); Defs.' Response to Pltfs.' MSJ ¶ 13, at 6 (citing HPD Dispatch Call at 00:08-00:16; HPD Dispatch Tr. at 2:3-5; CAD Report, at 1); Defs.' Response to Pltfs.' MSJ ¶ 15, at 6 (citing HPD Dispatch Call at 00:30-00:39; HPD Dispatch Tr.at 2:8-10); Pltfs.' Reply to Pltfs.' MSJ ¶ 3, at 3; Pltfs.' Response to Defs.' MSJ ¶¶ 3-4, at 2 (citing Dale Interview at 15:14-16; id. at 15:10-13; Pltfs.' Response to Defs.' MSJ ¶¶ 5-7, at 2 (citing Gastelum Interview at 7:6-18; id. at 7:22-24; id. at 10:11-15). Najar v. United States is also inapplicable, because, in that case, a series of answered but rapidly disconnected telephone calls between dispatcher and the residence, and Najar's insistence that he had not called the police, suggested that Najar might be preventing

Likewise, the Court concludes that the Defendant Officers committed a Constitutional violation when they entered the laundry room. First, the entry was a search of Todd's home. See Kentucky v. King, 563 U.S. at 459 ("'It is a basic principle of Fourth Amendment law,' we have often said, 'that searches and seizures inside a home without a warrant are presumptively unreasonable.'" (quoting Brigham City v. Stuart, 547 U.S. at 403)); Payton v. New York, 445 U.S. 573, 585-86 (1980)("[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" (quoting United States v. U.S. Dist. Court, 407 U.S. 297, 313 (1972))). Second, as discussed above, the Defendants had no exigency that justified a search, and, given the facts discussed above, Ward's entry into the home could found no reasonable belief in the need to protect someone's safety.

The Defendants also address the exigency test's second prong -- whether the searches were reasonable -- and argue that the Defendant Officers entered the house only to the extent needed to retrieve Ward and Hargrove. See Defs.' Resposne to Pltfs. MSJ at 20. The Court agrees with the Defendants that, if an exigency existed, because Ward and Hargove posed a threat to the home's occupants, the Defendant Officers reasonably limited their search to the intrusion necessary to stop Ward and Hargrove from entering the house. The Defendant Officers arrested Hargrove as soon as they stopped him in the garage, see Defs.' Response to Pltfs.' MSJ ¶ 47, at 10-11 (citing Gastelum Body Camera at 00:56-1:30), and Dale stopped Ward in the laundry room immediately inside the house and returned with her quickly to the garage, see Defs.' Response to Pltfs.' MSJ ¶ 49, at 11 (citing Dale Body Camera at 1:05-2:15); Defs.' MSJ ¶ 4, at 3 (citing Brackeen Body

_____

someone's communication with the police. See 451 F.3d at 720. No facts here suggest that a victim attempted to obtain assistance.

Camera at 1:07-2:06, Gastelum Body Camera at 1:45-2:11); Pltfs.' Response to Defs.' MSJ ¶ 2, at 2. Because the Court does not determine, however, that a reasonable person could believe that the Defendant Officers had an immediate need to protect someone, no exigency justified the entry into Todd's residence.

<p style="margin-left:2em;"><b>B.   NO CLEARLY ESTABLISHED LAW REFLECTS THAT, ON THESE FACTS, THE DEFENDANT OFFICERS VIOLATED THE PLAINTIFFS' RIGHTS AT THE TIME OF THE OFFENSE.</b></p>

The Court agrees, however, with the Defendants that qualified immunity protects the Defendant Officers.  See Defs.' Response to Pltfs.' MSJ at 20-24; Defs.' MSJ at 6-21.  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."   Currier v. Doran, 242 F.3d at 923.  According to the Tenth Circuit, "'[g]eneral statements of the law can clearly establish a right for qualified immunity purposes if they apply with obvious clarity to the specific conduct in question.'"   A.N. by & through Ponder v. Syling, 2019 WL 2910798, at *4 (quoting Halley v. Huckaby, 902 F.3d at 1149). The Tenth Circuit has cautioned that such an approach is inappropriate in a case that involves "relevant ambiguities," Colbruno v. Kessler, 2019 WL 2751434, at *6 (citing Aldaba v. Pickens, 844 F.3d at 879; Wilson v. City of Lafayette, 510 F. App'x at 778; Thomson v. Salt Lake Cty., 584 F.3d at 1315-17), such as here, where a reasonableness test governs.  The relevant question is whether the law is clearly established whether an exigency existed.  To determine whether qualified immunity protects the Defendant Officers here, the Court looks to this case's specific facts -- where the Defendant Officers learned of a 911 call of a domestic fight, the Defendant Officers communicated with a male at the home where the alleged fight occurred, and the male

attempted to retreat from the Defendant Officers' observation and to enter the home, where his family, whose safety the Defendant Officers had not ascertained was located. The Plaintiffs cite United States v. Davis, Storey v. Taylor, Lundstrom v. Romero, and United States v. Martinez to show that clearly established law controls this case. See Pltfs.' MSJ at 9-10; Pltfs.' Reply to Pltfs.' MSJ at 4-7; Pltfs.' Response to Defs.' MSJ at 6-13. These cases differ, however, in significant ways from this case. No case establishes that an exigency exists where law enforcement receive a 911 caller's report of a domestic disturbance, law enforcement officers cannot verify the alleged victim's safety, and several factors do not exculpate the presumed perpetrator.

The Court agrees with the Defendants that United States v. Davis does not provide clearly established law governing this case. The Tenth Circuit does not in United States v. Davis apply the law that controls this case. See United States v. Davis, 290 F.3d at 1242. The Tenth Circuit decided United States v. Davis in 2002, before the Supreme Court decided Brigham City v. Stuart. In United States v. Davis, the Tenth Circuit asks whether the officers had something close to probable cause to suggest that an exigency existed. See United States v. Davis, 290 F.3d at 1242. In Brigham City v. Stuart, the Supreme Court held, however, that this standard did not apply to exigencies grounded on concerns about a person's safety. See Brigham City v. Stuart, 547 U.S. at 406-07. Hence, United States v. Davis does not provide clearly established law.

Storey v. Taylor is also not on point here. In Storey v. Taylor, the New Mexico Police Department received an anonymous call about a loud argument at Michael Storey's address. See 696 F.3d at 990. After an officer arrived at the residence, Storey explained to the officer that Storey and Storey's wife had an argument, but that Storey's wife had left the house and would return later. See 696 F.3d at 990. Storey's wife arrived home while the officer and Storey spoke.

See 696 F.3d at 991.  After the conversation, the officer ordered Storey from the house, and, when Storey refused to step outside, the officer reached into the house, pulled Storey from the building, and arrested him.  See 696 F.3d at 990-91.  The officer admitted that he did not have probable cause to arrest Storey for domestic violence, but contended that he had probable cause to arrest Storey for failing to obey the order to leave the house.  See 696 F.3d at 992.  The wife emerged from the house to speak with the officer after he arrested Storey.  See 696 F.3d at 991.  The Tenth Circuit noted that "[a] report of a domestic argument -- standing alone -- does not demonstrate exigent circumstances per se."  Storey v. Taylor, 696 F.3d at 994 (citing United States v. Davis, 290 F.3d at 1244).  The Tenth Circuit then listed five circumstances that it deemed illustrated that the officer did not have a reasonable belief that he needed to immediately protect others' safety:

> First, Los Lunas police received a report of a domestic dispute -- specifically, a loud argument -- at Storey's residence.  Second, by the time police arrived, they could not hear or otherwise detect an ongoing altercation; the argument, apparently, had ended.  Third, there were no other visual or audible indications of past or present violence.  Fourth, Storey answered the door and admitted he had an argument with his wife, but claimed the argument was now over and she had left.  Fifth, while the officers were talking with Storey, they observed Storey's wife, Theresa, returning to the house via the garage.  Nothing the officers observed about her suggested a risk to her safety.

Storey v. Taylor, 696 F.3d at 994.  The Tenth Circuit rejected the defendant's arguments that the wife's return home might "have reignited a volatile situation," and "the presence of police officers and the absence of facts supporting an escalating situation" persuaded the Tenth Circuit to reach this conclusion.  696 F.3d at 995.  The Tenth Circuit explained: "[T]his fact . . . did not significantly alter the exigent-circumstances equation since Taylor did not even ask Storey's wife to come to the door before he arrested Storey."  Storey v. Taylor, 696 F.3d at 995.

The Court looks closely at this case's facts as compared to the facts in Storey v. Taylor to determine whether the law is clearly established that a Constitutional violation occurred here. The Court concludes that Storey v. Taylor differs from these facts. Unlike in Storey v. Taylor, the Defendant Officers did not arrive with knowledge that only a loud argument had occurred; the Defendant Officers believed that a physical altercation had taken place. Compare Storey v. Taylor, 696 F.3d at 990, with Defs.' Response to Pltfs.' MSJ ¶ 13, at 6 (citing HPD Dispatch Call at 00:08-00:16; HPD Dispatch Tr. at 2:3-5; CAD Report, at 1); Pltfs.' Reply to Pltfs.' MSJ ¶ 3, at 3; Defs.' Response to Pltfs.' MSJ ¶ 15, at 6 (citing HPD Dispatch Call at 00:30-00:39; HPD Dispatch Tr.at 2:8-10); Pltfs.' Reply to Pltfs.' MSJ ¶ 3, at 3; Defs.' Response to Pltfs.' MSJ ¶ 16, at 6 (citing Brackeen Aff. ¶ 5, at 2; Dale Aff. ¶ 5, at 2; Gastelum Aff. ¶ 5, at 2). Although, in both cases, the officers saw no evidence of a recent or ongoing altercation, in Storey v. Taylor, the officers observed Storey's wife return home through the garage and noticed no risks to her safety. Compare Storey v. Taylor, 696 F.3d at 994, with Pltfs.' Response to Defs.' MSJ ¶¶ 3-4, at 2 (citing Dale Interview at 15:14-16; id. at 15:10-13); Pltfs.' Response to Defs.' MSJ ¶¶ 5-7, at 2 (citing Gastelum Interview at 7:6-18; id. at 7:22-24; id. at 10:11-15). The Tenth Circuit emphasized this fact in Storey v. Taylor. See Storey v. Taylor, 696 F.3d at 994. Here, Hargrove told the Defendant Officers that his family was within the Todd's house, but the Defendant Officers did not have the opportunity while speaking to Hargrove to verify the family's presence and to assess everyone's physical safety. See Pltfs.' MSJ ¶ 11, at 3 (citing Gastelum Body Camera at 00:37; Gastelum Body Camera Tr. at 2:15); Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3; id. ¶ 29, at 8 (citing Gastelum Body Camera at 00:34-00:41; Gastelum Body Camera Tr. at 2:15-16); Pltfs.' Reply to Pltfs.' MSJ

¶ 9, at 3.  A reasonable officer might not, therefore, have known at any point during these events that the law controlling this case is clearly established based on Storey v. Taylor.

Lundstrom v. Romero also differs in significant ways from this case.  In Lundstrom v. Romero, a 911 caller reported a woman beating a toddler at Joseph Lundstrom's house.  See 616 F.3d at 1115.  The neighbor admitted that she could not see the events at Lundstrom's house.  See 616 F.3d at 1115.  About forty minutes later, an officer arrived at Lundstrom's door and identified herself as a police officer who the dispatcher had sent to inquire whether a child required assistance.  See 616 F.3d at 1116.  Lundstrom responded that there were no children at his house and closed his door.  See 616 F.3d at 1116.  The officer called for backup and, "[w]hen [the other officers] arrived at the scene, they understood that a disorderly subject had 'barricaded' himself inside the house and that Officer Romero had originally been sent to Lundstrom's residence to check on a child's welfare."  616 F.3d at 1116.  Before Lundstrom closed the door, Jane Hibner, Lundstrom's girlfriend, had left the house, see 616 F.3d at 1116, and officers arrested Hibner and patted her down, but did not question her about a child, see 616 F.3d at 1116-17.  While Lundstrom was in the house, officers called the dispatcher to verify the report's information.  See 616 F.3d at 1117.  The dispatcher then spoke with the original 911 caller who admitted that she might have provided the incorrect address.  See 616 F.3d at 1117.  The Tenth Circuit could not determine, however, how much information about this call the dispatcher conveyed to the officers.  See 616 F.3d at 1117.  While inside the house, Lundstrom had also called 911, because he suspected that the officers were not actual police officers, and he eventually spoke with a dispatcher.  See 616 F.3d at 1116-17.  The officers could see Lundstrom pacing in his bedroom as he spoke on the

telephone, <u>see</u> Lundstrom at 1117-18, and the dispatcher eventually convinced Lundstrom to leave his house, <u>see</u> 616 F.3d at 1117-18.

The Tenth Circuit concluded that no reasonable person could believe that the officers had an immediate need to protect a person's safety. <u>See Lundstrom v. Romero</u>, 616 F.3d at 1125. The Tenth Circuit listed several factors that exculpated Lundstrom from the 911 caller's allegations:

> the neighbor reported hearing a *woman* -- not a *man* -- disciplining a child; Lundstrom told Officer Romero there was no child at the house; the neighbor backtracked about her initial story and the location of the incident; Hibner had yet to be interviewed; some time had passed since the initial 911 call and nothing otherwise suggested criminal activity; and the officers did not perceive anything suggesting a child's presence at the house.

<u>Lundstrom v. Romero</u>, 616 F.3d at 1124. The Tenth Circuit noted that the officers could have interviewed Hibner and that, because the 911 caller had recounted that she heard a female voice reprimanding the child, Hibner might have committed the abuse. <u>See</u> 616 F.3d at 1124. Additionally, according to the Tenth Circuit, the officers should have paused after learning of the caller's admission that she might have given law enforcement the wrong address. <u>See</u> 616 F.3d at 1124. Moreover, while Lundstrom was inside the house, he was on the telephone with the dispatcher; no known person was in the house; and an officer could see Lundstrom moving within the residence. <u>See</u> 616 F.3d at 1124.

The circumstances here differ from the situation in <u>Lundstrom v. Romero</u>. Here, the Defendant Officer knew that Hargrove's family was in the house, and knew that a man and a woman -- like Ward and Hargrove -- had been involved in a domestic dispute, unlike in <u>Lundstrom v. Romero</u>, where the officers should have noted several exculpatory factors including that a woman allegedly committed the abuse and that Lundstrom was a man. <u>See Lundstrom v. Romero</u>, 616 F.3d at 1124. <u>See also</u> Defs.' Response to Pltfs.' MSJ ¶ 13, at 6 (citing HPD Dispatch Call at

00:08-00:16; HPD Dispatch Tr. at 2:3-5; CAD Report, at 1); Pltfs.' Reply to Pltfs.' MSJ ¶ 3, at 3;

Pltfs.' MSJ ¶ 11, at 3 (citing Gastelum Body Camera at 00:37; Gastelum Body Camera Tr. at 2:15);

Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3; id. ¶ 29, at 8 (citing Gastelum Body Camera at 00:34-

00:41; Gastelum Body Camera Tr. at 2:15-16); Pltfs.' Reply to Pltfs.' MSJ ¶ 9, at 3.  Although,

here, the Defendant Officers observed no evidence of a domestic dispute at the scene, and Ward

and Hargrove denied that domestic violence had occurred, the exculpatory factors in Lundstrom

v. Romero are stronger than they are here.  See, e.g., Pltfs.' MSJ ¶ 1, at 2; Defs.' Response to

Pltfs.' MSJ ¶ 1, at 4 (citing CAD Report at 1; 911 Call at 00:52-00:59; 911 Call Tr. at 3:8-12);

Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3; Defs.' Response to Pltfs.' MSJ ¶ 2, at 4 (citing 911 Call at

00:03-00:18; 911 Call Tr. at 22:2-6); Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3; Defs.' Response to

Pltfs.' MSJ ¶ 3, at 4 (citing 911 Call at 00:03-00:18, 911 Call Tr. at 2:2-6); Pltfs.' Reply to Pltfs.'

MSJ ¶ 1, at 3; Pltfs.' MSJ ¶ 2, at 2 (CAD Report at 1); Defs.' Response to Pltfs.' MSJ ¶ 4, at 5

(citing 911 Call at 00:332-00:43; 911 Call Tr. at 2:18-19); MSJ Reply ¶ 1, at 3; Defs.' Response

to Pltfs.' MSJ ¶ 5, at 5 (citing 911 Call at 00:42-00:48; 911 Call Tr. at 2:25-3:4); Pltfs.' Reply to

Pltfs.' MSJ ¶ 1, at 3; Defs.' Response to Pltfs.' MSJ ¶ 6, at 5 (citing 911 Call at 01:06-01:18; 911

Call Tr. at 3:16-19); Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3; Defs.' Response to Pltfs.' MSJ ¶ 7, at 5

(citing 911 Call at 02:31-02:33; 911 Call Tr. at 5:7); Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3; Defs.'

Response to Pltfs.' MSJ ¶ 9, at 5 (citing CAD Report at 1); Pltfs.' Reply to Pltfs.' MSJ ¶ 2, at 3;

Defs.' Response to Pltfs.' MSJ ¶ 12, at 5-6 (citing HPD Dispatch Call at  00:00-00:16, HPD

Dispatch Tr. at 2:1-65; CAD Report, at 1); Defs.' Response to Pltfs.' MSJ ¶ 13, at 6 (citing HPD

Dispatch Call at 00:08-00:16; HPD Dispatch Tr. at 2:3-5; CAD Report, at 1); Defs.' Response to

Pltfs.' MSJ ¶ 15, at 6 (citing HPD Dispatch Call at 00:30-00:39; HPD Dispatch Tr.at 2:8-10);

Pltfs.' Reply to Pltfs.' MSJ ¶ 3, at 3; Pltfs.' Response to Defs.' MSJ ¶¶ 3-4, at 2 (citing Dale Interview at 15:14-16; id. at 15:10-13); Pltfs.' Response to Defs.' MSJ ¶¶ 5-7, at 2 (citing Gastelum Interview at 7:6-18; id. at 7:22-24; id. at 10:11-15). In Lundstrom v. Romero, the caller admitted that she might have given the dispatcher the wrong address for the house at which she observed the abuse. See 616 F.3d at 1117. Moreover, here, unlike in Lundstrom v. Romero, wherein the dispatcher spoke on the telephone with Lundstrom and the officers could see Lundstrom through the bedroom window, had Hargrove entered the house, the Defendants Officers would have lost contact with and sight of him. See Lundstrom v. Romero, 616 F.3d at 1124. See also Pltfs.' Response to Defs.' MSJ ¶¶ 3-4, at 2 (citing Dale Interview at 15:14-16; id. at 15:10-13); Pltfs.' Response to Defs.' MSJ ¶¶ 5-7, at 2 (citing Gastelum Interview at 7:6-18; id. at 7:22-24; id. at 10:11-15); Defs.' Response to Pltfs.' MSJ ¶ 20, at 7 (citing Brackeen Body Camera at 00:14-00:42; Dale Body Camera at 00:03-00:20, Gastelum Body Camera at 00:02-00:23); Pltfs.' Reply to Pltfs.' MSJ ¶ 6, at 3; Pltfs.' MSJ ¶ 6, at 3 (citing Gastelum Body Camera at 00:17, and citing generally Ward Criminal Complaint); Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3; Defs.' Response to Pltfs.' MSJ ¶ 23, at 7-8 (citing Gastelum Body Camera at 00:01-00:47)); Pltfs.' Reply to Pltfs.' MSJ ¶ 6, at 3; Defs.' Response to Pltfs.' MSJ ¶ 22, at 7 (citing Gastelum Body Camera at 00:14-00:32); Pltfs.' Reply to Pltfs.' MSJ ¶ 6, at 3; Defs.' Response to Pltfs.' MSJ ¶ 24, at 8 (citing Gastelum Body Camera at 00:01-00:47; 911 Call Tr. at 3:13-19); Pltfs.' Reply to Pltfs.' MSJ ¶ 6, at 3; Pltfs.' MSJ ¶ 5, at 3 (citing Gastelum Body Camera; Ward Criminal Complaint; Hargrove Criminal Complaint); Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3; Defs.' Response to Pltfs.' MSJ ¶ 25, at 8 (citing Gastelum Body Camera at 00:17-00:22; Gastelum Body Camera Tr. at 2:3); Pltfs.' Reply to Pltfs.' MSJ ¶ 6, at 3; Gastelum Body Camera at 00:35-1:00; Pltfs.' MSJ ¶ 9, at 3 (quoting

Gastelum Body Camera at 00:33; Gastelum Body Camera Tr. at 2:10-11); Defs.' Response to Pltfs.' MSJ ¶ 37, at 9 (citing Dale Body Camera at 00:48-00:50; Gastelum Body Camera Tr. at 2:24-25); Pltfs.' Reply to Pltfs.' MSJ ¶ 12, at 4. Accordingly, the Court cannot soundly say that the Defendant Officers would have known clearly and beyond dispute at any point on these facts that no exigency existed under the existing law based on Lundstrom v. Romero.

The Plaintiffs' reliance on United States v. Martinez also does not convince the Court. See Pltfs.' Reply to Pltfs.' MSJ at 8-9; Pltfs.' Response to Defs.' MSJ at 11-13. In United States v. Martinez, the officers saw no indication that anyone was in the home or that anyone required assistance. See United States v. Martinez, 643 F.3d at 1294-95, 1297-98. Here, Hargrove told the Defendant Officers that his family was in the house. See Pltfs.' MSJ ¶ 11, at 3 (citing Gastelum Body Camera at 00:37; Gastelum Body Camera Tr. at 2:15); Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3; id. ¶ 29, at 8 (citing Gastelum Body Camera at 00:34-00:41; Gastelum Body Camera Tr. at 2:15-16); Pltfs.' Reply to Pltfs.' MSJ ¶ 9, at 3. The Defendant Officers had an indication that someone was in the residence.

Accordingly, the Plaintiffs have not identified a case sufficiently on point that clearly establishes that no exigency existed either when Gastelum opened the door or when the Defendant Officers entered the garage. The Plaintiffs "cannot show any Supreme Court or Tenth Circuit decision on point or that the clearly established weight of authority from other circuits prohibited the officers' conduct in this case." Brown v. City of Colo. Springs, 709 F. App'x 906, 915 (10th Cir. 2017)(unpublished). Hence, the Court concludes that qualified immunity protects the Defendant Officers against the Plaintiffs' Count III.

## II. ALTHOUGH THE DEFENDANT OFFICERS UNLAWFULLY ARRESTED WARD AND HARGROVE, QUALIFIED IMMUNITY PROTECTS THE DEFENDANT OFFICERS, BECAUSE NO CLEARLY ESTABLISHED LAW GOVERNS THESE FACTS.

Ward and Hargrove also each bring a claim for unlawful arrest based on their individual arrests.  See Complaint ¶¶ 73-84, at 7-8.  The Defendant Officers violated Ward's and Hargrove's constitutional rights when the Defendant Officers arrested Ward and Hargrove.  The Court determines, however, that qualified immunity protects the Defendant Officers against these claims.

### A. THE DEFENDANT OFFICERS UNLAWFULLY ARRESTED WARD AND HARGROVE, BECAUSE NO PROBABLE CAUSE OR EXIGENT CIRCUMSTANCES JUSTIFIED THE ARRESTS.

The Court concludes that the Defendant Officers violated both Ward's and Hargrove's constitutional rights when the Defendant Officers committed the arrests.  The Defendants contend that the Defendant Officers lawfully arrested Ward and Hargrove, because the Defendant Officers needed to guarantee the safety of the people within Todd's house given the report about the domestic dispute and had probable cause to arrest Ward and Hargrove pursuant to Hobbs, New Mexico, Ordinance 9.04.080, because Ward and Hargrove disobeyed the Defendant Officers' orders.  See Defs.' Response to Pltfs.' MSJ at 24-26; Defs.' MSJ at 19-21.  The Court concludes, however, that the Defendant Officers had no exigency or probable cause that justified arresting either Ward or Hargrove.

An arrest is a seizure.  See United States v. Young, 347 F. Supp. 3d at 770 (describing an arrest as a seizure).

In a public place, officers may arrest an individual without a warrant or exigent circumstances, so long as they have probable cause to make the arrest.  But if officers seek to arrest an individual within his dwelling, they must also have the right to enter the home to effectuate the arrest.

Beattie v. Smith, 543 F. App'x 850, 859 (10th Cir. 2013)(unpublished)(citing United States v. Watson, 423 U.S. at 423-24; Payton v. New York, 445 U.S. at 590). To lawfully seize someone in a home without a warrant, law enforcement officers must have a need to protect people from injury, or have probable cause and other exigent circumstances. See Lundstrom v. Romero, 616 F.3d at 1124.

> Exigent circumstances may justify a search or seizure at a home without a warrant, or probable cause, where the need exists to assist persons who are seriously injured or threatened with such injury. *See* Armijo[ ex rel. Armijo Sanchez v. Peterson, 601 F.3d 1065,] 1073 [(10th Cir. 2010)]. When officers are acting in furtherance of routine investigatory purposes, however, they may search or seize an individual at a home only if they have a warrant or exigent circumstances are present and they have probable cause. *See id.* at 1073.

Lundstrom v. Romero, 616 F.3d at 1124. See United States v. Reeves, 524 F.3d 1161, 1167 (10th Cir. 2008)("That *Payton* applies to all warrantless seizures in the home is the only logical outcome. If we were to hold otherwise, it would allow a seizure in the home when only reasonable suspicion exists, yet prohibit a seizure in the home when an officer has probable cause to arrest, but no exigent circumstances."); Smith v. Kenny, 678 F. Supp. 2d 1124, 1149-50 (D.N.M. 2009)(Browning, J.)("The Tenth Circuit has repeatedly held that, absent exigent circumstances, officials acting under the color of authority and without a warrant may not seize a person inside their home, or effect a seizure by ordering a person inside a home to come to the door." (citing United States v. Flowers, 336 F.3d 1222, 1225-27 (10th Cir. 2003); United States v. Maez, 872 F.2d 1444, 1446 (10th Cir. 1989))).

Lundstrom v. Romero governs this case even though Ward and Hargrove were Todd's guests and not homeowners. See Pltfs.' MSJ ¶ 4, at 3 (asserting this fact)(citing generally Todd Aff.); Defs.' Response to Pltfs.' MSJ ¶ 3-13, at 3. The law governing seizures within the home

emerged in Payton v. New York, which the Supreme Court grounds on concerns about privacy within the home, see Minnesota v. Olson, 495 U.S. 91, 95 (1990), Armijo ex rel. Armijo Sanchez v. Peterson, 601 F.3d at 1073 (citing Payton v. New York for the standard), and the Tenth Circuit has concluded that a guest with a "degree of acceptance into the household" has an expectation of privacy within the home, United States v. Poe, 556 F.3d at 1122 (citing United States v. Rhiger, 315 F.3d at 1286). In Minnesota v. Olson, the Supreme Court applied Payton v. New York's rule to an overnight guest. See Minnesota v. Olson, 495 U.S. at 96-100. The Supreme Court reasoned:

> To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share.
>
> . . . .
>
> That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy. The houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest.

Minnesota v. Olson, 495 U.S. at 98-100. Moreover, the Tenth Circuit draws its test for determining whether a social guest has a reasonable expectation of privacy within a home from Minnesota v. Carter, in which the Supreme Court recognizes Minnesota v. Olson's role in describing guest's privacy interests. See Minnesota v. Carter, 525 U.S. at 90; United States v. Poe, 556 F.3d at 1122. The Court previously determined in the Analysis' Section I(A) that Ward and Hargrove were social guests with a degree of acceptance in Todd's household. See supra. Lundstrom v. Romero's rule controlling seizures within a home controls, therefore, this case.

The Court concludes that the Defendant Officers cannot show that they satisfied Lundstrom v. Romero's rule. The Court concludes that no reasonable person could believe that Ward and Hargrove posed an immediate threat to someone's safety at any time during the Defendant

Officers' encounter with Ward and Hargrove. The Court previously determined that no exigency existed up to the time at which the Defendant Officers entered the garage and Gastelum was ordering Hargrove to leave the house. See supra. Cf. Lundstrom v. Romero, 616 F.3d at 1124 ("Exigent circumstances may justify a search or seizure at a home without a warrant, or probable cause, where the need exists to assist persons who are seriously injured or threatened with such injury."). No events after this moment and leading into Ward's and Hargrove's arrests indicate that an exigency arose. Ward and Hargrove continued walking slowly to the door leading into the house. See Gastelum Body Camera at 00:50-1:10; Dale Body Camera at 00:55-1:15. They eventually started struggling to avoid the Defendant Officers and screaming for the attention of the people within the house. See Gastelum Body Camera at 00:50-1:10; Dale Body Camera at 00:55-1:15. Nothing suggests that Hargrove would seek to continue any domestic violence with the Defendant Officers at the residence, and nothing inculpates Ward other than her resistance to the Defendant Officers. Contra Defs.' Response to Pltfs.' MSJ at 18-19; Defs.' MSJ at 12-13. No reasonable person could interpret Ward's and Hargrove's actions to indicate an immediate threat to someone's safety.

The Court disagrees with the Defendants that the Defendant Officers had probable cause to arrest Ward and Hargrove for resisting the Defendant Officers' orders. See Defs.' Response to Pltfs.' MSJ at 24-26; Defs.' MSJ at 19-21. Ward and Hargrove must have resisted, evaded, obstructed, or refused to obey the Defendant Officers' lawful orders to give the Defendant Officers probable cause to arrest them pursuant to Hobbs, New Mexico, Ordinance 9.04.080. The statute pursuant to which Hobbs charged Ward and Hargrove provides:

No person in the City shall resist, evade, obstruct or refuse to obey a police officer.

Resisting, evading, obstructing or refusing to obey a police officer consists of either:

> A.    Knowingly obstructing, resisting or opposing any officer in this City, or outside this City in the event that the officer at such time and place is in pursuit of someone fleeing the jurisdiction of this City, or any other duly authorized person serving or attempting to serve or execute any process or any rule or order of the municipal court or any other judicial writ that may be legally in the possession of such officer or authorized person; or

> B.    Resisting or abusing the Municipal Judge or any officer in the lawful discharge of his or her duties; or

> C.    Refusing to obey or comply with any lawful process or order given by any police officer acting in the lawful discharge of his duties; or

> D.    Intentionally fleeing, attempting to evade or evading an officer of this City when the person committing the act of fleeing, attempting to evade or evading has knowledge that the officer is attempting to apprehend or arrest him; or

> E.    Willfully refusing to bring a vehicle to a stop when given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal, by a uniformed officer in an appropriately marked police vehicle; or

> F.    Interfering with, obstructing or opposing any officer in the lawful discharge of his regular and affixed duties.

Hobbs, N.M., Ordinance 9.04.080.  The Court deems caselaw on New Mexico's similar statute on resisting officers persuasive in interpreting this ordinance.  Compare N.M. Stat. Ann. § 30-22-1,[61]

---

[61]The New Mexico statute provides:

Resisting, evading or obstructing an officer consists of:

> A.    knowingly obstructing, resisting or opposing any officer of this state or any other duly authorized person serving or attempting to serve or execute any process or any rule or order of any of the courts of this state or any other judicial writ or process;

with Hobbs, N.M., Ordinance 9.04.080.  To establish a defendant's guilt for resisting officers under New Mexico's § 30-22-1, a party must show that: (i) the officer who gave the orders was lawfully discharging his or her duty; and (ii) the defendant, with the knowledge that the officer was attempting to apprehend or arrest the defendant, fled, attempted to evade, or evaded the officer. See State v. Gutierrez, 2007-NMSC-033, ¶ 27, 162 P.3d 156, 166.  The Hobbs statute likewise requires that an officer be lawfully discharging his or duties for the government to bring a charge under the ordinance.  See Hobbs, N.M., Ordinance 9.04.080.  For an order to have been lawful, it must have rested on adequate reasonable suspicion, probable cause, and/or exigent circumstances. See Storey v. Taylor, 696 F.3d at 993.  The Court believes that the Supreme Court of New Mexico would agree with this statement.  The Supreme Court of New Mexico has stated that an officer who lacks reasonable suspicion to temporarily seize a defendant lacks the authority to detain the defendant pursuant to New Mexico's resisting statute § 30-22-1, because the defendant has a

---

B.      intentionally fleeing, attempting to evade or evading an officer of this state when the person committing the act of fleeing, attempting to evade or evasion has knowledge that the officer is attempting to apprehend or arrest him;

C.      willfully refusing to bring a vehicle to a stop when given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal, by a uniformed officer in an appropriately marked police vehicle; or

D.      resisting or abusing any judge, magistrate or peace officer in the lawful discharge of his duties.

Whoever commits resisting, evading or obstructing an officer is guilty of a misdemeanor.

N.M. Stat. Ann. § 30-22-1.

constitutional right to walk away from the encounter.  See State v. Gutierrez, 2007-NMSC-033,

¶¶ 30-36, 162 P.3d at 167-68.  The Supreme Court of New Mexico explained:

> [W]e emphasize that had the officer in this case not articulated reasonable suspicion to support detaining Defendant, or if a reasonable person would not have understood he was not free to leave, Defendant could not then be punished for evading and eluding an officer simply because he exercised his constitutional right to walk away from the officer and end the encounter.

State v. Gutierrez, 2007-NMSC-033, ¶ 35, 162 P.3d at 168.

In interpreting the New Mexico statute's lawful discharge element in relation to probable

cause, accordingly, the Tenth Circuit has held that an officer must issue a lawful order before that

officer has probable cause to arrest pursuant to the statute.  See Storey v. Taylor, 696 F.3d at 993

& n.6.  See also United States v. Romero, No. CR 17-2190 KG, 2018 WL 1896551, at *7 (D.N.M.

April 19, 2018)(Gonzales, J.)("In construing the resisting statute, the Tenth Circuit has 'found an

arrest justified under *various* provisions of the resisting statute where the defendant has refused to

comply with an officer's command, but *only* under circumstances where the command

precipitating the arrest was 'actually lawful.'"  (quoting Youbyoung Park v. Gaitan, 680 F. App'x

724, 733 (10th Cir. 2017)(unpublished), and citing Romero v. Story, 672 F.3d 880, 889 (10th Cir.

2012)); Wilson v. Jara, 866 F. Supp. 2d at 1301-03 (concluding that a genuine dispute of material

fact exists whether officers had probable cause to arrest pursuant to N.M. Stat. Ann. § 30-22-1,

because a genuine dispute of material fact existed whether the officers acted constitutionally and

lawfully for N.M. Stat. Ann. § 30-22-1's purposes where they "reached across the threshold" and

arrested an individual within the home).  The Court concludes that the Defendant Officers issued

no lawful orders.  The Court notes that the Defendant Officers issued three series of orders that

would have constituted seizures had Ward and Hargrove complied.

The Defendant Officers first attempted a seizure by ordering Hargrove to leave open the door. See Gastelum Body Camera at 00:43-00:50. A seizure occurs when the police identify themselves, order an individual to open a door, and the individual opens the door. See United States v. Reeves, 524 F.3d at 1168 ("Further, this court has held that if an individual's decision to open the door to his home to the police is not made voluntarily, the individual is seized inside his home." (citing United States v. Flowers, 336 F.3d at 1226 n.2)). Cf. Kentucky v. King, 563 U.S. at 470 ("[E]ven if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time."). An order to leave open a door, even if the door is in a screen, reflects an order that the individual open a private space and confront law enforcement. To this extent, the order to leave open a door differs little from an order to open a door. Here, the Defendant Officers wore uniforms that identified them as police officers, see Brackeen Body Camera at 1:15-1:30; United States v. Reeves, 524 F.3d at 1168-70 (listing several cases that mention the law enforcement officers' self-identification as a factor counseling toward concluding that an order to open a door was coercive), and Brackeen and Gastelum insisted three times between them that Hargrove leave open the door, see Brackeen Body Camera at 1:00-1:06. That Gastelum physically intervened to prevent Hargrove from closing the door evidences that Brackeen and Gastelum expected Hargrove to treat their statements as orders. See Brackeen Body Camera at 1:00-1:10. The orders here signal the Defendant Officers' desire to continue their confrontation with Hargrove, as Gastellum's next order that Hargrove step outside evidences. See Dale Body Camera at 00:50-1:00; Gastelum Body Camera at 00:55-1:05. Although Hargrove attempted to close the door in the Defendants Officers' faces and to bar the Defendant Officers, in the circumstances, no reasonable person would have

felt free to ignore Brackeen's and Gastelum's orders, to close the door, and to continue his or her activities while ignoring the Defendant Officers' presence. Cf. United States v. Conner, 127 F.3d 663, 665 (8th Cir. 1997)(holding that, where a police officer knocked three times at a door and announced a police presence, a seizure occurred when the occupant opened the door).[62]

Gastellum then attempted to seize Hargrove by ordering him outside. See Dale Body Camera at 00:50-1:00; Gastelum Body Camera at 00:55-1:05. "A sufficiently coercive order requiring an individual to leave his own house counts as a seizure subject to the protections of the Fourth Amendment." Storey v. Taylor, 696 F.3d at 993-94 (citing Lundstrom v. Romero, 616 F.3d at 1124). See Storey v. Taylor, 696 F.3d at 993-94 (reflecting that an order to step outside would constitute a seizure if followed); De Baca v. Meisinger, No. 12-CV-698-BRB/RHS, 2013 WL 12333990, at *3 (D.N.M. March 19, 2013)(Baldock, J., sitting by designation)("Absent a warrant or probable cause coupled with exigent circumstances, 'a show of force [such] that a suspect comes out of his home under coercion and submits to be taken into custody' violates the

---

[62]The Court considered whether the order was not a search, because the Defendant Officers could have spoken to Hargrove through the screen. The Court concludes that this fact does not change its analysis. An order to open a door or an order to leave open a door signifies more than an ability to speak with someone. Were the inquiry whether officers could literally communicate with someone within a home, a seizure would not occur when officers command that an individual open a door, because the officers could have a conversation while yelling through the door. A confrontation with law enforcement at an open door carries a particular significance. The door is the portal into the home. Any confrontation at an open door threatens that someone may enter the home. Moreover, an order to open a door or an order to open a door is more than an order that an individual open a door; it is generally an order that the individual behind the door encounter or continue an encounter with law enforcement. As discussed in the text, the Court deems that such is the case here. Furthermore, the Defendant Officers did not speak to Hargrove through the screen and never attempted to speak to Hargrove through the screen. Hargrove tried to shut the screen in a manner that a reasonable person would understand as a signal that the Defendant Officers were barred from the garage and as an assertion of privacy from the Defendant Officers, but the Defendant Officers nevertheless ordered him to leave the screen door open. See Brackeen Body Camera at 1:00-1:10.

Fourth Amendment." (quoting <u>United States v. Maez</u>, 872 F.2d at 1451)). Gastelum ordered Hargrove to step outside. <u>See</u> Dale Body Camera at 00:50-1:00; Gastelum Body Camera at 00:55-1:05. Although Hargrove tried to leave, an objectively reasonable person facing that order and three uniformed, and armed officers would not have felt free to leave, and, if Hargrove had complied with the order, a seizure would have occurred. <u>See</u> Brackeen Body Camera at 1:20-1:30.

The Defendant Officers next attempted to seize Ward and Hargrove as the Defendant Officers ordered Ward and Hargrove to stop, to come back, and to go with the Defendant Officers. <u>See</u> Gastelum Body Camera at 1:00-1:10; Brackeen Body Camera at 1:20-1:27; Dale Body Camera at 1:00-1:30. Despite Ward's and Hargrove's actual attempts to leave, a reasonable person would not believe that he or she was free to walk away from three armed and uniformed police officers who were giving such orders while following him or her. <u>See</u> Gastelum Body Camera at 1:00-1:10; Brackeen Body Camera at 1:20-1:27; Dale Body Camera at 1:00-1:30. <u>See also</u> <u>United States v. Mosley</u>, 743 F.3d at 1325-26 (identifying an order to stop, if complied with, as a seizure); <u>Storey v. Taylor</u>, 696 F.3d at 993-94 (reflecting that an order to step outside would constitute a seizure if followed); <u>Smith v. Kenny</u>, 678 F. Supp. 2d at 1149-50 (describing an order to come to the door as a potential seizure). Again, had Ward and/or Hargrove complied, a seizure would have occurred.

The Court concludes that no need to protect a person's physical safety justified these orders, and that the Defendant Officers also did not have a different exigency or probable cause. As discussed, <u>supra</u>, no reasonable person could believe that the Defendant Officers needed to protect a person's physical safety at any point during the encounter, so no exigency grounded on

a person's safety justified the orders. The Defendants do not suggest any other exigency that warranted the acts, and the Court has not identified another exigency to justify the acts.

The Defendants also do not suggest what probable cause the Defendant Officers had to issue the orders. See Defs.' Response to Pltfs.' MSJ at 24; Defs.' MSJ at 19. The Court does not see that the Defendant Officers had probable cause that either Ward or Hargrove had committed domestic abuse. The Defendants do not attempt to argue that the Defendant Officers could have arrested Ward and Hargrove at any time during the encounter on probable cause that either participated in domestic violence. See Defs.' Response to Pltfs.' MSJ at 24-26; Defs.' MSJ at 19-21.

> "Probable cause exists where the facts and the circumstances within their [(the officers')] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed [by the person to be arrested]."

Dunaway v. New York, 442 U.S. 200, 208 n.9 (1979)(alterations in Dunaway v. New York)(quoting Brinegar v. United States, 338 U.S. 160, 175-76 (1949)). The Defendant Officers had only the 911 call to suggest that Hargrove had committed domestic violence and, given the lack of evidence suggesting domestic violence when the Defendant Officers arrived and throughout the encounter, and Ward's and Hargrove's denials that any violence had occurred, the 911 call does not suffice as grounds on which a reasonable person could believe that Hargrove or Ward were involved in domestic violence. See, e.g., Pltfs.' MSJ ¶ 1, at 2; Defs.' Response to Pltfs.' MSJ ¶ 1, at 4 (citing CAD Report at 1; 911 Call at 00:52-00:59; 911 Call Tr. at 3:8-12); Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3; Defs.' Response to Pltfs.' MSJ ¶ 2, at 4 (citing 911 Call at 00:03-00:18; 911 Call Tr. at 22:2-6); Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3; Defs.' Response to

Pltfs.' MSJ ¶ 3, at 4 (citing 911 Call at 00:03-00:18; 911 Call Tr. at 2:2-6); Pltfs.' Reply to Pltfs.'

MSJ ¶ 1, at 3; Pltfs.' MSJ ¶ 2, at 2 (CAD Report at 1); Defs.' Response to Pltfs.' MSJ ¶ 4, at 5

(citing 911 Call at 00:332-00:43; 911 Call Tr. at 2:18-19); MSJ Reply ¶ 1, at 3; Defs.' Response

to Pltfs.' MSJ ¶ 5, at 5 (citing 911 Call at 00:42-00:48; 911 Call Tr. at 2:25-3:4); Pltfs.' Reply to

Pltfs.' MSJ ¶ 1, at 3; Defs.' Response to Pltfs.' MSJ ¶ 6, at 5 (citing 911 Call at 01:06-01:18; 911

Call Tr. at 3:16-19); Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3; Defs.' Response to Pltfs.' MSJ ¶ 7, at 5

(citing 911 Call at 02:31-02:33; 911 Call Tr. at 5:7); Pltfs.' Reply to Pltfs.' MSJ ¶ 1, at 3; Defs.'

Response to Pltfs.' MSJ ¶ 9, at 5 (citing CAD Report at 1); Pltfs.' Reply to Pltfs.' MSJ ¶ 2, at 3;

Defs.' Response to Pltfs.' MSJ ¶ 12, at 5-6 (citing HPD Dispatch Call at  00:00-00:16, HPD

Dispatch Tr. at 2:1-65; CAD Report, at 1); Defs.' Response to Pltfs.' MSJ ¶ 13, at 6 (citing HPD

Dispatch Call at 00:08-00:16; HPD Dispatch Tr. at 2:3-5; CAD Report, at 1); Defs.' Response to

Pltfs.' MSJ ¶ 15, at 6 (citing HPD Dispatch Call at 00:30-00:39; HPD Dispatch Tr.at 2:8-10);

Pltfs.' Reply to Pltfs.' MSJ ¶ 3, at 3; Pltfs.' Response to Defs.' MSJ ¶¶ 3-4, at 2 (citing Dale

Interview at 15:14-16; id. at 15:10-13); Pltfs.' Response to Defs.' MSJ ¶¶ 5-7, at 2 (citing Gastelum

Interview at 7:6-18; id. at 7:22-24; id. at 10:11-15).

The Defendant Officers also did not have probable cause that Ward and Hargrove had

resisted the Defendant Officers' lawful orders.  Gastelum's and Brackeen's orders to Hargrove to

leave open the door were unlawful, because the Defendant Officers lacked probable cause that

Hargrove had committed any crime.  As the orders to leave open the door were unlawful, the

Defendant Officers had no probable cause that Hargrove had disobeyed orders when Gastelum

ordered Hargrove from the house.  See Storey v. Taylor, 696 F.3d at 993 & n.6.  Accordingly, the

orders to leave the house were unlawful.  Likewise, the Defendant Officers had no probable cause

that Ward and Hargrove had resisted lawful orders when the Defendant Officers issued their later orders to stop, and to go with the Defendant Officers. See Storey v. Taylor, 696 F.3d at 993 & n.6. Any actions that Ward and Hargrove took after the Defendant Officers initiated the arrest do not provide probable cause for the arrest. See Beck v. Ohio, 379 U.S. 89, 91 (1964)("Whether [an] arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it." (citing Brinegar v. United States, 338 U.S. at 175-76; Henry v. United States, 361 U.S. 98, 102 (1959)); Romero v. Story, 672 F.3d at 886 ("[T]hat statute applies only where law enforcement officers have reasonable suspicion or probable cause to apprehend or arrest a person *prior to* the flight."); Keylon v. City of Albuquerque, 535 F.3d at 1217 ("[T]he only resistance that can provide probable cause for her arrest must, necessarily, precede the arrest. Therefore, the alleged physical resistance to the arrest is irrelevant."). The Defendant Officers had, therefore, no probable cause to arrest Ward and Hargrove. Accordingly, the arrests violated Ward's and Hargrove's constitutional rights.[63]

## B.   NO CLEARLY ESTABLISHED LAW REFLECTS THAT, ON THESE FACTS, AN ARREST IS ILLEGAL.

No clearly established law reflects that the Defendant Officers committed a Constitutional violation. The Court looks at the particular facts of this case to determine whether the law is clearly

---

[63]The Plaintiffs also contend that the Defendant Officers could not lawfully arrest Ward and Hargrove, because the Defendant Officers' unlawful entry into Todd's garage to retrieve Ward and Hargrove means that the Defendant Officers were not lawfully discharging their duties at the time that they arrested Ward and Hargrove. See Pltfs.' MSJ at 11-12. The standard for seizures within the home incorporates, however, concerns about the reasonable expectation of privacy within the home, so the Defendant Officers' unlawful entry does not present alternative grounds for the seizure's unreasonableness. See Minnesota v. Olson, 495 U.S. at 95 (describing Payton v. New York as concerned with warrantless entries).

established. The law is clearly established that "To lawfully seize someone in a home without a warrant, law enforcement officers must have a need to protect people from injury, or have probable cause and other exigent circumstances." See Lundstrom v. Romero, 616 F.3d at 1124. As the Court addressed in the Analysis' Section I(B), no clearly established law shows that an exigency existed to justify Ward's and Hargrove's arrests, or to justify the Defendant Officers' orders. The lack of clearly established law in this area alone protects the Defendant Officers, because only such an exigency would justify the following actions. The Defendants do not attempt to argue that the Defendant Officers could have arrested Ward and Hargrove at any time during the encounter on probable cause that either participated in domestic violence. See Defs.' Response to Pltfs.' MSJ at 24-26; Defs.' MSJ at 19-21. The Court has not found a case discussing probable cause to arrest a defendant pursuant to the Hobbs ordinance, but Storey v. Taylor makes clear that an officer does not have probable cause to arrest an individual pursuant to New Mexico's § 30-22-1 when the individual disobeys unlawful orders and, given the similarities between the New Mexico statute and the Hobbs ordinance, Storey v. Taylor makes clear that resisting an unlawful order does not create probable cause for an arrest for resisting an officer. As, here, however, the law establishing whether the first seizure was lawful is not clearly established, the lawfulness of the subsequent seizures is also not clearly established. Accordingly, the Court concludes that no clearly established law prohibited arresting Ward and Hargrove.

**III.  THE COURT CONCLUDES THAT THE PLAINTIFFS DO NOT BRING CLAIMS UNDER § 1983 AGAINST THE CITY OF HOBBS, BUT, IF THE PLAINTIFFS DO BRING SUCH CLAIMS, THE COURT WILL GRANT SUMMARY JUDGMENT FOR THE DEFENDANTS ON THE CLAIMS.**

The Court reads the Complaint to reflect that, in Counts III through VI, the Plaintiffs do not allege claims against the City of Hobbs under a respondeat superior theory. The Plaintiffs note

in the Pltfs.' Response to Defs.' MSJ that they do not allege a respondeat superior claim in Count III and direct the Court to consider the claims' context. See Pltfs.' Response to Defs.' MSJ at 14 n.2. The Plaintiffs emphasize that, in Count III, they discuss the "Defendants" who entered Todd's residence and suggest that the City of Hobbs did not enter the home. Pltfs.' Response to Defs.' MSJ at 14 n.2. The Court concludes that a similar contextual analysis reveals that the Plaintiffs do not bring claims against the City of Hobbs in Counts IV or V. In both Counts IV and V, the Plaintiffs allege actions that the "HPD officers," Complaint ¶¶ 74-78, 80-84, at 7-8, took, although the Counts include a sentence in which the Plaintiffs note that the "Defendants' actions were willful, wanton, obdurate and in gross and reckless disregard of [Ward's and Hargrove's] constitutional rights," without distinguishing to which Defendants the Plaintiffs refer, Complaint ¶¶ 78, 84, at 7-8. That the Plaintiffs focus on the Defendant Officers' actions suggests that the Plaintiffs intend to bring claims against the Defendant Officers, but not against the City of Hobbs. Moreover, in Counts I and II, the Plaintiffs explicitly indicate that they seek relief from the City of Hobbs under a respondeat superior theory. See Complaint ¶ 60, at 6; id. ¶ 65, at 7. The Court interprets, thus, the Complaint not to include in Counts III, IV, and V claims under the doctrine of respondeat superior.

If the Plaintiffs seek to bring claims against the City of Hobbs under § 1983, the Court will grant summary judgment for the City of Hobbs on those claims. "'Section 1983 does not authorize liability under a theory of respondeat superior.'" Schneider v. City of Grand Junction Police Dep't, 717 F.3d at 767 (quoting Brown v. Montoya, 662 F.3d at 1164). The Plaintiffs allege no facts that suggest the City of Hobbs' liability under a different theory. See generally Complaint. Accordingly, the Court will grant the City of Hobbs summary judgment on these claims.

## IV. THE COURT WILL NOT GRANT THE DEFENDANTS SUMMARY JUDGMENT ON COUNTS I AND II, BECAUSE THE DEFENDANT OFFICERS UNLAWFULLY ARRESTED WARD AND HARGROVE.

The Court will not grant summary judgment for the Defendants on Counts I and II. The NMTCA waives immunity from suit for law enforcement officers who commit battery when acting within the scope of their duties. See N.M. Stat. Ann. § 41-4-12. The statute provides:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

N.M. Stat. Ann. § 41-4-12. See Sisneros v. Fisher, 685 F. Supp. 2d at 1220 ("The NMTCA waives immunity from suit for law-enforcement officers who commit certain intentional torts, including assault, battery, false imprisonment, false arrest, and malicious prosecution." (citing N.M. Stat. Ann. § 41-4-12; Lessen v. City of Albuquerque, 2008-NMCA-085, ¶ 38, 187 P.3d 179, 186)[64]). Under New Mexico law, a party commits battery if: "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive contact with the person of the other directly or indirectly results." Restatement (Second) of Torts § 18.[65] A contact that causes no bodily harm may be an offensive bodily contact, see Restatement (Second) of Torts § 15 cmt., "if it offends a reasonable

---

[64]The Court predicts that the Supreme Court of New Mexico would agree with the Court of Appeals' conclusion in Lessen v. City of Albuquerque, because § 41-4-12 explicitly identifies the torts for which New Mexico waives liability.

[65]The Court predicts that the Supreme Court of New Mexico would follow the Restatement (Second) of Torts. See supra n.50.

sense of personal dignity," Restatement (Second) of Torts § 19 cmt.  Where a law enforcement officer unlawfully arrests a person, the officer may be liable for battery if the person who was arrested can satisfy battery's elements.  In Sisneros v. Fisher, the Court concluded:

> If Sisneros's testimony is believed and Mr. Fisher is found without justification for his arrest, Mr. Fisher's acts of running up to Sisneros with gun drawn, grabbing Sisneros, and forcing Sisneros to the ground would meet the elements of assault and battery under New Mexico law.  The Court will deny the Defendants' motion for summary judgment as to these claims.

Sisneros v. Fisher, 685 F. Supp. 2d at 1220-21.[66]  See Restatement (Second) of Torts § 121 (noting that a peace officer is privileged to arrest another without a warrant when the peace officer is "acting within the limits of his appointment").[67]  Cf. Dickson v. City of Clovis, 2010-NMCA-058, ¶ 21, 242 P.3d 398, 404 (noting that a claim for battery failed, because the defendant had probable cause to arrest the plaintiff).[68]

Because the Defendant Officers lacked justification to arrest Ward and Hargrove, the Court denies the Defendant Officers summary judgment.  The court must resolve all reasonable inferences and doubts in the nonmoving party's favor.  See Hunt v. Cromartie, 526 U.S. at 550-55; Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all

---

[66]The Court predicts that the Supreme Court of New Mexico would agree with the statement in the text, because the statement adheres to the Restatement (Second) of Torts § 121, which states that a peace officer is privileged to arrest another without a warrant when the peace officer is "acting within the limits of his appointment," and the Court expects that the Supreme Court of New Mexico will follow the Restatement (Second) of Torts.  Restatement (Second) of Trots § 121.  See supra note 50.

[67]See supra note 50.

[68]The Court concludes that the Supreme Court of New Mexico would agree with the statement in the text, because the statement follows the Restatement (Second), of Torts, which the Court predicts that the Supreme Court of New Mexico would follow.  See supra note 50.

justifiable inferences are to be drawn in his favor." (citing <u>Adicks v. S. H. Kress & Co.</u>, 398 U.S. at 158-59)). A reasonable juror could conclude that the Defendant Officers' actions of intentionally grabbing Ward and Hargrove, and arresting them meet New Mexico's elements for battery. <u>See</u> <u>Sisneros v. Fisher</u>, 685 F. Supp. 2d at 1220-21. Even if Ward and Hargrove did not suffer physical harm, a reasonable juror could conclude that the Defendant Officers' grabbing, pulling, and arresting of individuals who were relaxing within a host's home would offend a reasonable person. <u>See</u> Restatement (Second) of Torts §§ 15, 19 cmts. <u>Cf.</u> <u>Sisneros v. Fisher</u>, 685 F. Supp. 2d at 1220-21.

As the Court concludes that the Defendant Officers may be liable for battery, the Court also will not grant summary judgment for the City of Hobbs on Counts I and II. The Defendants contend that the Court should grant summary judgment for the City of Hobbs only because, according to the Defendants, the Defendant Officers are not liable for battery. <u>See</u> Defs.' MSJ at 26-27. The doctrine of respondeat superior applies under § 41-4-4. <u>See</u> <u>Silva v. State</u>, 1987-NMSC-107, ¶ 15, 745 P.2d 380, 385 (noting that respondeat superior applies under the NMTCA). Accordingly, the Court does not grant summary judgment for the City of Hobbs. The Court, accordingly, denies summary judgment for the Defendants on Counts I and II.

## V.  THE COURT DECLINES TO EXERCISE JURISDICTION OVER COUNTS I AND II.

Having granted summary judgment on the claims which invoked the Court's federal-question jurisdiction under 28 U.S.C. § 1331, the Court, pursuant to 28 U.S.C. § 1367(c), declines to exercise supplemental jurisdiction over Counts I and II.  See Merrifield v. Bd. of Cty. Comm'rs, 654 F.3d 1073, 1086 (10th Cir. 2011)(concluding that, in the interest of comity, the district court should have remanded a state law claim after it dismissed the claims over which it had original jurisdiction).  Under the supplemental jurisdiction statute, 28 U.S.C. § 1367, a district court may "decline to exercise supplemental jurisdiction over a claim if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c).  The Tenth Circuit has encouraged such a result, holding that "district courts should dismiss state claims without prejudice after all federal claims have been dismissed, particularly when the federal claims are dismissed before trial[.]"  Bd. of Cty. Comm'rs v. Geringer, 297 F.3d 1108, 1115 n.6 (10th Cir. 2002).  See Brooks v. Gaenzle, 614 F.3d 1213, 1229-30 (10th Cir. 2010)("'[I]f federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.'"  (quoting Bauchman v. West High Sch., 132 F.3d 542, 549 (10th Cir. 1997)).  Thus, pursuant to 28 U.S.C. § 1367(c), the Court declines to exercise supplemental jurisdiction over the remaining Counts I and II, and dismisses the claims without prejudice to Ward and Hargrove renewing them in state court.

Thus, the Court denies the requests in the Pltfs.' MSJ, and grants in part and denies in part the requests in the Defs.' MSJ.  Qualified immunity protects the Defendant Officers against the Plaintiffs' Counts III, IV, and V.  The Court determines that the Plaintiffs do not bring claims against the City of Hobbs in Counts III, IV, and V, but the Court would grant the City of Hobbs

summary judgment if the Plaintiffs seek to bring such claims.  The Court does not grant the Defendants summary judgment on Counts I and II, but will dismiss the claims without prejudice.

**IT IS ORDERED** that: (i) the Plaintiff's Motion for Summary Judgment, filed January 8, 2019 (Doc. 12), is denied; (ii) the City Defendants' Motion for Summary Judgment, filed January 31, 2019 (Doc. 21), is granted in part and denied in part; (iii) Plaintiffs Octavia Ward, Dennis Hargrove, and Sandra Todd's Counts III, IV, and V are dismissed with prejudice; (iv) if, in Counts III, IV, and V, Ward, Hargrove, and Todd seek to bring claims against Defendant City of Hobbs, New Mexico, under the doctrine of respondeat superior, the Court grants summary judgment on those Counts for the City of Hobbs; (v) the Court denies summary judgment for the Defendants on Counts I and II; (vi) all federal claims against all Defendants are dismissed with prejudice; and (vi) the Court declines to exercise jurisdiction over Counts I and II -- the remaining state law claims -- and dismisses them without prejudice.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Joseph P. Kennedy
Shannon L. Kennedy
Larissa M. Lozano
Kennedy, Kennedy & Ives, LLC
Albuquerque, New Mexico

    *Attorney for the Plaintiffs*

Luis Robles
Robles, Rael & Anaya, P.C.
Albuquerque, New Mexico

*Attorneys for the Defendants*